CHAD W. DUNN
*Admitted Pro Hac Vice*
SONNI WAKNIN
*Admitted Pro Hac Vice*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019

ROSEMARY RIVAS
(*Pro Hac Vice application forthcoming*)
AMANDA M. KARL
(*Pro Hac Vice application forthcoming*)
Gibbs Law Group LLP
505 14th Street, Suite 1110
Oakland, WA 94612
Telephone (510) 350-9700
Facsimile (510) 350-9701

LUIS ROBERTO VERA, JR.
lrvlaw@sbcglobal.net
Law Offices of Luis Roberto Vera, Jr.
111 Soledad St Ste 1325
San Antonio, TX 78205-2260
Telephone: 210-225−3300

MOLLY P. MATTER, WSBA #52311
Amend Law, LLC
PO Box 13203
Burton, WA 98013
Telephone: 206-280-8724

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JESSE REYES, CINTHIA ÁLVAREZ LUCATERO, DANIEL REYNOSO, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, LATINO COMMUNITY FUND OF WASHINGTON<br><br>        Plaintiffs,<br><br>    v. | Case No.: 4:21-cv-05075-RMP<br><br>**SECOND AMENDED COMPLAINT FOR RELIEF**<br><br>Judge: HON. ROSANNA MALOUF PETERSON.<br><br>Date Action filed: May 7, 2021<br>Date set for trial: August 8, 2022 |

BRENDA CHILTON, in her official capacity as Benton County Auditor and Canvassing Review Board member, ANDY MILLER, in his official capacity as Benton County Prosecutor and Canvassing Review Board member, JEROME DELVIN, in his official capacity as Benton County Canvassing Review Board member, CHARLES ROSS, in his official capacity as Yakima County Auditor and Canvassing Review Board Member, JOSEPH BRUSIC, in his official capacity as Yakima County Prosecutor and Canvassing Review Board member, RON ANDERSON in his official capacity as Yakima County Canvassing Review Board member, SKIP MOORE, in his official capacity as Chelan County Auditor and Canvassing Review Board member, ROBERT SEALBY, in his official capacity as Chelan County Prosecutor and Canvassing Review Board member, BOB BUGERT in his official capacity as Chelan County Canvassing Review Board member

Defendants.

## I.    INTRODUCTION

1.    "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 US 23 (1968).

2.    Since 2013, Washington State has conducted its elections primarily by mail-in ballots. For a mailed vote to be counted, a county's Canvassing Review Board must be satisfied that the voter's signature on the outside of their envelope matches the voter's signature in the voter registration record.

SECOND AMENDED COMPLAINT FOR RELIEF

3.     But alarmingly, thousands of Latino[1] voters are routinely and disproportionately denied their right to vote due to the discriminatory application and effect of Washington State's ballot signature matching filter.  In Benton, Yakima and Chelan Counties, Latino voters are three to ten times more likely to have their ballots rejected compared to other voters. Although alarming, this is the unsurprising result of a too-discretionary system where Spanish surnames, which indicate that a voter is Latino, are central to the verification process.  Unlike other governmental officials in Washington, County Canvassing Review Boards are not mandated to receive training on how to match signatures.

4.     Ballot rejection based on a perceived signature mismatch is not a usual burden of voting. Due to socioeconomic factors, Latino voters are less likely to cure their ballots once initially flagged. This ballot-flagging is directly connected to the perceived race and/or ethnicity of voters with a Spanish surname. When a Latino voter's ballot is rejected for a mismatched signature, a Latino voter is three times less likely to turn out and vote in the next election.  This cumulative burden disenfranchises Latinos and abridges the right to vote exponentially.

5.     A system in which Latino voters must surmount barriers that their non-Latino counterparts need not is neither fair nor race-neutral—it is a patently discriminatory abridgement of these voters' fundamental right to vote.

6.     This exclusion of Latino votes through the signature review process directly contradicts several provisions of our Constitution, including the First, Fourteenth, and Fifteenth Amendments.  Rejecting ballots because of the race of the voter constitutes abridgement

---

[1] This Complaint uses the terms "Hispanic" and "Latino" interchangeably to refer to individuals who identify as Latino/a and/or Hispanic.

**SECOND AMENDED COMPLAINT FOR RELIEF**

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

of the right to vote on account of race and language minority status, in violation of Section 2 of the federal Voting Rights Act, enacted under Section 2 of the Fifteenth Amendment.

7.    For these reasons, Plaintiffs—three attempted voters and two organizations—seek actual and nominal damages, as well as injunctive relief to prevent further discrimination on the basis of race.

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

2.    This Court has personal jurisdiction over Defendants, who are elected or appointed officials for the Washington Counties and are sued only in their official capacities as officials of the State of Washington and are residents of the State of Washington.  The violations complained of concern their conduct in such capacity.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and will occur in this judicial district.

4.    This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## III.    PARTIES

5.    Plaintiff Jesse Reyes is over the age of 18 and registered to vote in Chelan County.

6.    Plaintiff Reyes is Latino.

7.    Mr. Reyes resides in Chelan County.

8.    Between 2016 and 2020, Mr. Jesse Reyes had his ballot rejected for a signature mismatch.

**SECOND AMENDED COMPLAINT FOR RELIEF**

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

9.    Mr. Reyes received a letter in the mail from Chelan County Elections Office notifying him that he must cure his signature.

10.    Plaintiff Mr. Reyes was unable to cure his ballot.  His ballot was not counted.

11.    Plaintiff Cinthia Álvarez Lucatero is over the age of 18 and registered to vote in Benton County.

12.    Plaintiff Álvarez Lucatero is Latina.

13.    In 2016, Ms. Álvarez Lucatero resided in Benton County.

14.    In 2016, Ms. Álvarez Lucatero signed her own ballot and had her ballot initially rejected and her signature challenged for a perceived signature mismatch.

15.    As a person who immigrated to the United States and gained citizenship, Ms. Álvarez Lucatero deeply values her right to vote and was very concerned that her ballot would not count due to a perceived mismatched signature.

