1   Callie A. Castillo, WSBA No. 38214
2   Devon J. McCurdy, WSBA No. 52663
    Erika O'Sullivan, WSBA No. 57556
3   LANE POWELL PC
    1420 Fifth Avenue, Suite 4200
4   P.O. Box 91302
    Seattle, Washington 98111-9402
5   Telephone: 206.223.7000
    Facsimile: 206.223.7107
6   castilloc@lanepowell.com
    mccurdyd@lanepowell.com
7   osullivane@lanepowell.com
    Attorneys for Defendants

THE HONORABLE MARY K. DIMKE

8

9               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF WASHINGTON
10

11  MARISSA REYES, LEAGUE OF          No. 4:21-cv-05075-MKD
    UNITED LATIN AMERICAN CITIZENS,
    LATINO COMMUNITY FUND,            **DEFENDANTS' MOTION
12                                    FOR SUMMARY
                                      JUDGMENT**
13                  Plaintiffs,

                                      **NOTED FOR HEARING:
14        v.                          AUGUST 10, 2023 AT 9:00
                                      A.M.**
15  BRENDA CHILTON, in her official
    capacity as Benton County Auditor and   **ORAL ARGUMENT
16  Canvassing Review Board member, ANDY    REQUESTED**
    MILLER, in his official capacity as Benton
17  County Canvassing Review Board member,
    XAN AUGEROT, in his official capacity as
18  Benton County Canvassing Review Board
    member, CHARLES ROSS, in his official
19  capacity as Yakima County Auditor and
    Canvassing Review Board Member,
20  JOSEPH BRUSIC, in his official capacity
    as Yakima County Canvassing Review
21  Board member, RON ANDERSON in his
    official capacity as Yakima County
22  Canvassing Review Board member, SKIP
    MOORE, in his official capacity as Chelan
23  County Auditor and Canvassing Review
    Board member, DOUGLAS SHAE, in his
24  official capacity as Chelan County
    Canvassing Review Board member, BOB
25  BUGERT in his official capacity as Chelan
    County Canvassing Review Board member,
26
                    Defendants.
27

1

## TABLE OF CONTENTS

2   I    INTRODUCTION ........................................................................1

3   II   BACKGROUND ........................................................................1

4   III  ARGUMENT ..............................................................................3

5        A.   Plaintiffs' Results-Based Voting Rights Act Claim Fails. ...................4

6             1.   The *Brnovich* Guideposts Do not Show an Unequal Voting
                   System. .................................................................................6
7
             2.   The *Gingles* Factors Do not Show an Unequal Voting
8                  System. .................................................................................9

9        B.   Plaintiffs' Intentional Discrimination, Equal Protection, and
              Fifteenth Amendment Claims Fail. ......................................................15
10
         C.   Plaintiffs' Fundamental Rights and Procedural Due Process
11            Claims Fail. ...........................................................................18

12  IV   CONCLUSION..........................................................................20

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - i
CASE NO. 4:21-cv-05075-MKD

132996.0004/9402452.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)...............................................................9, 15

*Allen v. Milligan*,
   No. 21-1086, slip. op. (U.S. June 8, 2023) ...................................5

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983).......................................................................18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................3

*Ariz. Democratic Party v. Hobbs*,
   18 F.4th 1179 (9th Cir. 2021) ................................................*passim*

*Brnovich v. Democratic Nat'l Comm.*,
   141 S. Ct. 2321 (2021)............................................................*passim*

*Burdick v. Takushi*,
   504 U.S. 428 (1992)...................................................................18, 20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................3

*Chisom v. Roemer*,
   501 U.S. 380 (1991).......................................................................15

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980).........................................................................15

*Crawford v. Marion Cnty. Bd. of Elections*,
   553 U.S. 181 (2008)................................................................4, 7, 19

*Dudum v. Arntz*,
   640 F.3d 1098 (9th Cir. 2011) .....................................................18

*Fair Fight Action, Inc. v. Raffensperger*,
   No. 1:18-CV-5391-SCJ, 2022 WL 4725887 (N.D. Ga. Sept. 30,
   2022) ..............................................................................6, 10, 11

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

*Farrakhan v. Washington,*
    338 F.3d 1009 (9th Cir. 2003) ............................................................5

*Frank v. Walker,*
    768 F.3d 744 (7th Cir. 2014) ...........................................................8, 9

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960)..........................................................................16

*Gonzalez v. Arizona,*
    677 F.3d 383 (9th Cir. 2012) ..............................................................5

*Johnson v. Waller County,*
    593 F. Supp. 3d 540 (S.D. Tex. 2023)..........................................10, 11

*Lemons v. Bradbury,*
    538 F.3d 1098 (9th Cir. 2008) ......................................................19, 20

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)..........................................................................18

*Maynard v. City of San Jose,*
    37 F.3d 1396 (9th Cir. 1994) .............................................................15

*Montes v. City of Yakima,*
    40 F. Supp. 3d 1377 (E.D. Wash. 2014).............................................10

*Richardson v. Tex. Sec'y of State,*
    978 F.3d 220 (5th Cir. 2020) ...............................................................7

*Rogers v. Lodge,*
    458 U.S. 613 (1982)..........................................................................15

*Smith v. Salt River Project Agricultural Improvement & Power Dist.,*
    109 F.3d 586 (9th Cir. 1997) .........................................................6, 14

*Thornburg v. Gingles,*
    478 U.S. 30 (1986).....................................................................*passim*

*Valladoli v. City of National City,*
    976 F.2d 1293 (9th Cir. 1992) .........................................................3, 15

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - iii
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).................................................................15, 16, 17

*Washington v. Davis*,
    426 U.S. 229 (1976)...........................................................................15

*Weber v. Shelley*,
    347 F.3d 1101 (9th Cir. 2003) ......................................................18, 20

*Yick Wo v. Hopkins*,
    6 S. Ct. 1064 (1886).........................................................................16