16.    Ms. Álvarez Lucatero missed a full day of work trying to cure her ballot.  Ms. Alvarez Lucatero's ballot was counted.

17.    Ms. Álvarez Lucatero's brother, whose permanent residence is the same as hers, also had his ballot challenged for a perceived mismatched signature in 2016.

18.    Ms. Álvarez Lucatero notified her younger brother that he also needed to cure his ballot, but he was unable to because he was away at college.

19.    Plaintiff Daniel Reynoso is over the age of 18 and is registered to vote in Yakima County.

20.    Plaintiff Reynoso is Latino.

21.    Mr. Reynoso resides in Yakima County.

SECOND AMENDED COMPLAINT FOR RELIEF

22. In 2018, Mr. Reynoso signed his own ballot, and his ballot was rejected for a mismatched signature.

23. Mr. Reynoso was unable to cure his ballot and his ballot was rejected.

24. Due to the ballot rejection, Mr. Reynoso did not vote in the next election.

25. In 2020, Mr. Reynoso voted in the general presidential election and signed his own ballot with the same signature he had signed his ballot in 2018, however, his ballot was counted.

26. Plaintiff League of United Latin American Citizens ("LULAC") is the oldest and largest national Latino civil rights organization in the United States. LULAC is a non-profit membership organization with a presence in most of the fifty states, including Washington. It was founded with the mission of protecting the civil rights of Latinos, including voting rights.

27. LULAC participates in civic engagement activities, such as voter registration, voter education, and voter turnout efforts throughout the United States.

28. LULAC's mission to educate voters includes expending resources to ensure that LULAC membership and Latinos have their ballots counted.

29. LULAC has to expend more resources to educate voters due to their membership being at higher risk of being disenfranchised due to disproportionate rate of ballot rejection.

30. LULAC has been recognized and accepted as an organizational plaintiff protecting Latino rights in federal courts across the country, including the United States Supreme Court.

**SECOND AMENDED COMPLAINT FOR RELIEF**

31. LULAC has multiple chapters in the state of Washington, including the Tri-Cities LULAC, which hosts events for Latinos in Benton County and has membership from Benton County, Washington

32. Plaintiff Latino Community Fund of Washington is a statewide organization that invests in community based non-profit organizations that serve to educate, increase civic participation, improve health outcomes, and improve economic, social and technological development for all Washingtonians.

33. Latino Community Fund (LCF) of Washington participates in civic engagement activities, such as voter registration, voter education, and voter turnout efforts statewide but specifically in Yakima County, Benton County, and Chelan County.

34. LCF of Washington's mission to educate voters includes expending resources to educate Latino on how to cure their ballots and ensure their ballots count.

35. LCF of Washington has to expend more resources in Yakima County, Benton County and Chelan County to educate voters due to the higher risk of Latino voters being disenfranchised due to the disproportionate rate of ballot rejection.

36. LCF of Washington funds organizations across the state that engage in voter outreach and voter education by registering voters who are eligible to, have voted, and plan to vote in Washington through the mail voting system.

37. LCF of Washington engages in voter education and voter empowerment activities, including educating voters on how to properly vote in Washington.

38. LCF of Washington also leads legislative advocacy with community leaders regarding the impact of legislation on the Latino community.

39. Defendants Brenda Chilton, Andy Miller and Jerome Delvin are current members of the Benton Board of Canvassers for Benton County.

40. The Benton County Canvassing Review Board has authority to determine whether a signature matches the signature on file for a given voter during the ballot processing stage.

41. The members of the Board of Canvassers for Benton County are each being sued in their official capacity only.

42. Defendants Charles Ross, Joseph Brusic and Ron Anderson are current members of the Yakima Board of Canvassers for Yakima County.

43. The Yakima County Canvassing Review Board has authority to determine whether a signature matches the signature on file for a given voter during the ballot processing stage.

44. The members of the Board of Canvassers for Yakima County are each being sued in their official capacity only.

45. Defendants Skip Moore, Robert Sealby and Bob Bugert are current members of Chelan County Board of Canvassers.

46. The Chelan County Canvassing Review Board has authority to determine whether a signature matches the signature on file for a given voter during the ballot processing stage.

47. The members of the Board of Canvassers for Chelan County are each being sued in their official capacity only.

**SECOND AMENDED COMPLAINT FOR RELIEF**

# IV.    FACTUAL ALLEGATIONS

## Mail Voting in the State of Washington

48.    In 2005, the State of Washington passed multiple election reforms, chief among them was that counties were given the option of conducting elections entirely by mail.  This reform resulted in over two-thirds of counties in Washington utilizing the mail ballot-only election voting system.

49.    In 2011, Senate Bill 5124 was signed into law, replacing the existing election infrastructure and mandating that all counties in the State of Washington conduct their elections by mail.

50.    Since 2013, the State of Washington's elections have been conducted almost entirely through the mail.

51.    The mail voting system in Washington is governed by Chapter 29A.40 of the Washington Code.

52.    Under this system, Washington state law requires that each active registered voter of the state, overseas voter, and service voter automatically be issued a mail ballot for each general election, special election, or primary. Wash. Rev. Code Ann. § 29A.40.010.

53.    While there are some in-person opportunities to provide access for those with disabilities, nearly all voters vote via a mail ballot.  In 2019, 99.8% of all voters voted by mail.  In 2020, 99.3% of all voters voted by mail.  *See* Kim Wyman, Office of the Secretary of State Elections Division, 2020 Report on Election in Washington State (January 2021), https://www.sos.wa.gov/_assets/elections/research/2020%20annual%20elections%20report.pdf.

54. After a voter has received her ballot, the voter must properly mark up the ballot, if she chooses to vote. After marking the ballot, the voter is required to place the ballot into a security envelope, which conceals the voted ballot. Wash. Rev. Code Ann. § 29A.40.091.

55. To properly cast a mail ballot, a voter is required to sign the declaration that is printed on the outer return envelope on the mail ballot, which is sent out by the respective county auditor along with the voter's ballot.