**Statutes**

28 U.S.C. § 2403(b) ...................................................................................4

RCW 29A.40.110.......................................................................................4

RCW 29A.40.160....................................................................................8, 9

Voting Rights Act ...........................................................................*passim*

**Other Authorities**

First Amendment....................................................................................18

Fourteenth Amendment ......................................................4, 15, 18, 20

Fifteenth Amendment ....................................................................4, 15

Fed. R. Civ. P. 5.1....................................................................................4

Fed. R. Civ. P. 56....................................................................................3

WAC 434-261-050....................................................................................4

WAC 434-379-020........................................................................2, 12, 15

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

1

## I    INTRODUCTION

2    Defendants Benton County, Chelan County, and Yakima County move for
3  summary judgment against plaintiffs' Voting Rights Act and constitutional claims.
4  These claims attack the defendant counties' implementation of Washington's
5  longstanding and commonplace requirement that counties verify ballot declaration
6  signatures before counting mail-in ballots. Plaintiffs' discrimination claims rest on
7  the fact that in recent years defendant counties collectively rejected 748 of 118,881
8  ballots signed with Latino-sounding names and 2,955 of 1,193,867 ballots signed
9  with non-Latino-sounding names. Each pair of statistics can be divided to find a
10  rejection percentage—0.63% and 0.25%, respectively. Dividing these percentages
11  yields a ratio between them that plaintiffs equate to discrimination. But this ratio
12  does not show discrimination. Nor does any county's individual ratio. The ratios
13  must be weighed against defendant counties' even-handed implementation of a
14  multi-tier review process, their staffs' and canvassing board members' training to
15  use a detailed and scientific state signature verification standard, their faithful
16  attempts to secure voter signature cure forms, and the explanation that voter age and
17  inexperience predict ballot rejection rates better than does imputed voter race. That
18  more than 98% of all voters—Latino and non-Latino alike—succeed in submitting
19  matching ballot signatures in the three counties dooms plaintiffs' discrimination
20  claims. That voters succeed because the signature requirement is both easy to meet
21  and easy to cure dooms plaintiffs' fundamental rights and procedural due process
22  claims. Summary judgment and dismissal of this action is warranted.

23

## II    BACKGROUND

24    Defendants' Statement of Undisputed Material Facts sets out relevant
25  background in detail. Defendant counties follow century-old Washington law to
26  verify that ballot declaration signatures match voters' signatures in the voter
27  registration file. Def.'s Statement ¶¶ 1-20. They do so in a multi-tier review process

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 1
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

that favors ballot acceptance by immediately accepting ballots deemed to have matching signatures and subjecting only ballots flagged for mismatching signatures to additional review. *Id.* ¶¶ 40-78. The counties' elections staff, who are trained by a well-respected signature expert to use a scientifically-grounded and detailed state standard, WAC 434-379-020, recommend that a small handful of ballots be rejected. *Id.* ¶¶ 21-33, 90. These recommendations are then voted on by county canvassing boards, consisting of elected officials or their delegates, who almost always receive the same training staff do. *Id.* ¶¶ 32-33. At the county canvassing board there is opportunity to discuss—and often actual in-depth discussion—applying WAC 434-379-020 to ballot declaration signatures. *Id.* ¶¶ 57, 66-67, 77-78. The counties consider signatures as images; rarely do they consider a voter's name to better discern letter combinations. *Id.* ¶¶ 54-55, 65. And a ballot declaration signature is accepted if it matches *any* voter signature available in the voter's registration file. *Id.* ¶¶ 50, 61, 73.

Elections staff begin signature review promptly and mail cure notices to voters immediately after determining a signature mismatch. *Id.* ¶¶ 49, 52, 59, 80-82. A voter may cure a signature by submitting a signature matching the ballot declaration to the counties by email, mail, FAX, or an in-person visit. *Id.* ¶¶ 51, 64, 75; *see also* ¶¶ 88-89. The cure notices advertise this and the statutory deadline to submit the new signature. *Id*. If the voter mails a ballot on election day so that the cure notice cannot be issued until the deadline is near—or if the voter does not respond to the mailed notice—defendant counties attempt to reach the voter by phone. *Id.* ¶¶ 52, 64, 81.

The process works for the overwhelming majority of voters. Across elections for which data is available (2019 to 2022), defendant counties rejected 3,703 ballots for signature mismatch, out of 1,312,748 ballots cast—or 0.28%. *Id.* ¶ 92. Of the total rejected ballots, 748 or 20% were signed with Latino-sounding names. *Id.* Plaintiffs divide the tiny percentage of rejected ballots bearing Latino-sounding

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 2
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1    names by the tiny percentage of rejected ballots bearing non-Latino names to allege

2    a disparity of three to four times. *Id.* ¶¶ 97-99.

3        As is often the case, the devil is in the details. For instance, the biggest

4    disparity plaintiffs show comes from dividing Chelan County's rejection of 0.97%

5    of ballots with Latino-sounding first and last names (62 ballots total) by its rejection

6    of 0.21% of ballots with non-Latino last names (530 ballots total). *Id.* ¶¶ 94, 98.

7    Plaintiffs' statistical analysis stops there and fails to identify what defendants' expert

8    found—that after controlling for other variables, including imputed voter race, what

9    matters to ballot rejection is voter age and inexperience, not race. *Id.* ¶¶ 101-21.

10        On these core facts, plaintiffs seek not to reform defendant counties' signature

11    matching procedures but to enjoin them from implementing state law by preventing

12    them from verifying ballot declaration signatures *at all*. *Id.* ¶ 129.