56. Under Wash. Rev. Code Ann. § 29A.40.091(2),

> The voter must swear under penalty of perjury that he or she meets the qualifications to vote and has not voted in any other jurisdiction at this election. The declaration must clearly inform the voter that it is illegal to vote if he or she is not a United States citizen; it is illegal to vote if he or she has been convicted of a felony and has not had his or her voting rights restored; and it is illegal to cast a ballot or sign a ballot declaration on behalf of another voter. The ballot materials must provide space for the voter to sign the declaration, indicate the date on which the ballot was voted, and include a telephone number.

57. Once a voter signs the declaration, the voter must return her ballot to the county auditor no later than 8:00pm on the day of the election or mail the ballot with a postmark no later than the day of the election. Wash. Rev. Code Ann. § 29A.40.091(4).

58. Once a voter's ballot has been received, election officers may begin opening and processing the return envelopes for any primary or elections upon receipt. Wash. Rev. Code Ann. § 29A.40.110(1). Before the processing of a ballot, "the canvassing board, or its designated representatives, shall examine the postmark on the return envelope and

**SECOND AMENDED COMPLAINT FOR RELIEF**

signature on the declaration before processing the ballot." Wash. Rev. Code Ann. § 29A.40.110(3).

59. Each county in Washington State has a County Canvassing Board that consists of three members: the county auditor, the county prosecutor, and the chair of the county board of commissioners.   RCW 29A.60.140, RCW 29A.08.820, WAC 434-262-010.

60. The County Canvassing Board certifies every election and determines whether each ballot counts. *See* Kim Wyman, Office of the Secretary of State, Introduction to Canvassing Boards, Washington State Elections (2014), https://www.sos.wa.gov/_assets/elections/introduction-to-county-canvassing-boards.pdf.

61. All activities of the County Canvassing Board are open to the public. *Id.*

62. Board meetings of the County Canvassing Board fall under the Open Public Meetings Act and the County Auditor is mandated to publish a public notice for every meeting. *Id.*

63. The canvassing board and designated representatives assign staff to verify that the voter's signature on the ballot envelope declaration is the same as the signature in the voter registration files of the County.  Wash. Rev. Code Ann. § 29A.40.110(3).

64. If a reviewer at the County Elections Office determines that the signatures do not match ("signature mismatch"), the ballot is flagged and not counted until a voter corrects or cures the ballot.

65. A signature on a declaration otherwise known as a petition sheet (the outer envelope of the ballot) must be matched to the signature on file in the voter registration records. The following characteristics must be used to evaluate signatures to determine whether they are by the same writer: (1) The signature is handwritten;  (2) Agreement in style and

**SECOND AMENDED COMPLAINT FOR RELIEF**

general appearance, including basic construction, skill, alignment, fluency, and a general uniformity and consistency between signatures; (3) Agreement in the proportions of individual letters, height to width, and heights of the upper to lower case letters; (4) Irregular spacing, slants, or sizes of letters that are duplicated in both signatures; (5) After considering the general traits, agreement of the most distinctive, unusual traits of the signatures. A single distinctive trait is insufficient to conclude that the signatures are by the same writer. There must be a combination or cluster of shared characteristics. Likewise, there must be a cluster of differences to conclude that the signatures are by different writers.  Wash. Admin. Code § 434-379-020.

66.    A variation between the signature of the voter on the ballot declaration and the signature of that voter in the registration files due to the substitution of initials or the use of common nicknames is permitted so long as the surname and handwriting are clearly the same. Wash. Rev. Code Ann. § 29A.40.110(3).

67.    If the signature on the ballot declaration does not match the signature on the registration record because the voter signed with a middle name, nickname, or initials, the ballot may be counted as long as the last name and handwriting are clearly the same.  Wash. Admin. Code § 434-261-050.

68.    There are no standards employed by the Defendants whatsoever to guide individual county level reviewers in determining what characteristics to look for when determining when "handwriting is clearly the same."

69.    If the canvassing board or designated representative perceives a discrepancy between the signature on file and the signature on the ballot, "the county auditor shall notify the voter by first class mail of the correct procedures for curing the signature." Wash. Admin.

**SECOND AMENDED COMPLAINT FOR RELIEF**

Code § 434-261-050.  This also applies to cases in which the voter neglects to sign a ballot envelope declaration or signs with a mark and fails to have two witnesses attest to the signature.

70.   If the signature on the declaration does not match the signature on the voter registration record, the voter must either: (a) Appear in person and sign a new registration form no later than the day before certification of the primary or election.  The updated signature provided on the registration form becomes the signature in the voter registration record for the current election and future elections; or (b) Sign a signature update form that includes both the ballot declaration required by WAC  434-230-015 and the voter registration oath required by RCW 29A. 08.230, and return it to the county auditor no later than the day before certification of the primary, special or general election.  The signature provided on the signature update form becomes the signature in the voter registration record for the current election and future elections. Wash. Admin Code 434-261-050(3).

71.   If the ballot is received during the last three business days before the final meeting of a county's canvassing board or the voter has already been notified of the discrepancy and has not responded by the last three days before the final canvassing review board meeting, the county auditor is required to notify the voter by telephone. Wash. Admin Code 434-261-050(1).

72.   If a voter does not cure or correct their signature mismatch, their vote will not be counted.

73.   Even following a cure attempt either in person or by mail, voters may still have their vote denied due to a signature mismatch or mis-verification.

SECOND AMENDED COMPLAINT FOR RELIEF

74. The Washington State Voter Registration Form publicly available does not inform voters that their signature will later be used to verify their mail ballots. *See* Washington State Voter Registration Form,

https://www.sos.wa.gov/_assets/elections/abvr/forms/english/vrf_english_web_a5.pdf

75. There is no indication that county officials inform voters that the signature on their voter registration will be later matched to their ballots.

76. When Washington residents register to vote through the Washington Department of Licensing, they provide their signature on an electronic signature pad. There is no indication, however, that the Washington Department of Licensing informs each voter that the electronic signature used for their driver's license will be later matched to their ballots.

77. Staff members assigned to verify signatures are required to receive training on statewide standards for signature verification. Wash. Rev. Code Ann. § 29A.40.110(3).