### III    <u>ARGUMENT</u>

14        Federal Rule of Civil Procedure 56 "provides that summary judgment 'shall

15    be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

16    admissions on file, together with the affidavits, if any, show that there is no genuine

17    issue as to any material fact and that the moving party is entitled to a judgment as a

18    matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting

19    Fed. R. Civ. P. 56(c)). The Rule "mandates the entry of summary judgment . . .

20    against a party who fails to make a showing sufficient to establish the existence of

21    an element essential to that party's case, and on which that party will bear the burden

22    of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary

23    judgment is also appropriate, despite "some alleged factual dispute," if "a reasonable

24    [fact-finder] could [not] return a verdict for the nonmoving party." *Anderson*, 477

25    U.S. at 248. The court should not weigh evidence, but "evidence [that] is merely

26    colorable . . . or is not significantly probative" does not warrant trial. *Id.* at 249.

27    Summary judgment may be entered against voting rights plaintiffs. *See Valladoli v.*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 3
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

*City of National City*, 976 F.2d 1293, 1295 (9th Cir. 1992). Here, summary judgment is warranted against plaintiffs' (A) results-based Voting Rights Act claim; (B) Fifteenth Amendment, Fourteenth Amendment, and Voting Rights Act intentional discrimination claims; and (C) fundamental rights and procedural due process claims.

Before analyzing each claim in turn, it bears considering the relief plaintiffs seek. When plaintiffs "seek[] relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion." *Crawford v. Marion Cnty. Bd. of Elections*, 553 U.S. 181, 200 (2008) (Stevens, J.) (plurality opinion). Here, plaintiffs seek "a permanent injunction against" defendant counties declaring "application of the signature verification process RCW 29A.40.110 violative of the United States Constitution and of Section 2 of the Federal Voting Rights Act." Def.'s Statement ¶ 129. They seek to permanently enjoin defendant counties "from implementing RCW 29A.40.110," requiring signature matching and other ballot processing tasks, "and WAC 434-261-050," describing the process to cure a mismatched signature, "in future elections." *Id*. Plaintiffs do not seek reforms to signature matching. *See id.* They seek to eliminate it in defendant counties by drawing into question the constitutionality of the state statute and regulation. This increases their burden.[1]

A.    Plaintiffs' Results-Based Voting Rights Act Claim Fails.

Plaintiffs contend defendant counties violate Section 2 of the Voting Rights Act by verifying signatures in a manner that results in vote denial on account of race.

---

[1] It also requires the court to "certify such fact to the attorney general of [Washington] and . . . permit [Washington] to intervene." 28 U.S.C. § 2403(b). Plaintiffs had to notify the court of this challenge and to serve Washington's attorney general—but they have not. *See* Fed. R. Civ. P. 5.1; Dkt. 75 at 9.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 4
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

Dkt. 49 ¶¶ 143-51. This claim relies on plaintiffs' expert's opinion that ballot declarations signed with Latino-sounding names are disproportionately determined not to match voter registration signatures. *See* Dkt. 81 at 1; Dkt. 103 at 6; Dkt. 104 at 7. But the Voting Rights Act does not impose a "freewheeling disparate-impact regime." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 1341 (2021). The statute provides:

> **(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any . . . political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of [certain language minority] guarantees . . . . as provided in subsection (b).

> **(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the . . . political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .

52 U.S.C § 10301.

"Plaintiffs must demonstrate that, under the totality of the circumstances, the [challenged practices] result in unequal access to the electoral process." *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986); *see also Brnovich*, 141 S. Ct. at 2338. "That occurs where an individual is disabled from entering into the political process in a reliable and meaningful manner in light of past and present reality, political or otherwise." *Allen v. Milligan*, No. 21-1086, slip. op. at 17 (U.S. June 8, 2023) (quotations and brackets omitted). "[P]roof of causal connection between the challenged voting practice and a prohibited discriminatory result is crucial." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012). This requires determining "whether a challenged voting practice interacts with surrounding racial discrimination in a meaningful way or *whether the practice's disparate impact is better explained by other factors independent of race*." *Farrakhan v. Washington*,

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 5
CASE NO. 4:21-cv-05075-MKD

132996.0004/9402452.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

338 F.3d 1009, 1018 (9th Cir. 2003) (quotations omitted) (emphasis added). Accordingly, long before *Brnovich*, "[s]everal courts of appeal," including the Ninth Circuit, "rejected [Section] 2 challenges based purely on a showing of some relevant statistical disparity." *Smith v. Salt River Project Agricultural Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997) (citing cases).

*Brnovich* and *Gingles* supply "important considerations" in evaluating an electoral system's openness—described as "guideposts" in *Brnovich* and "factors" drawn from a Senate Judiciary Committee report in *Gingles*—but these considerations are not exhaustive, and none is dispositive. *See Brnovich*, 141 S. Ct. at 2338; *Gingles*, 478 U.S. at 45. Rather, "[a]ny circumstance that has a logical bearing on whether voting is equally open and affords equal opportunity may be considered." *Brnovich*, 141 S. Ct. at 2338. Certain *Gingles* factors, however, are less relevant to "regulations that govern how ballots are collected and counted," *Brnovich*, 141 S. Ct. 2330, so in evaluating the practices at issue, it is appropriate to "give greater weight to the *Brnovich* guideposts than the *Gingles* . . . factors." *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2022 WL 4725887, at *86 (N.D. Ga. Sept. 30, 2022). Plaintiffs' claim fails in light of (1) the *Brnovich* guideposts and (2) the *Gingles* factors.

1.    The *Brnovich* Guideposts Do not Show an Unequal Voting System.

There are five *Brnovich* guideposts. Each demonstrate that defendant counties administer Washington's voting system in a manner that is equally open and accessible to Latino and non-Latino voters alike.