78. Signature verification training is not mandated for the County Board of Canvassers.

79. Instead, "The secretary of state shall prepare a training program for county canvassing board members. The training shall be made available *upon request*." (emphasis added) Wash. Admin. Code § 434-260-320.

**Discrimination in Signature Verification**

80. Defendants' system of reliance on signature verification, implemented by untrained or somewhat trained persons, is a flawed means of determining whether a mail ballot was fraudulently cast by a voter.

81. Generally, no two signatures, even by the same signer, are the same.

**SECOND AMENDED COMPLAINT FOR RELIEF**

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

82.  Moreover, the signature on file that officials are comparing to the signed declaration may be years if not decades old.

83.  A signature by a voter can vary due to intentional or unintentional factors. *See* Tomislav Fotake, et al., *Handwritten signature identification using basic concepts of graph theory,* WSEAS Transactions on Signal Processing, Vol 17, No. 4, pp 117-129, 117 (October 2011).

84.  Signature matching processes are particularly burdensome and harmful for racial and ethnic minority voters.

A report by Dr. Daniel Smith, studying ballot rejections in Florida, found that in multiple elections, ballots cast by Black registered voters in Florida were twice as likely to be rejected as those cast by older white voters. *See* Daniel A. Smith, *Vote-by-Mail Ballots Cast In Florida,* American Civil Liberties Union of Florida (Sep. 19, 2018), http://www.aclufl.org/sites/default/files/aclu_-vote_by_mail_-_report.pdf.

85.  Because a signature of a voter logically contains a voter's surname, surnames and perceptions of a voter's race connected to a surname means that a signature matching law is a law that is not race neutral.

86.  Surnames are a proxy for race and/or ethnicity.

87.  While it is clear that the signature matching process has the effect of racial discrimination, it is also that reviewers, by being able to see and associate the surname of a voter with a specific race, have the intent to discriminate as well.

88.  While there is statewide guidance for the signature verification process as described above, it provides a great deal of discretion to individual county board of canvassers in

determining whether the handwriting of a voter on their ballot declaration matches that on file.

89.  Arbitrary and discretionary review is demonstrated by the fact that Counties' application of the signature matching system, including voter outreach, differ widely. They vary on the rate at which Latino voters are flagged, cured and rejected and they vary on the implementation of practices and procedures in order to contact voters. This arbitrary and divergent implementation across the state allows some voters more opportunities than others to cure their ballots.

90.  Some counties mail a self-addressed stamped envelope in order to facilitate the return of a voter's signature cure form; some counties allow receipt of cure forms up until one day prior to the day of certification whereas other counties allow receipt of cure forms up until three days prior to the day of certification; some counties call voters multiple times; and some counties email as well as mail letters to inform voters of their challenged ballot. *See* Kim Wyman, Office of the Secretary of State Elections Division, 2020 Annual Report of WA State Elections (January 2021), https://www.sos.wa.gov/_assets/elections/research/2020%20annual%20elections%20report.pdf

91.  This discretion has been applied in a discriminatory way towards Latino voters in almost all counties in the State of Washington, including Yakima, Benton, and Chelan Counties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### Washington's Signature Matching Requirement Is Applied in a Manner that Unconstitutionally Burdens Latino Voters

92.    In 2020, over 4,500 Latino voters statewide were denied their right vote. This significant denial frequently prevents Latino voters from electing candidates of their choice, particularly when local election races can be certified by a difference as small as 30 votes.

93.    The practical significance of this number in relation to local elections creates an undue burden on Latino voters.

94.    Especially in local elections, Latino voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

95.    Ballot rejection based on a perceived signature mismatch is not a usual burden of voting. Examples of usual burdens of voting include the actions a voter takes *before* casting a ballot such as driving to a polling place. This burden is placed on Latino voters *after* they have already complied with voting rules and cast their ballots.

96.    The signature matching policy and process in the State of Washington has the effect of discriminating against Latino voters.

97.    The lack of clearly intelligible standards for what constitutes "handwriting that is clearly the same" allows for the untrained discretion of the canvassing review board, which has had the effect of disproportionately burdening Latino voters in the State of Washington.

98.    Ballot status files publicly provided by the Washington Secretary of State for all elections conducted in 2019 and 2020 show a clear pattern: Latino voters or those with Spanish

**SECOND AMENDED COMPLAINT FOR RELIEF**

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

surnames have their ballots rejected at higher rates than Anglo voters for the reason of a mismatched signature.

99.  Compared to other voters, Latinos were 2.3 times more likely to have their ballots rejected because of a signature mismatch on average for the primary, special, and general elections occurring during 2019 and 2020 primary.

100.  Signature mismatch rejection rates vary by county.

101.  In the 2016 general election, Latino voters in Yakima County were 10 times more likely than other voters to have their ballots rejected for the sole reason of a perceived mismatched signature.

102.  Across all primary and general elections in 2019 and 2020, Latino voters in Yakima County were 3.8 times more likely to have their ballots rejected for a mismatched signature compared to other voters.

103.  Across all elections in 2019 and 2020, Latino voters in Chelan County were 5.9 times more likely to have their ballots rejected for a mismatched signature compared to other voters.

104.  Across all elections in 2019 and 2020, Latino voters in Benton County were 3.1 times more likely to have their ballots rejected for a mismatched signature compared to other voters.

105.  The figure below shows how many times higher the signature mismatch rejection rate was for Latino voters compared to Anglo voters in Washington counties that have twenty percent or higher Latino population across all elections in 2019 and 2020.

**SECOND AMENDED COMPLAINT FOR RELIEF**



106.    In the 2020 general election, Latino voters in Yakima County were 5.8 times more likely to have their ballots rejected for a mismatched signature compared to other voters.

107.    In the 2020 general election, Latino voters in Chelan County were 6.1 times more likely than other voters to have their ballots rejected for a perceived signature mismatch.

108.    In the 2020 general election, Latino voters in Benton County were 3.4 times more likely to have their ballots rejected for a perceived signature mismatch.