"First, the size of the burden imposed by a challenged voting rule is highly relevant." *Brnovich*, 141 S. Ct. at 2338 (emphasis added). "[E]very voting rule imposes a burden of some sort," *id.*, and "quintessential examples of the usual burdens of voting" do not favor plaintiffs, *id.* at 2344. The type of signature verification requirement at issue imposes "only a small burden on the voter." *See*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 6
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1  *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021) (upholding an

2  election-day deadline to cure an unsigned ballot); *see also Crawford*, 553 U.S. at

3  197 (favorably comparing the burden of "requir[ing] voters to sign their names so

4  signatures can be compared with those on file" to the burden to show photo

5  identification); *see also Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 237 (5th

6  Cir. 2020) ("Signature-verification requirements are even less burdensome than

7  photo-ID requirements . . . .").

8          The facts of this case show why. State law requires counties to "verify that the

9  voter's signature on the ballot declaration is the same as the signature of that voter

10  in the registration files." RCW 29A.40.110(3). Defendant counties educate voters

11  about the requirement and the importance of signing a ballot declaration with a

12  signature resembling the voter's registration signature. Def.'s Statement ¶¶ 34-39.

13  They provide this education in the voters' pamphlet, at community events, and when

14  speaking to the media—including Spanish-speaking media. *Id.* County elections

15  officials stand ready to assist voters, including by providing telephone or in-person

16  help in Spanish. *Id.*; *see Brnovich*, 141 S. Ct. at 2344 (citing voter education efforts).

17  If a voter signs with a non-matching signature, defendant counties mail a notice

18  promptly after receiving the ballot declaration to give the voter an opportunity to

19  cure. The counties also attempt to call voters—sometimes repeatedly—to remind

20  them of the need to submit a cure form and the deadline to do so. Def.'s Statement

21  ¶¶ 52, 64, 89. Voters may submit the cure form by multiple means. *Id.* ¶¶ 51, 64, 75.

22  And voters have until the day before the statutory deadline for certifying elections

23  to submit the cure form. *Id.* ¶ 83. The defendant county canvassing boards meet on

24  this last day to give voters with challenged ballots as much time as possible to have

25  their vote count. *Id*.

26          <u>Second</u>, "the degree to which a voting rule departs from what was the standard

27  practice when [Section] 2 was amended in 1982 is a relevant consideration."

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 7
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1  *Brnovich*, 141 S. Ct. at 2338-39 (citing historical statutes in various states). This is

2  because Congress did not likely "intend[] to uproot facially neutral time, place, and

3  manner regulations that have a long pedigree or are in widespread use in the United

4  States." *Id.* at 2239. Washington's signature verification requirement is a long-

5  standing voting rule. Washington has required voter signature verification in some

6  form since 1905. Def.'s Statement ¶¶ 3-15, 17-20. Signature verification for

7  absentee voting and mail-in-voting has been required since 1921. *Id.* ¶¶ 7, 10-15, 17-

8  20. Washington was one of several states requiring signature verification in 1982,

9  when Section 2 was amended. *Id.* ¶15. Today, "[t]hirty-one states rely primarily on

10  signature verification" to assure voter identification. *Ariz. Democratic Party*, 18

11  F.4th at 1185. Unlike nearly half these states, Washington requires counties to

12  contact voters about signature problems, and defendant counties do so, sometimes

13  exceeding state law's minimum voter-contact requirements. *Id.* ¶¶ 79-82.

14      Third, "[t]he size of any disparities in a rule's impact on members of different

15  racial or ethnic groups is . . . an important factor." *Brnovich*, 141 S. Ct. at 2339. But

16  "what are at bottom very small differences should not be artificially magnified." *Id.*

17  Here, plaintiffs found their disparate rejection ratios using "statistical manipulation"

18  to divide numbers that "show only small disparity." *Id.* at 2345. But "[d]ividing one

19  percentage by another produces a number of little relevance to the problem . . . .

20  That's why we do not divide percentages." *Frank v. Walker*, 768 F.3d 744, 752 n.3

21  (7th Cir. 2014). "A policy that appears to work for 98% or more of voters to whom

22  it applies—minority and non-minority alike—is unlikely to render a system

23  unequally open." *Brnovich*, 141 S. Ct. at 2345. No defendant county accepts fewer

24  than 98.75% of ballots from *any* relevant voter demographic. Def.'s Statement

25  ¶¶ 93-94.

26      Fourth, "courts must consider the opportunities provided by a State's entire

27  system of voting." *Brnovich*, 141 S. Ct. at 2321. Washington embraces universal

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 8
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

vote-by-mail. But counties must still "open a voting center" starting 18 days before each election. RCW 29A.40.160(1). Voting centers must provide "voter registration materials, ballots . . . a ballot drop box, and voter's pamphlets, if a voter's pamphlet has been published." RCW 29A.40.160(4). In-person voters may "either sign a ballot declaration or provide identification." RCW 29A.40.160(9). Washington accordingly "offers an[other] easy way[] to vote." *Brnovich*, 141 S. Ct. at 2344.

Fifth, "the strength of the state interests served by a challenged voting rule is . . . an important factor." Preventing fraud is a "strong and entirely legitimate state interest." *Brnovich*, 141 S. Ct. at 2340. Vote-by-mail entails more concern about fraud than does in-person voting. *Brnovich*, 141 S. Ct. at 2347. It "is a real risk that accompanies mail-in voting even if [Washington] had the good fortune to avoid it." *Brnovich*, 141 S. Ct. at 2348. And anti-fraud measures do not just catch fraud for prosecution—they also "deter[] fraud (so that a low frequency stays low)." *Frank*, 768 F.3d at 750.

### 2.    The *Gingles* Factors Do not Show an Unequal Voting System.

"[T]he *Gingles* . . . factors. . . were designed for use in vote-dilution cases. Some . . . are plainly inapplicable in a case involving a challenge to a facially neutral time, place or manner voting rule." *Brnovich*, 141 S. Ct. at 2340. The most important of the seven *Gingles* factors show Washington's voting system is equally open and accessible to all voters.