"If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process."  *Castaneda*, 430 U.S. 482, 495 fn.13 (1977) (citing *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 fn. 13 (1977); *Washington v. Davis*, 426 U.S. 229, 241 (1976); *Eubanks v. Louisiana*, 356 U.S. 584, 587 (1958); *Smith v. Texas*, 311 U.S. 128, 131 (1940)).

109.   The disparity of the signature matching review's impact on Latino voters is significant. The number of ballots rejected for signature mismatch in each county during the respective election year is greater than the margin of victory in seventeen election contests in Benton, Chelan, and Yakima between 2017 and 2019. The impact of the disparity is significant and serious.

110.   The figure below demonstrates the difference between the margin of victory in election contests in Benton, Chelan, and Yakima compared to the number of ballots rejected for signature mismatch.

**SECOND AMENDED COMPLAINT FOR RELIEF**

| | Election Name | Year | Type | Margin of Victory | Signature Mismatch Rejections | Difference |
|---|---|---|---|---|---|---|
| Benton | Fire District #4 Comissioner Pos.2 | 2019 | General | 124 | 151 | (27) |
| Benton | Port Of Benton Commissioner District 1 | 2019 | General | 91 | 151 | (60) |
| Benton | City Of Benton City Council Pos. 3 | 2019 | General | 31 | 151 | (120) |
| Benton | West Benton Regional Fire Authority Commissioner Position 5 | 2017 | General | 29 | 104 | (75) |
| Benton | Kiona-Benton City School District 52 Director District 5 | 2017 | General | 58 | 104 | (46) |
| Benton | Prosser Consolidated School District 116 Director District 4 | 2017 | General | 101 | 104 | (3) |
| Benton | City Of Richland Council Pos. 4 | 2017 | Primary | 53 | 67 | (14) |
| Benton | City Of Richland Council Pos. 7 | 2017 | Primary | 39 | 67 | (28) |
| Benton | City Of West Richland Council Pos. 6 | 2017 | Primary | 43 | 67 | (24) |
| Chelan | City Of Entiat Council Member #2 | 2017 | General | 13 | 23 | (10) |
| Yakima | City Of Wapato Council, Position 5 | 2019 | General | 1 | 94 | (93) |
| Yakima | City Of Yakima - District 1 Council | 2019 | General | 27 | 94 | (67) |
| Yakima | City Of Sunnyside Council, Position 5, | 2019 | General | 1 | 94 | (93) |
| Yakima | Mount Adams School District N0.209 #2 | 2019 | General | 11 | 94 | (83) |
| Yakima | Fire District No. 1 Commissioner, Position 2 | 2019 | General | 26 | 94 | (68) |
| Yakima | Toppenish School District No.202 Local Propositon.1 | 2019 | General | 63 | 94 | (31) |
| Yakima | City Of Wapato Mayor | 2017 | General | 2 | 90 | (88) |

111. In the 2019 general election, mismatched signatures accounted for only 29% of rejected ballots.

112. In the 2020 general election, mismatched signatures accounted for the majority of rejected ballots at 74%.

113. Compared to the 2019 general election, Latino voter turn-out tripled in the general 2020 election. The increase in Latino voter turn-out correlated with an increase in Latino

**SECOND AMENDED COMPLAINT FOR RELIEF**

surname ballot rejections due to a perceived mismatched signature. The rate of rejection for Latino surname ballots, due to a perceived signature mismatch, doubled.

114.   In the 2020 general election, Latino voters, statewide, were 3 times more likely to have their ballots rejected compared to other voters.

115.   In Yakima County, in 2019, 16% of registered Latino voters turned out to vote compared to 42% of registered non-Latino voters. In 2020, 56% of registered Latino voters turned out to vote compared to 84% of registered non-Latino voters. Latino voter turn-out increased by 3.5 times between 2019 and 2020.

116.   Due to Yakima County's previous violation of Section 2 of the federal Voting Rights Act, Yakima County is mandated to publish the rate of Latino voter turn-out on its Yakima County Elections website.

117.   Latino voter turn-out is on average significantly lower than Anglo voter turn-out.

118.   Latino voters who do turn-out for elections are far less likely to vote after having their ballots rejected for a perceived mismatched signature.

119.   Latino voters whose ballots were rejected due to a signature mismatch in 2019 were 3 times more likely to not vote in 2020 compared to other Latino voters who did not have their ballots rejected for a mismatched signature.

120.   While the likelihood of signature mismatch ballot rejection varied for all voters depending on a voter's county of residence, Latino voters continually faced higher mismatch compared to non-Latino and/or Anglo voters regardless of what county of residence a Latino voter lived in.

121.   Simply put, a Latino voter in almost all counties in Washington was more likely than any Anglo voter to face a signature mismatch rejection.

**SECOND AMENDED COMPLAINT FOR RELIEF**

122. Compared to their share of total ballots cast, Latino voters are overrepresented in their share of signature mismatch rejected ballots.

123. The figure below provides a visualization of the share of Latino ballots rejected for signature mismatch compared to the Latino populations share of the vote per county for counties in Washington that have twenty percent or higher Latino population.



Defendants' unreliable signature verification process disproportionately rejects a significant number of validly cast ballots specifically by Latino voters as a result of Defendants' discretion, disparate treatment of Latino voters, and lack of intelligible signature matching standards.

124. Defendants' discriminatory application of the signature matching provision in a discriminatory manner has caused a disparate effect targeting Latino voters based on their race and/or ethnicity.

**SECOND AMENDED COMPLAINT FOR RELIEF**

125.    Because signature review centralizes the voter's name and surname, ballots of Latino voters are flagged at higher rates and face more intense scrutiny because of the voter's surname.

126.    Surnames are a proxy for race and/or ethnicity.

127.    Latino ballots are being rejected for signature mismatch *on account of* the perceived race of the voter.

128.    This practice is clearer in counties with higher Latino populations.  Latinos comprise 37% of the total population and 21% of the voting population in eight counties—Adams, Benton, Chelan, Douglas, Franklin, Grant, Walla Walla, and Yakima— in Central and Eastern Washington.