First, "the extent of any history of official discrimination in the . . . political subdivision that touched the right . . . to . . . participate in the political process" is relevant. *Gingles*, 478 U.S. at 36-37. But "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Defendant Yakima County was under a Voting Rights Act consent decree with the U.S. Department of Justice, but not since 2006. Def.'s Statement ¶ 38. Today, Yakima County devotes more resources to educating

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 9
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1   voters in Spanish than it does in English. *Id.* ¶ 39. It is also true a city in Yakima

2   County has more recently been held to violate the Voting Rights Act. *See Montes v.*

3   *City of Yakima*, 40 F. Supp. 3d 1377, 1415 (E.D. Wash. 2014). But relevant official

4   discrimination must have been by defendants, not other local officials. *See Johnson*

5   *v. Waller County*, 593 F. Supp. 3d 540, 602 (S.D. Tex. 2023). Across all defendant

6   counties, Latinos work in the elections offices and participate in the signature

7   verification process—and in some elections no signature has been rejected without

8   agreement by a Latino elections official. *See id.* at 604 (describing as "meaningful

9   on the margin" that African-American officials did not object to a challenged voting

10   schedule). Plaintiffs present no evidence that historical discrimination has any

11   bearing on defendant counties' equal application of Washington's signature

12   verification requirements.

13       <u>Second</u>, "the extent to which voting in the . . . political subdivision is racially

14   polarized," *Gingles*, 478 U.S. at 37, primarily bears on districting plans and matters

15   less to "neutral time, place, and manner rules," *Brnovich*, 141 S. Ct. at 2340.

16   Plaintiffs' expert will opine that there is racially polarized voting in each defendant

17   county. Dkt. 79-1 at 16. But this has little relevance to the signature verification issue

18   here. *Brnovich*, 141 S. Ct. at 2340.

19       <u>Third</u>, "the extent to which the . . . political subdivision has used unusually

20   large election districts, majority vote requirements . . . or other voting practices or

21   procedures that may enhance the opportunity for discrimination against the minority

22   group" matters to a vote dilution case. *Gingles*, 478 U.S. at 37. But this factor does

23   not apply to this non-vote-dilution case. *Brnovich*, 141 S. Ct. at 2340; *Johnson*, 593

24   F. Supp. 3d at 605-06; *Fair Fight Action, Inc.*, 2022 WL 4725887, at \*92.

25       <u>Fourth</u>, "whether members of the minority group have been denied access" to

26   "a candidate slating process" bears on vote dilution cases. *Gingles*, 478 U.S. at 37.

27   This factor likewise is inapplicable to cases such as this one. *Brnovich*, 141 S. Ct. at

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 10
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1    2340; *Johnson*, 593 F. Supp. 3d at 606.

2        <u>Fifth</u>, "the extent to which members of the minority group in the . . . political

3    subdivision bear the effects of discrimination in such areas as education,

4    employment[,] and health, which hinder their ability to participate effectively in the

5    political process" is relevant. *Gingles*, 478 U.S. at 37. Plaintiffs' expert testified that

6    Latinos "exhibit considerable socioeconomic disparities." Def.'s Statement ¶ 113.

7    But he had no opinion about what caused these disparities. *Id.* ¶ 114. His opening

8    report made no statement about how these disparities relate to participation in the

9    political process except to say that Latinos are less likely to experience a physical

10   disability preventing them from correctly signing a ballot. Dkt. 79-1. Plaintiffs

11   offered only in a rebuttal report an opinion on a matter they bear the burden to

12   prove—that disparities are related to lower rates of civic participation. Dkt. 100-1

13   ¶ 22. Even if this opinion survives the pending motion to exclude, Dkt. 99, it rests

14   only on a citation to *Gingles* and not on information specific to the defendant

15   counties. Def.'s Statement ¶ 114. Statistics on socioeconomic disparities "aren't

16   important in and of themselves. They are important to the extent it's shown that

17   discriminatory effects in education, employment, health, and the like have *hindered*

18   a minority's ability to participate in the political process." *Johnson*, 593 F. Supp. 3d

19   at 607. There is no evidence that socioeconomic disparities hinder Latinos'

20   participation in the political process, and plaintiffs have the burden to show

21   otherwise.

22       <u>Sixth</u>, "whether political campaigns have been characterized by overt or subtle

23   racial appeals" matters to districting cases, *Gingles*, 478 U.S. at 37, but is less

24   relevant to cases such as this one. *Brnovich*, 141 S. Ct. at 2340. A plaintiffs' expert

25   subject to a motion to exclude testimony, Dkt. 97, would opine that such appeals

26   exist, Dkt. 79-1 at 34-43. But even if this expert's testimony is admitted, it fails to

27   show the sort of cognizable racial appeals courts look for. *See Fair Fight Action*,

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 11
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

*Inc.*, 2022 WL 4725887, at *92-93 (describing a "'deportation bus" tour stating that undocumented aliens are "[m]urders, rapist, [and] kidnappers" and advertised endorsement by the Proud Boys). In any event, campaign appeals have an obvious relevance to districting and racial bloc voting that is lacking with respect to signature consistency.

Seventh, "the extent to which members of the minority group have been elected to public office in the jurisdiction" matters to districting cases, *Gingles*, 478 U.S. at 37, but is, again, less relevant to cases such as this one. *Brnovich*, 141 S. Ct. at 2340. Plaintiffs present no expert opinion on this. Dkt. 79-1 at 5.

*    *    *    *

The above considerations are "neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45. Statistics aggregate individual stories behind non-matching ballot declaration signatures. Considering these stories and analyzing the statistics shows defendant counties' signature matching practices do not "interact[] with social and historical conditions to cause an inequality." *Id.* at 45.