129.    Latinos in these counties account for 29% of the total Latino voting population in Washington.  *See* Joy Borkholder, *Latino Voters Have Higher Than Average Ballot Signature Rejection Rates in Washington State,* InvestigateWest (Feb. 15, 2021) https://www.invw.org/2021/02/15/latino-voters-have-higher-than-average-ballot-signature-rejection-rates-in-washington-state/.

130.    "In these eight counties, Latino voters contributed 17% of accepted ballots in November 2020, but 46% of ballot rejections."  *Id.*

131.    Latino voters are also correcting or curing their signatures when flagged at lower rates than non-Latino voters.  *Id.*

132.    Two of the major cities in these eight counties, the City of Yakima and the City of Pasco, have both been found in violation of Section 2 of the Voting rights Act for their discriminatory election systems.

133. When the Department of Justice sued Yakima County for voter discrimination, this action resulted in a 24% increase in Latino voter registration.  H.R. REP. 109-478, 19-20, 2006 U.S.C.C.A.N. 618, 629-30.

134. The burden placed on Latino voters is excessive because it interacts with socioeconomic disparities.

135. Here, in the State of Washington, voters may not be notified of their challenged ballot for weeks AFTER Election Day and may not be notified with sufficient time to cure their ballots.

136. Voters have to either appear in-person at the county elections office in order to cure their challenged ballot or have to fill out multiple forms and return such forms in the mail.

137. Due to the socioeconomic conditions and socioeconomic disparity of Latino voters, these additional actions required of Latino voters places an undue burden on accessing the franchise.

138. Lower wage workers, agricultural workers, and essential workers have a more difficult time taking time off work to cure and thus, face greater financial repercussions.

139. Voters who use public transportation and voters who do not live near the Elections Office also face a greater burden accessing their local Elections Office to cure their signatures during work hours.

140. The burdens faced by Latino voters in Yakima, Chelan, and Benton counties are beyond the usual burdens of voting.

141. The burden is not slight.  The burden is excessive.

142. This burden is demonstrated by the low rate at which Latino voters respond to the challenge and are able to effectively cure their ballots.

**SECOND AMENDED COMPLAINT FOR RELIEF**

1
2
3
4
5
6

## V.    CLAIMS FOR RELIEF

### Count 1

### Race and Language Minority Discrimination,

### Section 2 of the Voting Rights Act

### 52 U.S.C. § 10301

7
8

143.    Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegations in this Complaint.

9
10
11
12
13
14
15

144.    Washington's Latino voters are disproportionately burdened by the signature matching policy in the State, as Latino voters are more than twice as likely as Anglo voters to have their signatures flagged for mismatch.  Latino voters in Yakima, Benton and Chelan Counties are three to ten times more likely to have their ballots rejected due to a signature mismatch.  Consequently, voters who have had their ballots flagged must correct or cure their ballot in order for their vote to be processed and counted.

16
17
18

145.    Latino voters, however, cure their ballots at lower rates than non-Latino voters which demonstrates that the burden is more severe for Latino voters compared to other voters, and that Latino voters are disparately impacted.

19
20
21
22

146.    When a Latino voter's ballot is flagged, there is a higher likelihood that they will not have their ballot counted compared to non-Latino voters and will be denied their right to vote.

23
24
25

147.    When a Latino voter's ballot is rejected for a mismatched signature, a Latino voter is three times less likely to turn out and vote in the next election.  This cumulative burden disenfranchises Latinos and abridges the right to vote exponentially.

26

148.    Defendants' implementation of the signature matching policy violates Section 2 of the

Voting Rights Act, 52 U.S.C. § 10301, because it results in the denial of the right to vote

on account of race and language minority status, insofar as, under the totality of the

circumstances, Plaintiffs and minority voters are denied an equal opportunity to

participate effectively in the political process.

149.    Due to the severe burden placed on Latino voters *after* they cast a ballot, Latino voters

have less opportunity than other members of the electorate to participate in the political

process and to elect representatives of their choice.

150.    Voters with Spanish surnames in these Washington State counties bear the effects of

discrimination in education, employment, and health, which hinder their ability to

participate in the political process.  These socioeconomic disparities interact with

signature verification process to create an excessive burden to the equal opportunity to

vote.

151.    The application of Washington's signature matching policies by the Defendants in

Yakima, Benton, and Chelan counties in Washington violates Section 2 because it denies

and abridges the right to vote on account of race and language minority status.

**Count 2**

**Race and Language Minority Discrimination,**

**Section 2 of the Voting Rights Act**

**52 U.S.C. § 10301**

152.    Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegations in this Complaint.

153.    The application of Washington's signature matching policy by individual counties and named Defendant counties intentionally discriminates against Latino voters.

154.    The County Defendants, through the canvassing boards, are rejecting Latino ballots for signature mismatch *on account of* the perceived race of the voter when examining the voter's signature.

155.    Washington's signature matching policy violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because the Defendants are intentionally applying the law in a discriminatory manner and placing a severe burden on Latino voters.

156.    Defendant County Board of Canvassers have knowledge of the racial disparity of rejected ballots and continue to enforce the state's signature matching policy in an intentional discriminatory manner.

157.    Plaintiffs and minority voters are denied an equal opportunity to participate effectively in the political process.

158.    Washington's signature matching policy's application by the canvassing boards in counties in Washington violates Section 2 because it denies and abridges the right to vote on account of race and language minority status.

**SECOND AMENDED COMPLAINT FOR RELIEF**

## Count 3

### Arbitrary Disenfranchisement in Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

### 42  U.S.C. § 1983

159. Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegations in this Complaint.

160. Due to arbitrary decisions made by local election officials, voters in Yakima, Chelan, and Benton Counties face burdens on their ability to have their vote counted based on their race, as Latino voters have their ballots rejected for a signature mismatch over three times higher than Anglo voters.

161. Latino voters are treated unequally in access to the franchise as a class across the state of Washington due to both the signature matching requirement under Washington law and the application of such requirement by the individual canvassing boards.