First, the counties make signature determinations even-handedly. Each county uses a multi-tier review process, subjecting only suspected mismatching signatures to additional review and immediately passing signatures deemed matching. Def.'s Statement ¶ 45. No ballot is ever rejected without having first been determined to be a mismatch by a staff person trained—often repeatedly—in signature verification. *Id.* ¶ 26. Almost every canvassing board member has also been trained. *Id.* ¶ 32. In every county, Latino staff are part of the review process—and may accept a ballot declaration signature with no further review. *Id.* ¶ 54-55, 65, 74. In staff review and at the canvassing board, defendant counties apply WAC 434-379-020's detailed signature verification standard, which reflects scientific principles. *Id.* ¶¶ 49, 50, 57, 61, 66, 72. County staff and canvassing board members look mostly at the signatures as images and pay little attention to voter name. *Id.* ¶ 54-55, 74. Race—and names

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 12
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1      as proxies for race—are not part of the defendant counties' review process.

2          Defendant counties evaluate signatures promptly after receiving ballots. *Id.*
3 ¶¶ 49, 52, 59, 80-82. They send cure letters promptly too. *Id.* Benton County and
4 Yakima County write to voters in English and Spanish. *Id.* ¶¶ 51, 75. Each county
5 attempts at least one telephone call to voters needing a reminder to cure, and in
6 Yakima County bilingual staff place the calls. *Id.* ¶¶ 52, 64, 81. Cure letters and
7 notices provide clear direction to voters. *Id.* ¶¶ 51, 64, 75. Bilingual staff are ready
8 to assist voters who call or visit the elections offices. *Id.* ¶¶ 36, 38, 54.

9          Defendant counties have applied these processes to flag ballots for
10 mismatched signature of a named *defendant* and another official. Yakima County
11 Commissioner Ron Anderson's signature was determined at least once to be a
12 mismatch. *Id.* ¶ 86. By his own account, his signature was inconsistent. *Id*. He
13 updated his signature so his ballot would count. *Id*. So too Benton County
14 Commissioner Jerome Delvin's ballot declaration signature. *Id.* ¶ 87. Years signing
15 papers as a legislator had changed his signature. *Id*. He took five minutes to fill out
16 a cure form and return it, and his signature was updated. *Id*.

17          Plaintiffs' stories are similar in many respects, except that they did not take
18 steps to cure their ballots. The year Daniel Reynoso's signature was determined to
19 be a mismatch he had also been the victim of a forgery. *Id.* ¶ 88. His voter
20 registration signature was "just like a scribble," but his ballot declaration signature
21 was more "careful." *Id*. Mr. Reynoso had not updated his address so was receiving
22 elections mail at his parents' house. *Id*. His parents told him about the cure notice
23 after "it was too late to . . . submit it." *Id*. Jesse Reyes likewise received his elections
24 mail at his parents' house. *Id.* ¶ 89. His ballot declaration signature did not compare
25 to his voter registration signature. *Id*. The two signatures are part of the record, as
26 are the signatures of members of his household. *Id*. Mr. Reyes's recollection for why
27 he did not cure—that he lacked the time to go in-person to the elections office—

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 13
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

conflicts with the cure form's express instruction that it could also be submitted by email, mail, or FAX. *Id*.

Second, "differences in employment, wealth, and education may make it virtually impossible . . . to devise rules that do not have some disparate impact." *Brnovich*, 141 S. Ct. at 2343. This makes relevant regression analysis to plaintiffs' claim , focusing "on the variable of interest, here race, but also include[ing] theoretically reasonable and cogent explanations . . . that might compete with race." *Smith*, 109 F.3d at 590. Here, the evidence shows that race fails to predict ballot rejection for signature mismatch. Plaintiffs' statistical expert, Matt Barreto, designed his analysis so that race would be the sole determinant of ballot rejection. Def's Statement ¶ 101. In comparison, defendants' expert, Aleksandr Aravkin, used a statistical method that allows *the data* to determine the degree of relevance—if any—of various voter characteristics. *Id.* ¶¶ 116, 118. Dr. Aravkin ran his analysis across seven elections in each of the three defendant counties to study 21 separate elections. *Id.* ¶ 117. The results were strikingly consistent in nearly every election and across every county—voter age and experience matter, while voter race, gender, and economic status do not. *Id.* ¶¶ 119-20. After controlling for other variables, new voters were 10 times more likely to be flagged for signature mismatch than experienced voters. *Id*. Similarly, a 20-year-old's signature was 2.8 times more likely to be determined non-matching than was a 40-year-old's and 7.8 times more likely than was a 60-year-old's. *Id.* Relatedly, the Washington State Auditor's statewide ballot signature analysis concluded that after controlling for other variables, increased rejection of Latino-name ballots for signature mismatch was nearly indistinguishable from increased rejection for missing signature, a determination made with virtually no county discretion. *Id.* ¶¶ 105-08.

"[E]qual openness remains the touchstone" of Section 2. *Brnovich*, 141 S. Ct. at 2338. Over 98.75% of voters—Latino and non-Latino alike—submit matching

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 14
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1    signatures. Those who do not are disproportionately young and inexperienced,

2    something all voters were once. Plaintiffs' results-based Voting Rights Act claim

3    fails as a matter of law in light of the totality of the circumstances.

4    B.    Plaintiffs' Intentional Discrimination, Equal Protection, and Fifteenth
      Amendment Claims Fail.

5
          Intentional discrimination claims rarely succeed where a results-based claim

6    fails. *See, e.g.*, *Valladolid*, 976 F.2d at 1298. Each of plaintiffs' Fifteenth

7    Amendment, Equal Protection Clause, and intentional-discrimination Section 2

8    claims requires discriminatory intent. *Chisom v. Roemer*, 501 U.S. 380, 394 n.21

9    (1991) (Voting Rights Act); *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980),

10   *abrogated on other grounds as stated in Gingles*, 478 U.S. at 43 (Fifteenth

11   Amendment); *Washington v. Davis*, 426 U.S. 229, 239 (1976) (Fourteenth

12   Amendment). Intent must be a motivating or causal factor in the challenged action.

13   *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977);

14   *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994). Discriminatory

15   intent may be proved or rebutted by direct evidence or inference "from the totality

16   of relevant facts." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982); *see also Abbott*, 138

17   S. Ct. at 2328 ("[T]he direct evidence suggest[s] that the 2013 legislature lacked

18   discriminatory intent.").