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v Gore*, 531 U.S. 98, 104-05 (2000); *see also id.* at 106 (finding that voting procedures that "vary not only from county to county but indeed within a single county" are not "sufficient [to] guarantee[] equal treatment"); *see, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

162.   Defendants' application and implementation of the signature matching requirement creates disparate burdens on Latino voters across and within counties and allows arbitrary disenfranchisement in violation of the Equal Protection Clause of the Fourteenth Amendment.

### Count 4

### Violation of Plaintiffs' Fundamental Right to Vote

### First and Fourteenth Amendments

### 42 U.S.C. § 1983

163.   Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegation in this Complaint.

The First and Fourteenth Amendments of the United States Constitution protect the fundamental right to vote.  The First Amendment protects the right to vote as free speech and as freedom of association.  *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992).  The political franchise of voting "is regarded as a fundamental political right, because it is preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, (1886).  "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into

consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  When a burden on the right to vote is severe or discriminatory, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

164.  Defendants' application of Washington's signature matching policy disproportionately affects Latino voters because Latino voters in Yakima, Chelan, and Benton Counties are, on average, more than three times as likely as Anglo voters of having their ballots rejected due to mismatch.  This places Latino voters at higher risk of total disenfranchisement than Anglo voters because Latino voters bear the burden to correct or cure their ballots.

165.  The burden is made even more severe by Washington's all-mail elections. Latino voters are not given the opportunity to utilize other voting methods in a meaningful way and simply cannot vote elsewhere in order to cast a ballot that is not at a higher risk than non-Latino voters of being rejected for signature mismatch.

166.  The burden is made even more severe by the socioeconomic disparities of Latino voters and how these disparities interact with the voter verification processes.

167.  The First Amendment protects the fundamental right to vote. The right to vote has been interpreted by the Supreme Court as a First Amendment right to freedom of association and free speech.  *See Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *Buckley v. Valeo*, 424 US 1 (1976).

**SECOND AMENDED COMPLAINT FOR RELIEF**

168.    The application of the signature matching requirement causes a chilling effect on Latino voters' free speech.  Latino voters' First Amendment right of free speech is chilled when Yakima, Chelan, and Benton Counties reject Latino ballots at statistically significant and substantially higher rates than their non-Latino counterparts. Chilling of speech is demonstrated by the fact that Latino voters are three times less likely to vote *after* a rejected ballot based on a signature mismatch.  This cumulative burden disenfranchises Latinos and abridges the right to vote exponentially.

169.     The application of the signature matching requirement unconstitutionally burdens the fundamental right of Latino voters in Yakima, Chelan, and Benton Counties to access the franchise, including individual and organizational Plaintiffs, in violation of the First and Fourteenth Amendments to the U.S. Constitution.

**Count 5**

**Violation of Plaintiffs' Right to Vote Free from Racial Discrimination**

**Fifteenth Amendment**

**42  U.S.C. § 1983**

170.    Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegations in this Complaint.

196.    The signature matching policy in the State of Washington permits intentional discrimination, as those with Latino surnames and Latino voters can be flagged for a signature mismatch and have their ballots rejected at a higher rate than non-Latino voters by the canvassing boards in each county.

**SECOND AMENDED COMPLAINT FOR RELIEF**

197.    The Yakima, Chelan, and Benton Counties, through the canvassing boards, are rejecting Latino ballots for signature mismatch *on account of* the perceived race of the voter when examining the voter's signature.

198.    The application of Washington's signature matching policy violates the Fifteenth Amendment to the U.S. Constitution because Defendants are intentionally applying the law in a racially discriminatory manner.

199.    This system discriminates against Plaintiffs on the basis of race and national origin in violation of the Fifteenth Amendment to the U.S. Constitution.

### Count 6

### The Challenged Provisions Result in the Denial of Procedural Due Process

### Fourteenth Amendment

### 42 U.S.C. § 1983

200.    Plaintiffs repeat, replead, and incorporate by reference, as though fully set forth in this paragraph, all allegation in this Complaint.

201.    The Fourteenth Amendment of the United States Constitution prohibits states from depriving "any person of … liberty… without due process of law…." U.S. Const. amend. XIV, § 1.

202.    The right to vote is a constitutional right and citizens retain a liberty interest in voting. In the State of Washington, the right to vote is equated with the right to vote using a mail ballot, as Washington has created a mail voting scheme. Voters, therefore, have and retain a liberty interest in voting using mail ballots and any state laws governing that

SECOND AMENDED COMPLAINT FOR RELIEF

policy must comply with the Due Process Clause. *See Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty'… or it may arise from an expectation or interest created by state laws or policies.").

203.    Once a plaintiff shows that the State has deprived them of a liberty interest and that the state has done so without due process of law, the Court applies a three-part balancing test, first set out in *Mathews v. Eldridge,* 424 U.S. 319, 424 (1976). Courts balance: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation and "the probable value, if any, of additional or substitute procedural safeguards"; and (3) the "government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.* at 335.

204.    Defendants' application of the State of Washington's signature matching policy violates the Due Process Clause because individual boards of canvassers are implementing a curing process that is standardless: County canvassing boards are permitted to reject ballots based on their own assessment, discretion and standards.  Inasmuch as this standardless assessment is applied and individual boards of canvassers have discretion to determine what handwriting is "clearly the same," Latino voters are denied their private liberty interest without due process of law.

205.    Defendants' application of the State of Washington's signature matching policy also violates the Due Process Clause by implementing divergent practices and procedures across the state that allow some voters more opportunities than others to cure their ballots (e.g., some counties mail a self-addressed stamped envelope in order to facilitate the

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

return of a voter's signature cure form; some counties allow receipt of cure forms up until one day prior to the day of certification whereas other counties allow receipt of cure forms up until three days prior to the day of certification; some counties call voters multiple times; some counties email as well as mail letters to inform voters of their challenged ballot).

206. Defendants' application of the signature matching policy also violates the Due Process Clause by not notifying voters of their challenged ballots for weeks AFTER Election Day or providing sufficient time to cure their ballots.