19
          No direct evidence of discrimination exists here. To the contrary, defendant

20   counties almost always consider a signature as an image and rarely consider the

21   name of a voter in deciphering a signature. Def.'s Statement ¶¶ 54, 64. That leaves

22   plaintiffs to rely on circumstantial evidence. *Arlington Heights* provides the

23   framework for assessing circumstantial evidence of discriminatory intent. *See* Dkt.

24   103 at 7. The *Arlington Heights* factors and other circumstances show no

25   discriminatory intent.

26
          First, there is no "clear pattern" showing discriminatory intent. *Arlington*

27   *Heights*, 429 U.S. at 266. *Brnovich* forecloses the existence of a pattern when

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 15
CASE NO. 4:21-cv-05075-MKD

132996.0004/9402452.5

statistics show more than 98% of all county voters succeed in submitting matching signatures. *Brnovich*, 141 S. Ct. at 2345. Even before *Brnovich*, a "stark" pattern was required to infer intent. *See Arlington Heights*, 429 U.S. at 266; *see also Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (city limits changed to remove all but 4 or 5 of 400 African-Americans and 0 white residents); *Yick Wo v. Hopkins*, 6 S. Ct. 1064, 1066 (1886) (200 Chinese applications denied and only 1 non-Chinese application denied). No "stark" pattern exists here. Plaintiffs' statistical analysis shows voters with Latino-sounding names constitute only 20% of those whose ballots defendant counties rejected for signature mismatch; voters with non-Latino-sounding names comprise the lion's share. Dkt. 79-1 at 8 (Table 1).

Second, no relevant historical background "reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. Verifying signatures has been part of Washington's election law since the turn of the last century and has remained so through all elections law amendments. Def.'s Statement ¶¶ 3-19. Similarly, there is no relevant history to defendant counties' implementation of the signature verification requirement that shows invidious intent. When defendant counties changed signature verification processes it was to improve them so ballots had every possible opportunity to count. *See, e.g.*, *id.* ¶ 78.

Third, the "sequence of events leading up to the challenged decision" indicates that defendant counties' "purposes" are *non*discriminatory. *Arlington Heights*, 429 U.S. at 267. There is no evidence any defendant county departed from multi-tier signature review, tilted in favor of ballot acceptance. Every ballot flagged for signature mismatch is reviewed by multiple individuals trained in signature verification and WAC 434-379-020's standard. After signatures are flagged for mismatch, cure letters are sent promptly—both individual plaintiffs acknowledge receiving them. *Id.* ¶¶ 88-89. And defendant county canvassing boards meet and decide non-cured ballots on the last possible day. *Id.* ¶ 83.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 16
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1      <u>Fourth</u>, no evidence exists that defendant counties depart from their normal

2  procedures or that they ignore or incorrectly apply the signature verification standard

3  when reviewing ballot signatures. *See Arlington Heights*, 429 U.S. at 267 (discussing

4  possible relevance of officials departing from normal procedural or substantive

5  decisions as a sign of intent). Plaintiffs have not identified any wrong signature

6  determinations. *See* Dkt. 103 (opposing motion to compel). That leaves only the

7  allegations from individual plaintiffs, whose nonmatching signatures are in the

8  record. Def.'s Statement ¶¶ 88-89. Plaintiffs failed to meet part of their burden to

9  show wrong results. *See Arlington Heights*, 429 U.S. at 267. By contrast, defendant

10  counties' expert evidence shows their signature determinations were appropriate.

11  Def.'s Statement ¶ 121-24. Even if proof of discriminatory intent existed—and there

12  is not—"the same decision would have resulted" for virtually every rejected

13  signature across several elections. *Arlington Heights*, 429 U.S. at 271 n.21; Def.'s

14  Statement ¶¶ 121-23. Accordingly, plaintiffs cannot "fairly attribute the injury" of

15  ballot rejection "to improper consideration of a discriminatory purpose." *Arlington

16  Heights*, 429 U.S. at 271 n.21.

17      <u>Fifth</u>, the "administrative history" of the defendant counties' signature

18  verification process shows no "contemporary statements by members of the

19  decision-making body" indicating discriminatory purpose. *Arlington Heights*, 429

20  U.S. at 268. Plaintiffs have no evidence otherwise.

21                       \*    \*    \*    \*

22      As with plaintiffs' results-based claim, these factors are not "exhaustive" of

23  the necessary "sensitive inquiry into . . . circumstantial and direct evidence of

24  intent." *Arlington Heights*, 429 U.S. at 266, 268. Here, however, no evidence—

25  direct or circumstantial—exists to show the defendant counties intentionally

26  discriminate when following state law to verify ballot declaration signatures.

27  Plaintiffs' intentional discrimination claims fail too.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 17
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

C.    <u>Plaintiffs' Fundamental Rights and Procedural Due Process Claims Fail.</u>

Plaintiffs claim the counties' signature matching violates Latino voters' fundamental First Amendment and Fourteenth Amendment rights. *See* Dkt. 49 ¶¶ 163-69. They also claim they were denied procedural due process. *Id.* ¶¶ 200-14. The Supreme Court has addressed due process, First Amendment, and equal protection claims "collectively using a single analytic framework." *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011). *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), supply that framework, which is "better suited to the context of election law than is the more general" due process test supplied by *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Ariz. Dem. Party*, 18 F.4th at 1195 (quotations omitted).[2]

*Anderson-Burdick*'s framework requires considering "the character and magnitude of the asserted injury" to voting rights against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary burden . . . rights." *Burdick*, 504 U.S. at 434 (quotations omitted). The standard is "flexible," *id.*, because laws are necessary to ensure that "some sort of order, rather than chaos . . . accompan[ies] the democratic processes." *Anderson*, 460 U.S. at 788 (quotations omitted). "[E]very election law and regulation necessarily has *some* impact on the right to vote." *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).