207. Regardless of a curing period or provision, voters may still have their vote denied due to a signature mismatch or mis-verification even after a voter attempts to cure their ballot by either appearing in-person at the county elections office or by mailing in the required forms.

208. Due to the socioeconomic conditions and socioeconomic disparity of Latino voters, the additional actions required of Latino voters to cure a signature mismatch places an undue burden on accessing the franchise.

209. The burden is not slight. The burden is excessive.

210. This burden is demonstrated by the low rate at which Latino voters respond to the challenge and are able to effectively cure their ballots.

211. Voters have a significant private interest in having one's vote counted, as voting is a "fundamental political right" that is "preservative of all rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886).

212. There is a substantial risk of erroneously depriving a Latino voter of their right to vote by permitting individual boards of canvassers and their designated representatives to

determine what handwriting is "clearly the same" and to reject ballots based on their cursory, unfettered discretion that two signatures do not match.

213.   The government's interest in maintaining the integrity of an election weighs in favor of reforming the signature matching policy, as election integrity depends on counting all ballots that are legitimately cast.  Any additional burdens the government may incur are minimal in light of the substantial burden on voters.

214.   Latino voters who are having their ballots rejected due to the signature matching policy, as implemented by the counties, are being deprived of Due Process under the Fourteenth Amendment.

## VI.    PRAYER FOR RELIEF

Plaintiffs request that the Court:

1.   Declare that Defendants' application of Wash. Rev. Code Ann. § 29A.40.110 violates the United States Constitution;

2.   Declare that Defendants' application of Wash. Rev. Code Ann. § 29A.40.110 violates Section 2 of the Federal Voting Rights Act 52 U.S.C. § 10301;

3.   Enjoin Defendants, their agents and successors, and all persons acting in concert with, or as agents of, any Defendants in this action from implementing RCW 29A.40.110 and Wash. Admin. Code §434-261-050 in any future elections in the State of Washington without first implementing the following measures:

   a.   Adopt, after consultation with appropriate subject matter experts, published standards for determination of matching signatures.

**SECOND AMENDED COMPLAINT FOR RELIEF**

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

b.  Mandate annual diversity, equity and inclusion training for all elections staff that interact with the signature matching processes.

c.  Mandate a process by which voters can file a complaint with Yakima, Chelan, and Benton Counties and have their grievances elevated to the Washington State Secretary of State Elections Division for oversight and resolution.

d.  Adopt and publish a training manual approved by appropriate experts.

e.  Design and implement a quality control methodology that checks at random intervals rejected signatures for lack of compliance with the published standards.

f.  Fund, design and implement a meaningful process to permit a voter to timely cure a ballot determined to contain a mismatched signature.

g.  With input from Latino-community based organizations, develop, fund and resource bilingual voter education and outreach to target precincts where Latino voters have a high rate of signature mismatch.

h.  Publish, after each election, the number of rejected ballots by race of the voter and voting precinct.

i.  Publish, after each election, the rate of Latino voter turn-out.

j.  Identify by name, title, and photo each member of the Board of Canvassers and their respective term on the County Elections website.

k.  Publish the names of election staff and Board of Canvassers members who receive training and date of such training.

l.  Provide Cure Forms and Signature Update Forms in Spanish on County Auditor's webpage and in County Elections Offices.

**SECOND AMENDED COMPLAINT FOR RELIEF**

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

m. Require Canvassing Review Board and Election Staff training to be open to the public with all persons permitted to attend.

n. Publish notice of Canvassing Review Board meeting location and time in county libraries, Latino-based organizations, and other community locations.

o. Require Canvassing Review Boards to conduct their meetings at a time and location that is accessible to the public to ensure the public is informed and able to attend.

p. Follow all further remedies recommended by expert testimony.

4. Each of the Plaintiffs has suffered, and absent injunctive relief will continue to suffer, actual damages proximately caused by the unconstitutional conduct and effects described herein for which they pray recovery from Defendants.

5. Nominal damages for the unconstitutional harms Plaintiffs suffered for which they pray recovery from the Defendants.

6. Pre-judgment and post-judgment interest as provided by law, at the appropriate rate.

7. An order, pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10310, and other applicable laws, for Defendants to pay all costs, including reasonable attorneys' fees and litigation expenses incurred by Plaintiffs in connection with this action.

8. Any other relief that the Court may deem just and proper, and as may be necessary to afford Plaintiffs the full relief to which they are entitled under the United States Constitution and the Voting Rights Act.

Dated this 29th day of October, 2021.            Respectfully submitted,

**SECOND AMENDED COMPLAINT FOR RELIEF**

AMEND LAW LLC
P.O. Box 13203
Burton, Washington 98013 ~ (206) 280-8724

**AMEND LAW, LLC**

By: */s/ Molly P. Matter*
  Molly P. Matter, WSBA # 52311
  P.O. Box 13203
  Burton, WA 98013
  Phone: 206- 280-8724
  Email: molly@amendlawmatter.com

**GIBBS LAW GROUP LLP**
Rosemary Rivas *
Amanda M. Karl *
505 14th Street, Suite 1110
Oakland, WA 94612
Telephone (510) 350-9700
Facsimile (510) 350-9701

*Attorneys for Plaintiffs Latino Community Fund of Washington, Cinthia Álvarez Lucatero, and Daniel Reynoso*

and

**UCLA VOTING RIGHTS PROJECT**

Chad W. Dunn
*Admitted Pro Hac Vice*
Sonni Waknin
*Admitted Pro Hac Vice*
3250 Public Affairs Building
Los Angeles, CA 90065
Telephone: 310-400-6019

**LAW OFFICES OF LUIS ROBERTO VERA, JR.**

LUIS ROBERTO VERA, JR.*
111 Soledad St Ste 1325
San Antonio, TX 78205-2260
Telephone: 210-225−3300
lrvlaw@sbcglobal.net

*Attorneys for Plaintiffs, League of United Latin American Citizens, Jesse Reyes*

* Pro Hac Vice Motion Forthcoming

**SECOND AMENDED COMPLAINT FOR RELIEF**