<u>First</u>, as explained in connection with the first *Brnovich* guidepost, requiring a matching signature only lightly burdens a voter. If traveling to the correct polling place is part of the "usual burdens of voting," *Brnovich*, 141 S. Ct. 2344, so too is

---

[2] Plaintiffs may not end-run *Anderson-Burdick* "merely by raising the same challenge under the banner of procedural due process." *Ariz. Democratic Party*, 18 F.4th at 1195.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

1    signing a ballot declaration properly. The requirement to do so "imposes only a small

2    burden on the voter." *Ariz. Democratic Party*, 18 F.4th at 1188; *see also Crawford*,

3    553 U.S. at 197. This has been held to be so even when a voter lacks opportunity to

4    cure a rejected signature, such as in the case of signature verification for initiative

5    petitions. *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (holding review

6    of petition signatures implicates the "fundamental right to vote" but holding the

7    practice constitutional). The fact that nearly 99% of voters supply matching

8    signatures establishes the minimal burden of the requirement. Def.'s Statement ¶ 90;

9    *see also Brnovich*, 141 S. Ct. at 2345 (upholding a procedure that worked for 98%

10   of voters); *Lemons*, 538 F.3d at 1103, 1107 (upholding a procedure that led a county

11   to reject 3 of 21 signatures).

12          The burden cannot be made more severe by assessing it from the perspective

13   of a voter who signs with a nonmatching signature and fails to cure. "If the burden

14   . . . were measured by the consequence of noncompliance, then every voting

15   prerequisite would impose the same burden and therefore would be subject to the

16   same degree of scrutiny . . . . But this cannot be . . . ." *Ariz. Democratic Party*, 18

17   F.4th at 1188 (quotations omitted). Plaintiffs' allegation that signature rejection

18   chills speech, Dkt. 49 ¶ 168, does not change that *Anderson-Burdick* does not focus

19   on the consequences of failing to comply with a voting procedure. In any event, there

20   is no evidence that signature verification chills speech. The individual plaintiffs both

21   voted in elections *after* their ballots were rejected. Def.'s Statement ¶ 88-89. And

22   plaintiffs' experts did not opine on any matters specific to voter turnout. *Id.* ¶ 113.

23          Second, signature matching ensures voters vote their own ballots. As

24   explained above, preventing fraud is a "strong and entirely legitimate state interest."

25   *Brnovich*, 141 S. Ct. at 2340. This is so even if it is rarely prosecuted. *See id.* at 2348.

26          Third, the defendant counties act reasonably in deploying signature

27   verification to establish an orderly voting system. *See Burdick*, 504 U.S. at 438

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 19
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

1    ("[W]e have repeatedly upheld reasonable, politically neutral regulations . . . .").

2    This would be so even if the counties used a bare-bones standard stating only that

3    signatures must be "genuine." *See Lemons*, 538 F.3d at 1106. But they do more—

4    they deploy meaningful training to apply a detailed and scientific statewide standard.

5    Def.'s Statement ¶ 25. And they follow state law to permit voters to cure their

6    signatures. *Id.* ¶¶ 80-85.

7         The counties' century-old and well-worn practice of verifying ballot

8    declaration signatures is exactly the sort of elections procedure that courts leave

9    undisturbed. *See Ariz. Dem. Party*, 18 F.4th at 1195 (noting the deadline at issue had

10   been in effect for "many decades"). It is "reasonable and neutral," and therefore "free

11   from judicial second-guessing." *Weber*, 347 F.3d at 1107 (footnote omitted).

12   Plaintiffs' fundamental rights First and Fourteenth Amendment claim and

13   procedural due process claim fail.

## IV    CONCLUSION

15        Unlike in many states—and unlike in any state in 1982—a Washington voter

16   today may vote by mail as a matter of course. The price of doing this, rather than

17   visiting a county voting center to show identification in exchange for a ballot, is a

18   little security. The voter must sign a ballot declaration with a signature matching *any*

19   signature in the voter registration file. Defendant counties work conscientiously and

20   fairly to ensure every valid ballot counts, and they do not reject a ballot until its

21   signature has been through a multi-tier review, applying a scientific statewide

22   standard, and the voter has failed to cure after receiving a letter and an attempted

23   phone call. The system works for more than 98.75% of voters—Latino and non-

24   Latino alike. A trial to show these undisputed facts is unnecessary. This case should

25   be dismissed on summary judgment.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

1    DATED: June 9, 2023

2                                    LANE POWELL PC

3

4

5                             By:  *s/ Callie A. Castillo*
                                   Callie A. Castillo, WSBA No. 38214
6

7

8                             By:  *s/ Devon J. McCurdy*
9                                  Devon J. McCurdy, WSBA No. 52663
                                   Erika O'Sullivan, WSBA No. 57556
10                                  1420 Fifth Avenue, Suite 4200
                                   P.O. Box 91302
11                                  Seattle, Washington 98111-9402
                                   Telephone: 206.223.7000
12                                  castilloc@lanepowell.com
                                   mccurdyd@lanepowell.com
13                                  osullivane@lanepowell.com
14                             Attorneys for Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 21
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9402452.5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 9, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will automatically generate a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: None.

Executed this 9th day of June, 2023, at Seattle, Washington.


By *s/Kathryn Savaria*
Kathryn Savaria, Legal Assistant
Lane Powell PC
Address: 1420 Fifth Ave #4200
P.O. Box 91302
Seattle, WA 98111
Telephone: 206-223-7000
savariak@lanepowell.com

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 1
CASE NO. 4:21-cv-05075-MKD

132996.0004/9402452.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107