1
2
3
4
5
6
7

Callie A. Castillo, WSBA No. 38214
Devon J. McCurdy, WSBA No. 52663
Erika O'Sullivan, WSBA No. 57556
LANE POWELL PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, Washington 98111-9402
Telephone:  206.223.7000
Facsimile:  206.223.7107
castilloc@lanepowell.com
mccurdyd@lanepowell.com
osullivane@lanepowell.com
Attorneys for Defendants

THE HONORABLE MARY K. DIMKE

8

9      UNITED STATES DISTRICT COURT
10     EASTERN DISTRICT OF WASHINGTON

11
12

MARISSA REYES, LEAGUE OF
UNITED LATIN AMERICAN CITIZENS,
LATINO COMMUNITY FUND,

                              Plaintiffs,

13

        v.

14

15  BRENDA CHILTON, in her official
    capacity as Benton County Auditor and
16  Canvassing Review Board member, ANDY
    MILLER, in his official capacity as Benton
17  County Canvassing Review Board member,
    XAN AUGEROT, in his official capacity as
18  Benton County Canvassing Review Board
    member, CHARLES ROSS, in his official
19  capacity as Yakima County Auditor and
    Canvassing Review Board Member,
20  JOSEPH BRUSIC, in his official capacity
    as Yakima County Canvassing Review
21  Board member, RON ANDERSON in his
    official capacity as Yakima County
22  Canvassing Review Board member, SKIP
    MOORE, in his official capacity as Chelan
23  County Auditor and Canvassing Review
    Board member, DOUGLAS SHAE, in his
24  official capacity as Chelan County
    Canvassing Review Board member, BOB
25  BUGERT in his official capacity as Chelan
    County Canvassing Review Board member,

26                            Defendants.

No.  4:21-cv-05075-MKD

**DEFENDANTS'
STATEMENT OF
MATERIAL FACTS NOT IN
DISPUTE**

27

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 1
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

1.     Washington voters are "automatically . . . issued a mail ballot" for each election. RCW 29A.40.010. To ensure a voted ballot counts, a voter must deliver or mail it to the county elections office by election day, RCW 29A.40.110(3), and also sign a declaration attesting to the voter's qualification to vote, RCW 29A.40.091(2). "[T]he voter's signature on the ballot declaration" must be "the same as the signature of that voter in the registration files of the county." RCW 29A.40.110(3). This case concerns this final requirement—that the signature on a ballot declaration match the signature in the voter registration file.

2.     This statement of undisputed material facts explains: (A) the history of verifying voter signatures in Washington and other states, (B) Washington's current laws governing signature verification and the process for voters to cure signatures, (C) the standards defendant counties use in verifying signatures, (D) defendant counties' efforts to educate voters about signature verification, (E) training that signature reviewers receive, (F) the multi-tier process that defendant counties use before determining that an uncured ballot declaration signature should prevent a ballot from being counted, (G) the process for curing a signature determined not to match the voter registration file, (H) information about voters whose signatures the counties determined did not match, (I) competing explanations for reasons some voters see ballots rejected for signature mismatch, (J) community reaction to perceived issues with signature rejection rates, and (K) the relief plaintiffs seek.

A.     **History of Verifying Signatures**

3.     As early as 1905, Washington voters were required to sign poll books "opposite to the original signature of the voter offering to vote, which original signature shall be so concealed as not to be seen by the voter offering to vote." Castillo Decl. Ex. A (1905 Wash. Sess. Laws) 65.

4.     The requirement to sign the poll book remained part of Washington law until Washington adopted universal vote by mail. *See* Castillo Decl. Ex. B (Wash.

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 2
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

1    Rev. Code. (2010)) § 29A.44.210. Signatures were used to verify the provisional
2    ballots of voters required to cast one because they could not provide photo
3    identification at the polling place. *Id.* § 29A.44.205; *id.* § 29A.60.165(2).

4        5.    Signature verification was also historically part of Washington absentee
5    voting and remains part of Washington's vote-by-mail system today.

6        6.    Absentee voting entered state law in 1915. Castillo Decl. Ex. C (1915
7    Wash. Sess. Laws) 691. A voter first had to obtain a "certificate from the registration
8    officer of the home precinct" and sign it in that person's presence. *Id.* 691-92. This
9    enabled the voter to go to some other polling place, present the certificate, and sign
10   an oath explaining his or her inability to reach home on election day. *Id.* The faraway
11   polling place then issued a ballot that eventually made its way to the voter's home
12   canvassing board, which retained "the power and authority . . . to determine . . . the
13   legality of such ballot." *Id.* at 693-94.

14       7.    In 1921, the legislature amended the absentee voter statute to require
15   county auditors to "compare the signature" on the absentee voter affidavit "with the
16   signature upon the certificate" the voter signed in front of the home precinct's
17   registration officer so that the county auditor could determine "that the signatures
18   are made by the same person" and that the absentee voter was who he or she claimed
19   to be. Castillo Decl. Ex. D (1921 Wash. Sess. Laws) 529-31.

20       8.    In 1923, a voter could appear before a wider array of public officials to
21   vote absentee—but voters still had to submit a signature for comparison. Castillo
22   Decl. Ex. E (1923 Wash Sess. Laws) 187.

23       9.    Subsequent amendments in 1933, 1943, and 1950, preserved the
24   signature matching requirement. Castillo Decl. Ex. F (1933 Wash. Sess. Laws) 99-
25   103; *id.* Ex. G (1943 Wash. Sess. Laws) 150; *Id.* Ex. H (1950 Wash. Sess. Laws) 14.

26       10.   By 1955, the legislature permitted voters to apply to vote absentee by
27   mail. Castillo Decl. Ex. I (Wash. Sess. Laws) 716-17. And the ballot could be

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 3
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

returned by mail. *Id.* at 718. Before issuing the certificate, the registrar had to "identify the applicant by his signature." *Id.* at 716. A signed voter declaration on a ballot return envelope was retained with the signed certificate "in case any question should arise as to the validity of the vote." *Id.* at 719.

11.    In 1963, the legislature amended the statute to make clear that the canvassing board had to "verify the voter's signature" on the ballot envelope declaration "is the same as that on the original application" to vote by mail. Castillo Decl. Ex. J (1963 Wash. Sess. Laws) 1458.

12.    An amendment in 1965 permitted a voter who went through the absentee application process to achieve permanent absentee status. Castillo Decl. Ex. K (1965 Wash. Sess. Laws) 841. The amendment preserved the signature matching requirement. *Id.*  843.

13.    In 1967, the legislature permitted county auditors to require mail voting in precincts with fewer than 100 registered voters. Castillo Decl. Ex. L (1967 Wash. Sess. Laws) 1897-98. The signature matching requirement for mailed ballots stayed the same. *Id.*

14.    In 1977, the legislature permitted registrants too late to vote at a polling place to vote absentee instead. Castillo Decl. Ex. M (1977 Wash. Sess. Laws) 1630-31. The signature verification requirement remained. *Id.* at 1655.

15.    The absentee voter statute was not amended again until 1983. *See* Castillo Decl. Ex. N (1983 Wash. Sess. Laws) 2055. Accordingly, when the Voting Rights Act was amended in 1982, Washington law reflected a steady expansion of absentee voting to include permanent vote-by-mail at the option of some voters and as a requirement for others. Signature matching was required for ballots to be accepted.

16.    By 1982, signature verification was a common feature of absentee voting statutes around the country. In Pennsylvania, the chief clerk of the county

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 4
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

board of elections was required to verify the signature of a voter applying to vote absentee by comparing it to the signature in the "permanent registration records." *See* Castillo Decl. Ex. O (Pa. Stat. Ann., Tit. 25 (Purdon 1963)) § 3149.4. This signature was then compared to the signature of the elector on the ballot cast. *Id.* § 3149.7. In Florida, voters—and two witnesses—were required to sign the outside of an absentee ballot return envelope. Castillo Decl. Ex. P (Fla. Stat. Ann. (1981)) § 101.64(2). The county canvassing board was then required to compare the ballot envelope "with the registration book to . . . determine the legality of the absent elector's ballot." *Id.* § 101.68(1). In Illinois, election judges were required to "compare the signature upon the application [to vote absentee] with the signature upon the certification on the ballot envelope." Castillo Decl. Ex. Q (Ill. Rev. Stat. (West 1977)) ch. 46 § 19-9. If the "signatures d[id] not correspond," the election judge was to reject the ballot. *Id.*

17.     In 1983, Washington amended its vote-by-mail law to use modern language to explain the requirement that "[a] mail ballot shall be counted only if . . . the return envelope is signed by the registered voter to whom the ballot is issued, and if the signature is verified . . . . with the signature on the voter's registration record." 1983 Wash. Sess. Laws 2057.

18.     Washington expanded vote-by-mail in the 2000s. In 2005, the legislature permitted counties to "conduct all primary, special, and general elections entirely by mail." Castillo Decl. Ex. R (2005 Wash. Sess. Laws) 787. Elections personnel had to "verify that the voter's signature on the return envelope is the same as the signature of that voter in the registration files of the county." Castillo Decl. Ex. S (Wash. Rev. Code. (2006)) § 29A.40.110(3). The same signature requirement applied to provisional ballots, *id.* § 29A.60.165(2), submitted by voters who could not show photo identification when they sought to vote in-person, *id.* § 29A.44.205.

19.     In 2011, Washington adopted universal vote-by-mail, Castillo Decl. Ex.

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 5
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

1  T (2011 Wash. Sess. Laws) 402, and the statutes requiring verification of signatures
2  on ballot declarations took their current form. *See id.* at 406, 413.

3  B.    **Washington's Current Law**

4        20.    Today, Washington requires elections personnel and the canvassing
5  board to "verify that the voter's signature on the ballot declaration is the same as the
6  signature of that voter in the registration files of the county." RCW 29A.40.110(3);
7  *see also* RCW 29A.60.165(2)(C).

8  C.    **Standards**

9        21.    The Washington Secretary of State is the chief election officer for all
10  federal, state, county, city, town, and district elections in Washington. RCW
11  29A.04.230. The legislature mandated that the Secretary of State adopt "standards
12  for the verification of signatures on ballot declarations" via rulemaking. RCW
13  29A.04.611(54).

14        22.    The Secretary of State initially adopted an administrative code
15  provision in 2005 that provided in relevant part that a "ballot shall be counted only
16  if . . .(3) the signature has been verified pursuant to WAC 434-379-020." Castillo
17  Decl. Ex. U (06-02 Wash. Reg. 028 (December 28, 2005) (promulgated at WAC
18  434-250-120)). The current version of WAC 434-250-120 now states: "A ballot shall
19  be counted if . . . the signature has been verified by the county of current registration
20  pursuant to WAC 434-379-020." WAC 434-250-120(1)(c).

21        23.    The Secretary of State adopted an administrative code provision in
22  2005 setting a rudimentary signature verification standard that applies to both ballot
23  declarations and petition sheets for initiatives or referendum. Castillo Decl. Ex. V
24  (05-12 Wash. Reg. 116 (May 31, 2005) (promulgated at WAC 434-379-020)). The
25  rule was amended a few months later to provide more detail. Castillo Decl. Ex. U.

26        24.    Today, WAC 434-379-020, provides:

27        A signature on a petition sheet must be matched to the
         signature on file in the voter registration records. The

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 6
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

following characteristics must be utilized to evaluate signatures to determine whether they are by the same writer:

(1) The signature is handwritten.

(2) Agreement in style and general appearance, including basic construction, skill, alignment, fluency, and a general uniformity and consistency between signatures;

(3) Agreement in the proportions of individual letters, height to width, and heights of the upper to lower case letters;

(4) Irregular spacing, slants, or sizes of letters that are duplicated in both signatures;

(5) After considering the general traits, agreement of the most distinctive, unusual traits of the signatures.

A single distinctive trait is insufficient to conclude that the signatures are by the same writer. There must be a combination or cluster of shared characteristics. Likewise, there must be a cluster of differences to conclude that the signatures are by different writers.

25.    WAC 434-379-020 sets forth elements of the scientific method a forensic document examiner uses to ascertain whether two signatures are pictorially the same or different. *See* Dkt. 102-2 (Mohammed Tr.) 71:16-72:2; *see also id.* at 59:5-17, 70:1-7, 70:7-11, 70:20-25, 71:2-4, 71:6-9, 71:11-14, 71:16-72:2.

D.    **Training**

26.    "All personnel assigned to verify signatures must receive training on statewide standards for signature verification." RCW 29A.40.110(3). In each defendant county, staff who verify signatures are trained to do so, often repeatedly. Castillo Decl. Ex. X (Benton 30B6 Tr.) 17:22-18:21; *Id.* Ex. Y (Yakima 30B6 Tr.) 62:3-22, 88:19-22, 94:14-18; *Id.* Ex. Z (Chelan 30B6 Tr.) 121:18-123:8, 123:19-25.

27.    For more than a decade, the Washington State Patrol provided signature training to the counties. Benton 30B6 Tr. 19:23-20:4; Chelan 30B6 Tr. 124:1-10; *see* Bishop Decl. ¶¶ 3-4. Now the Secretary of State provides the training. Bishop Decl. ¶ 4. This training—whether through the Washington State Patrol or the Secretary of

DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE - 7
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

State—has been largely provided by Brett Bishop, a forensic document examiner. *Id.* ¶¶ 1, 3-4.

28.    Mr. Bishop's curriculum orients elections workers to the basics of signature examination. *Id.* ¶¶ 3, 5. It includes a form blindness test that students take at both the beginning and end of the training. *Id.* ¶ 5. It also includes the WAC provision that supplies signature verification standards. *Id*; *see also* Castillo Decl. Ex. AA (Overbay Tr.) 39:23-40:6; Chilton Decl. Ex. A; Fisher Decl. ¶ 15.

29.    Many of the students in Mr. Bishop's trainings are engaged and ask questions. Yakima 30B6 Tr. 91:5-12; Bishop Decl. ¶ 6. Some take the training multiple times. Bishop Decl. ¶ 6; Chilton Decl. ¶¶ 11-13; Fisher Decl. ¶ 11 & Ex. B; Rojas Decl. ¶ 5; Torres Decl. ¶ 2; Jimenez ¶ 9.

30.    Mr. Bishop instructs students in using a modified version of the "ACE" method that document examiners use to analyze, compare, and evaluate signatures, Bishop Decl. ¶ 5, with a focus on the signature analysis and comparison parts of the method, Yakima 30B6 Tr. 187:23-188:13; Chilton Decl. ¶ 9 & Ex. A. The training lasts about two hours. Bishop Decl. ¶ 7.

31.    Students learn to consider clusters of characteristics. Chilton Decl. ¶ 10. They learn that the same person may have a "fast" signature and a "slow" signature. *Id.* They learn that signatures change over time as a person ages. *Id.* They also learn to assess height and width of letters, the slant of the writing, and the handwriting style. Fisher Decl. ¶ 13; Moore Decl. ¶ 10.

32.    State law does not require elected canvassing board members to receive elections administration training. RCW 29A.60.140(1). But the officials generally take the elections-specific signature training. Benton 30B6 Tr. 56:16-20; Yakima 30B6 Tr. 189:18-191:2; Overbay Tr. 28:23-29:1; Delvin Decl. ¶ 6; 53:17-22; Chilton Decl. ¶ 42; Moore Decl. ¶ 41.

33.    Occasionally, an elected official has relied on signature training

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 8
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

received in another manner. For example, former Benton County Commissioner Shon Small was a detective, who received 24 hours of signature verification training around the year 2000 and then worked check-fraud cases before becoming a county commissioner. Castillo Decl. Ex. BB (Small Tr.) 60:13-61:22.

E.     **Voter Education**

34.     Each County educates voters about the need to sign ballot declarations with a signature matching a signature in the voter registration file.

35.     Benton County educates voters about its signature matching practices in the local voter's pamphlet and in media interviews. Benton 30B6 Tr. 102:16-103:14; Chilton Decl. ¶ 16. It also sends staff to local schools to discuss signature verification. Benton 30B6 Tr. 119:17-24; Chilton Decl. ¶ 16. Benton County encourages observers at canvassing board meetings and also projects its staff's signature verification work on large monitors visible from a viewing area. Benton 30B6 Tr. 90:5-91:7.

36.     Chelan County also uses the local voters' pamphlet to educate voters on using a signature matching the one used in registering to vote. Chelan Tr. 111:21-112:5. Chelan County employs bilingual staff able to assist Spanish-speaking voters with questions about voting or translation of voting materials. Moore Decl. ¶ 17. Chelan County Auditor Skip Moore personally attends naturalization ceremonies to register voters to vote. *Id.* ¶ 19. He works with Latino-oriented organizations such as Community for the Advancement of Family Education (CAFÉ) to do so. *Id.*

37.     Yakima County writes article for *El Sol*, a local Spanish-language newspaper and gives interviews to the local Spanish-language radio station, KDNA. Yakima County also presents at citizenship classes at La Casa Hogar and attends naturalization ceremonies. Yakima 30B6 Tr. 74:11-75:6; Jimenez Decl. ¶ 6. These education efforts address the signature verification process. Yakima 30B6 Tr. 75:21-76:1; Jimenez Decl. ¶ 6.

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 9
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

38.     Yakima County entered into a consent decree with the U.S. Department of Justice in 2004, agreeing to translate election-related materials into Spanish and to have trained bilingual elections personnel on staff. Fisher Decl. ¶ 6 & Ex. A. That consent decree was terminated in 2006. *Id.* ¶ 6. But Yakima County has continued translating elections materials into Spanish and employing staff whose job descriptions require that they be bilingual. *Id.* ¶¶ 7-8.

39.     Yakima County is especially committed to Spanish-language voter education and does more to reach voters in Spanish than it does to reach voters in English. Yakima 30B6 Tr. 76:7-9.

F.     **County Elections Offices and Multi-Tier Review**

40.     The elected county auditor is responsible for conducting state and local elections in each of the defendant counties. RCW 29A.04.025, .216. The county auditor may also appoint or deputize other persons to act as assistants or deputies for elections. RCW 36.22.220; Chelan 30B6 Tr. 122:2-7. Each of the defendant counties has an elections department within the county auditor's office that includes individuals who are certified elections administrators and other trained election staff. RCW 36.22.220; *see also* Fisher Decl. ¶¶ 4, 11; Moore Decl. 8, 14; Benton 30B6 Tr. 17:18-18:9.

41.     Benton County Auditor Brenda Chilton has 25 years of experience in elections and has spent 13 years as the elected county auditor. Chilton Decl. ¶ 3. She estimates she has reviewed 100,000 ballot declaration or voter petition signatures during her career. *Id.* ¶ 19.

42.     Chelan County Auditor Skip Moore has nearly 21 years of experience in elections, first as the county elections director and then as the elected county auditor since 2009. Moore Decl. ¶¶ 3-4. Mr. Moore estimates he has reviewed 200,000 ballot declaration or voter petition signatures during that time. *Id.* ¶ 21.

43.     In Yakima County, Elections Manager Kathy Fisher heads the elections

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 10
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

office. She has worked in Yakima County's Elections Division for nearly 30 years and has held her current position since 2005. Fisher Decl. ¶ 2.

44.    Plaintiffs' signature expert, Linton Mohammed, believes that looking at signatures every day "does develop some sort of skill" and that for this reason there is utility in bank tellers evaluating signatures on checks before they are processed. Mohammed Tr. 27:25-28:9.

45.    The defendant counties all use a multi-tier process to review ballot declarations. Chilton Decl. ¶ 24; Moore Decl. ¶ 25; Fisher Decl. ¶ 24. Each county gives voters the benefit of the doubt and instructs staff to presume that signatures are valid. *See* Moore Decl. ¶ 35; Torres Decl. ¶ 5; Jimenez Decl. ¶ 12.

46.    The voter registration files are contained in a statewide database called VoteWA. *See* Chilton Decl. ¶¶ 22-23; Fisher Decl. ¶ 16.

1.    **Benton County**

47.    To provide "every voter the best chance to have their vote counted," Benton county uses a multi-tier review process before determining to reject a ballot. Benton 30B6 Tr.139:9-17; Chilton Decl. ¶ 24.

48.    All staff who review signatures have taken state signature verification training, either from the Washington State Patrol or the Secretary of State's Office. Chilton Decl. ¶ 8-9.

49.    Election staff begin processing the ballots as soon as they are received. Chilton Decl. ¶ 22. Benton County conducts a "first-pass review" applying principles from signature training and the WAC, and for signatures determined in the first review to be a mismatch, a "second tier of review . . . done by [an] elections systems supervisor." Benton 30B6 Tr. 31:13-20, 37:3-10; Chilton Decl. ¶ 27. First-level reviewers have relevant administrative code sections and their Washington State Patrol training materials with them while they review. Chilton Decl. ¶ 27. If the ballot declaration is deemed a match at the first level of review, the ballot is

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 11
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

accepted, and the signature is not reviewed further. *Id.* ¶ 28.

50.    If the ballot declaration signature is deemed a mismatch by the first-level reviewer, it is reviewed again by a supervisor. *Id.* ¶¶ 29-30. Benton County's second-tier review has often been conducted by Jerry Torres or Rene Rojas, who hold or held supervisory elections positions. Benton 30B6 Tr. at 41:3-19. The supervisor also "uses the . . . elements set forth in . . . training and in . . . the WAC to break the signature down a little bit more and determine whether or not she believes it is still a signature discrepancy." *Id.* 31:20-25. The supervisor reviewers consult all available signatures in the voter registration file. Chilton Decl. ¶ 30. For voters with multiple signatures on file, if *any* of these signatures matches the ballot declaration, the ballot declaration signatures is deemed a match, even if it fails to match the *other* signatures in the voter registration file. *Id.* ¶ 26.

51.    If the supervisor considers the signature a match, the ballot is processed for counting. Benton 30B6 Tr. 31:25-32:4. If the supervisor agrees the signature does not match the registration file signature, the county mails the voter a cure notice and cure form. Chilton Decl. ¶ 32. The cure notice provides a date-certain deadline to return a cure form. *See id.* Ex. B. It instructs that the cure form may be returned by mail, email, or by a visit to the elections office. *See id.* Voters may also return the form to a ballot drop box or by FAX. *Id.* ¶ 34. The notice also advises the voter to "sign as close as possible to the way you signed your ballot envelope." *Id.* Ex. B. After the Washington Secretary of State began in 2022 providing translations of certain elections materials, Benton County provided cure notices in English and Spanish. *Id.* ¶ 36.

52.    Cure notices and cure forms are usually sent within 24 to 48 hours of the county first receiving a ballot. *Id.* ¶ 36. Benton County also attempts to call voters. *Id.* ¶ 37.

53.    If a cure form is returned by the deadline with a signature matching the

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 12
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

ballot declaration, the signature is deemed cured and the ballot is accepted. *Id.* ¶ 32. The cure-form signature is then added to the voter registration file. *Id.*

54.    Gerardo Torres is part of the Benton County supervisor review team. Torres Decl. ¶ 2. He has been a certified elections administrator since 2012 and has attended the Washington State Patrol signature training four or five times. *Id.* He has reviewed thousands of signatures in his career, too many to quantify. *Id.* In the second-tier supervisor review, Mr. Torres usually works with Benton County Elections Manager Amanda Hatfield. *Id.* ¶ 5. They discuss the signatures together. *Id.* Mr. Torres' review focuses on the signature image to apply the factors set out in the signature training. *Id.* ¶ 6. Mr. Torres is Mexican-American. *Id.* ¶ 3. He uses Spanish to translate letters and notices and to assist-Spanish-speaking voters who call or visit with questions about registering or voting. *Id.*

55.    Rene Rojas worked in Benton County's elections office from 2012 to 2021. Rojas Decl. ¶¶ 1, 2. He was a certified elections administrator and attended the Washington State Patrol signature verification training two or three times. *Id.* ¶ 5. As elections system supervisor, he oversaw three or four staff persons who conducted the first-tier signature review. *Id.* ¶ 4, 6. He conducted periodic checks of the first-tier review's signature determinations. *Id.* ¶ 6. Mr. Rojas also reviewed signatures flagged for mismatch. *Id.* As a supervisor, he often overturned the first-tier review's initial calls, and accepted a ballot declaration signature. *Id.* According to Mr. Rojas, when looking at a signature, a reviewer looks at the signature as an image and not specifically at the name. *Id.* Mr. Rojas is Hispanic, with a father born-and-raised in Mexico and a mother born in California to Mexican immigrants. *Id.* ¶ 3.

56.    If a voter fails to cure, the ballot declaration signature "gets moved to the third tier of review, which is the canvassing review board," which also reviews the ballot declaration signature using "applicable training and the . . . elements set

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 13
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

forth in the WAC." Benton 30B6 Tr. 32:4-33:2. Elected canvassing board members are encouraged to receive signature verification training at least once before serving. Chilton Decl. ¶ 42. Non-elected delegates of elected members are required to receive training. *Id.*

57.    Canvassing board meetings begin with reviewing the WAC. Benton 30B6 Tr. 59:13-17. Then the canvassing board discusses "whether or not they believe the signature matches" and ultimately votes on whether to accept the ballot. *Id.* 33:3-14. In doing so, canvassing board members "take a considerable amount of time to individually assess each signature as it compares to the . . . available signatures in the . . . voter's record" and to assess "every element in the WAC on every signature." *Id.* 59:1-19; *see also id.* at 61:13-21; *see also* Delvin Decl. ¶¶ 13, 15. This averages about one minute per signature. Delvin Decl. ¶ 16; *see also* Chilton Decl. ¶ 46. The canvassing board sometimes consults copies of the WAC signature verification standard in discussing ballots. Castillo Decl. Ex. CC (Delvin Tr.) 64:5-25. The canvassing board errs on the side of approving signatures to ensure that ballots count. Delvin Decl. ¶ 13.

### 2.    **Chelan County**

58.    Chelan County requires all staff who review signatures to have taken signature verification training provided by the state, either from the Washington State Patrol or the Secretary of State's Office. Moore Decl. ¶¶ 8-9. Elected canvassing board members are encouraged to receive signature verification training. *Id.* ¶ 41.

59.    Chelan County processes ballots as soon as they are received. Moore Decl. ¶ 24. Chelan County does not a have a ballot sorting machine, so its staff compare the wet-ink signatures on ballot envelopes to the voter registration file. Moore Decl. ¶ 26; Chelan 30B6 Tr. 57:16-58:15.

60.    Chelan County uses a multi-level process to ensure that every voter has

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 14
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

the best chance of having a vote counted. Moore Decl. ¶ 25. Mr. Moore and his staff spend more time on ballot declarations suspected to mismatch than they do on ballot declarations deemed to match. *Id.* ¶ 35. This is because they want to accept all votes that state law permits them to accept. *Id.*

61.    First, full-time and temporary staff verify signatures. *Id.* ¶ 27. They compare a ballot declaration signature to all available signatures in the voter registration file to determine whether the voter declaration signature is the same as *any* one signature in the voter registration file. *Id.* ¶¶ 28, 29. Elections staff apply the standard in WAC 434-479-020, as well as their training from the state. *Id.* ¶ 29. If the ballot declaration signature is deemed to be a match in the first-level review, it is accepted and there is no further review of the signature. *Id.* ¶ 30.

62.    If the ballot declaration signature is determined in the first level to be a "brutally obvious" mismatch, a cure notice is sent to the voter immediately. Chelan 30B6 Tr. 61:19-62:19; *see also* Moore Decl. ¶ 31.

63.    If the first-level reviewer has any question about a ballot declaration signature, he or she consults with other elections staff to attempt to reach a consensus determination about a signature. Chelan 30B6 Tr. 61:19-62:19; Moore Decl. ¶ 33. If the staff agree that the signature does not match, a cure notice is sent at this point. Moore Decl. ¶ 33. If the staff agree that the signature matches, it is accepted without further review of the signature. *Id.*

64.    The cure notice provides instruction on how to cure a signature and encloses the form necessary to do so. *Id.* ¶ 31. The notice provides the date-certain deadline to cure in bold. *See id.* Ex. B. It instructs that forms may be mailed or returned in-person. *Id.* Today, voters may return a form by mail, email, FAX, or a visit to the elections office. Chelan 30B6 Tr. 48:25-49:8, 54:22-53:3; Moore Decl. ¶ 36. If the signature on a returned cure form matches the ballot declaration signature, the ballot is accepted and the cure-form signature is added to the voter

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 15
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

registration file. Chelan 30B6 Tr. 32:24-33:4; Moore Decl. ¶ 31. Chelan County also places a robocall call to all voters who have failed to cure signatures four days before the deadline to certify the election. Chelan 30B6 Tr. 105:2-11; Moore Decl. ¶ 37.

65.    Evangelina Escalera is a staff member in the Chelan County elections office. Escalera Decl. ¶¶ 2-3. She participates in the county's first-stage signature review. *Id.* ¶ 6. She examines signatures for the characteristics she was taught to look for in the Washington State Patrol signature training course, including whether the voter used upper or lower case letters, the spacing, and the slant or slope of letters. *Id.* ¶ 7. Normally, Ms. Escalera looks only at the signature image, not at a voter's name. *Id.* ¶ 10. When a ballot declaration signature does not match the registration file, Ms. Escalera asks her colleagues to assess it as well. *Id.* ¶ 9. If Ms. Escalera and her colleagues do not consider the signature a match, it is reviewed by a supervisor. *Id.* As part of the her review, Ms. Escalera sometimes consults the signatures of other members of a voter's household. *Id.* ¶ 7. Occasionally she sees evidence that a parent signed a child's ballot. *Id.*; *see also* Moore Decl. ¶ 34. Ms. Escalera is of Mexican heritage. Escalera Decl. ¶ 4. While she is not a certified translator, she can speak, write, and translate Spanish. *Id.*

66.    Ballot declarations determined not to match and that remain uncured are referred to the canvassing board for final determination. Chelan 30B6 Tr. 94:2-9; Moore Decl. ¶ 39. The canvassing board takes considerable time to individually assess and discuss each signature, breaking down and applying the WAC elements to evaluate whether to accept or reject a ballot declaration signature. Moore Decl. ¶ 45. Election staff and canvassing board members look at multiple characteristics of a signature in determining a match or mismatch. Chelan 30B6 Tr. 102:15-23.

67.    The canvassing board discusses signature characteristics to determine whether a ballot declaration matches a voter's comparator signature. Moore Decl. ¶ 45.

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 16
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

68.     As Commissioner Overbay of Chelan County put it:

>       For me, when I look at the signatures, first off, I want to look and see . . . does the signature look like the signature that's on the card? In general appearance, does it look like . . . it has the same pressure points? . . . [W]here does the signature start? Where does it end? Are there similarities in regards to the structure of the letters that are constructed? Are they connected in the same locations on the letters? Is it—is the style—is it a print versus a cursive or a quasi[-]cursive where you have some folks who will write both in cursive and in print . . . ?

>       And taking a look at just the formation, the skill by which it was done, the fluidity of—of the signature, and looking at everything there with regards to the signature itself. Does it represent in part or in whole the signature that was provided that is on the record?

Overbay Tr. 36:5-37:2. Mr. Overbay received signature comparison training as a law enforcement officer and used that training throughout his career in the Washington State Patrol. Overbay Decl. ¶ 7. He also attended the Washington State Patrol's signature verification training as an elected official. *Id.*

69.     After an election is certified, Chelan County sends a letter to each voter whose ballot was rejected to explain why it was rejected. Moore Decl. ¶ 48. For voters whose ballot was rejected for signature mismatch, Chelan County sends a letter saying so and includes a signature update form. *Id.*

### 3.     **Yakima County**

70.     All Yakima County staff who review signatures have received voter signature verification training and are required to renew their training every two years. Fisher Decl. ¶ 11 & Ex. B.

71.     Yakima County reviews ballot declaration signatures in two steps before referring signatures to the canvassing board. *See id.* ¶ 24.

72.     At the first step, each of five permanent elections staff members individually reviews ballots "using the signature verification standards that are outlined in WAC 434-379-020, in addition to . . . training that was provided by the Washington State Patrol." Yakima 30B6 Tr. 31:4-23; Fisher Decl. ¶ 27. If a

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 17
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

signature is determined to match at this stage, "the ballot is accepted at the same time as the signature is deemed to match." Yakima 30B6 Tr. 32:8-17. The two staff persons primarily responsible for this stage of review are Alexandrea Ramirez and Rochelle Saucedo-Mendoza. Fisher Decl. ¶ 25.

73.    Only if a ballot declaration signature is determined to be a mismatch is it promoted to a second stage of review. Yakima 30B6 Tr. 32:19-24; Fisher Decl. ¶ 28. At the second stage of review, the elections manager and the bilingual program coordinator review ballots together. Yakima 30B6 Tr. 32:25-11; Fisher Decl. ¶ 31. If either of these persons considers the ballot declaration signature to match the voter registration signature, the ballot "moves forward for acceptance." *Id.* at 33:17-34:5. If a voter has more than one signature on file, Yakima County accepts the ballot declaration signature if it matches *any* of the file signatures. Yakima 30B6 Tr. 66:1-16; Fisher Decl. ¶ 29.

74.    In recent years, Martha Jimenez has served as bilingual program coordinator. Jimenez Decl. ¶ 2. In this role, Ms. Jimenez supervises bilingual specialists responsible for interacting with Spanish speaking voters on the phone and in-person. *Id.* ¶ 4. Ms. Jimenez is seeking her certification as an elections administrator and has taken the Washington State Patrol's signature verification training twice in recent years. *Id.* ¶ 9. As bilingual program coordinator, Ms. Jimenez works with Elections Manager Ms. Fisher to comprise the supervisory signature review team. *Id.* ¶ 10. Ms. Jimenez uses her training to look at various characteristics such as slant, slope, the way the letters are written, and how elaborate a signature is. *Id.* ¶ 12. She looks at the signature image and does not typically consider the voter's typed name. *Id.* ¶ 13. Ms. Jimenez feels comfortable disagreeing with Ms. Fisher about whether a signature matches. *Id.* Ms. Jimenez is Latina and bilingual. *Id.* ¶ 3.

75.    Yakima County begins processing ballots the day they are received. Fisher Decl. ¶ 23. The supervisory review occurs at 4:00 p.m. every day during an

DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE - 18
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

election. *Id.* ¶ 29. If a ballot is deemed a mismatch at the supervisory review, Yakima County mails the voter a cure form. *Id.* ¶ 32. These are sent within 24 hours of the signature being determined to be a mismatch. *Id.* The cure form states the date-certain deadline to return the form. It provides instructions to return the form by email, mail, FAX, or a visit to the elections office. *Id.* Ex. D. The form also advises, "Your signature on this form must match the signature on your ballot envelope." *Id.* The form is in both Spanish and English. *Id.* Yakima County also tries to contact voters by telephone. *Id.* ¶ 34 & Ex. E.

76.    If a voter returns a cure form by the deadline with a signature matching the signature on the ballot declaration, the ballot is counted, and the cure-form signature is added to the voter registration file. Fisher Decl. ¶ 32.

77.    Until 2020, the Yakima County canvassing board reviewed each individual ballot declaration flagged by staff as a mismatch, but now the canvassing board approves lists of staff recommendations and reviews only any ballot declarations its members specifically wish to see. Yakima 30B6 Tr. 154:12-17, 234:25-235:4. This rejection of a "batch" or "report of ballots" is permitted by RCW 29A.60.050. Fisher Decl. ¶ 42.

78.    When Yakima County switched to batch determinations at the canvassing board, it adopted its policy that any disagreement among the supervisory review team leads to a signature being accepted rather than sent to the canvassing board. Yakima 30B6 Tr. 234:25-237:17. Accordingly, by the time a ballot declaration reaches the canvassing board, at least three staff members have agreed that the declaration signature is a mismatch. Fisher Decl. ¶ 42 & Ex. F.

G.    **The Cure Process**

79.    When a ballot declaration signature does not match, counties are required to mail voters a form and instructions to update the registration file signature. RCW 29A.60.165(2)(a). If the voter has not responded by three days

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 19
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

1    before the final meeting of the canvassing board, the county must attempt to call the

2    voter. RCW 29A.60.165(2)(a).

3        80.    Benton County sends its cure notices to voters the day their ballot is

4    determined by staff to be a mismatch, or sometimes the next morning. Benton 30B6

5    Tr. 145:17-146:18. Benton County sends its cure forms in both English and Spanish.

6    Benton 30B6 Tr. 103:23-104:2. Benton County uses a call service to call voters. *See*

7    Benton 30B6 Tr. 24:18-19.

8        81.    Yakima County also sends its cure notices right after staff determine a

9    ballot declaration signature to be a mismatch and before the signature is presented

10    to the canvassing board. Yakima 30B6 Tr. 34:6-16. Yakima County sends cure

11    forms in both English and Spanish. Yakima 30B6 Tr. 44:3-13. Yakima County's

12    multilingual staff then calls voters, doing so ahead of the regulatory deadline and

13    more frequently than required. Yakima 30B6 Tr. 79:19-80:6, 81:14-20.

14        82.    Chelan County sometimes sends cure notices immediately following

15    the first level of review and sometimes after the supervisory review. Moore Decl.

16    ¶¶ 31, 33. It also places calls to voters. Chelan 30B6 Tr. 105:2-11; Moore Decl. ¶ 37.

17        83.    The day to certify the election is set by statute—10 days after a special

18    election or presidential primary election, 14 days after a primary election, and 21

19    days after a general election. RCW 29A.60.190. Defendant counties always certify

20    elections on the statutory date, which means that voters may submit cure forms up

21    to the day before the statutory date for each election. Chilton Decl. ¶ 47; Moore Decl.

22    ¶ 47; Fisher Decl. ¶ 33, 46.

23        84.    Cure notices state the deadline that signature update forms must be

24    returned and provide various return methods. A visit to the county elections office

25    to cure a signature is welcome but not at all required.

26        85.    If the signature cure form matches the flagged ballot declaration, the

27    counties count the ballot and update the registration file signature so the voter is less

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 20
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

1  likely to have a signature mismatch going forward. Yakima 30B6 Tr. 104:9-15;
2  Chilton Decl. ¶ 32; Moore Decl. ¶ 31; Fisher Decl. ¶ 32.

3  H. **Signatures Determined Not to Match**

4      86.    Former Yakima County Commissioner Ron Anderson had his ballot
5  flagged for signature mismatch at least once. Castillo Decl. Ex. DD (Anderson Tr.)
6  26:2-21. By his own account, his signature is inconsistent. *Id.* He updated his
7  signature so his ballot would count. *Id.*

8      87.    Benton County Commissioner Delvin had his ballot flagged for
9  signature mismatch. Delvin Tr. 109:24-110:10. His signature had "changed over the
10 years in the legislature when [he] was signing so many papers each day, the letters
11 each day." *Id.* at 110:5-8. He took five minutes "to fill out the form and sent it back
12 in" and his signature was updated. *Id.* 110:8-10; *see also* Delvin Decl. ¶ 10.

13     88.    Plaintiff Daniel Reynoso's ballot declaration was flagged for signature
14 mismatch by Yakima County in 2018. Castillo Decl. Ex. EE (Reynoso Tr.) 21:5-8,
15 Ex.1. Mr. Reynoso believes that his voter registration signature was "just like a
16 scribble" but he had signed his ballot declaration "careful." Reynoso Tr. 38:1-23;
17 Castillo Decl. Ex. FF, GG. Mr. Reynoso's ballot declaration and voter registration
18 signatures are part of the record. Fisher Decl. ¶¶ 47-48 & Exs. G, H. Mr. Reynoso
19 did not return the cure form mailed to him because his election mail had been going
20 to his parent's house and by the time his parents notified him of the mail "it was too
21 late to . . . submit it." Reynoso Tr. at 21:23-22:4. In the same year that Mr. Reynoso's
22 signature was flagged for signature mismatch, Mr. Reynoso's signature had also
23 been forged at a rental equipment location, so he changed his signature style. *Id.*
24 36:13-20. Mr. Reynoso voted again in 2020 and 2022. Castillo Decl. Ex. PP.; Fisher
25 Decl. ¶ 48 & Ex. H

26     89.    Mr. Reyes's ballot declaration signature and voter registration signature
27 are in the record. Moore Decl. ¶ 49 & Ex. C. So too are the signatures of those voters

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 21
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

registered in the same household as Mr. Reyes, which were also available for Chelan County's comparison. *Id.* Mr. Reyes's ballot was received by Chelan County on election day, November 3, 2021. *Id.* ¶ 50. The county mailed Mr. Reyes a cure letter the very same day. *Id.* The letter instructed that the cure form needed to be submitted by a date certain, November 22, 2021. It provided the option to return the cure form by mail, email, FAX, an in-person visit to the county elections office, or at any county elections drop box. *Id.* Ex. E. The letter also provided advice on signing a matching signature. *Id.* Additionally, it instructed, "If you have several variations of your signature, please feel free to sign the form with all versions of your signature." *Id.* Mr. Reyes received the letter. Castillo Decl. Ex. HH (Reyes Tr.) 35:6-36:13, Ex. 6. Mr. Reyes states he was not able to return the signature update form because he believed—despite the county's written instruction that it could be mailed or emailed—that he needed to go in person to the elections office and was too busy to do so. Reyes Tr. 37:5-21; *see also* 39:19-40:6; Castillo Decl. Ex. II. Chelan County received no signature update form from Mr. Reyes and his vote was not counted in the November 2021 election. Moore Decl. ¶ 51. Mr. Reyes voted again in the November 2022 election. Castillo Decl. Ex. QQ.

90.    As explained below, nearly 99% of voters succeed in submitting matching signatures so that their votes are counted.

91.    Plaintiffs' expert Matt Barreto studied reports of ballots rejected by the defendant counties for signature mismatch in 15 elections between 2019 and 2022. Dkt. 79-1 ¶ 16. Dr. Barreto calculated the rate at which defendant counties rejected ballot declarations signed with Latino names and non-Latino names. He did this by checking names on ballot status reports against U.S. Census Bureau lists of surnames and lists of first names derived from academic literature. Dkt. 79-1 ¶ 18. He then assigned voters to groups based on whether their first and last names appeared to be Latino. *Id.*

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 22
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

92.    Dr. Barreto determined that during these elections, Benton County, Chelan County, and Yakima County collectively rejected for signature mismatch 748 of 118,881 ballots signed with Latino-sounding names and 2,955 of 1,193,867 ballots signed with non-Latino-sounding names. *See id.* at 8 (Table 1).

93.    Dr. Barreto determined that across these elections, Benton County rejected a total of 2,401 out of 577,745 ballots, or 0.42% of ballots, after determining the signature on the declaration did not match the corresponding signature in the voter registration file. *Id.* In other words, 99.58% of all ballots were *not* rejected for this reason. *See id.* Dr. Barreto found that Benton County accepted 98.87% of ballot declaration signatures with assigned Latino surnames, rejecting 1.13% of ballot declaration signatures after determining they did not match the corresponding signatures in the voter registration file. *Id.*; *see also* Dkt. 100-1 (Barreto Tr.) 62:17-63:15. Using the same name-classification technique, Dr. Barreto found that Benton County accepted 99.62% of ballot declaration signatures with assigned *non*-Latino surnames, rejecting 0.38%. Dkt. 79-1 at 8 (Table 1).

94.    In the same time period, Chelan County rejected a total of 655 out of 262,301 ballots, or 0.25% of ballots, after determining the signature on the declaration did not match the corresponding signature in the voter registration file. *Id.* In other words, 99.75% of all ballots were *not* rejected for this reason. *See id.* Dr. Barreto found Chelan County accepted 99.13% ballot declaration signatures with assigned Latino surnames, rejecting 0.87% for signature mismatch. Dkt. 79-1 at 8 (Table 1); Barreto Tr. 63:16-22. Chelan County accepted 99.79% of ballot declaration signatures with assigned *non*-Latino surnames, rejecting 0.21%. Dkt. 79-1 at 8 (Table 1).

95.    Yakima County rejected even fewer ballots for signature mismatch. During the same elections, Yakima County rejected a total of 647 out of 472,702 ballots, or 0.14% of ballots after determining the signature on the declaration did not

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 23
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

1    match the corresponding signature in the voter registration file. Dkt. 79-1 at 8 (Table

2    1). In other words, 99.86% of all ballots were *not* rejected for this reason. *See id.*

3    Yakima County accepted 99.62% of ballot declaration signatures with assigned

4    Latino surnames, rejecting 0.38% for signature mismatch. *Id.*; Barreto Tr. 63:16-22.

5    Yakima County accepted 99.91% of ballot declaration signatures with assigned *non*-

6    Latino surnames, rejecting 0.09%. Dkt. 79-1 at 8 (Table 1).

7        96.    Yakima County Voters with assigned Latino surnames were just as

8    likely to have their ballots rejected for signature mismatch as were Benton County

9    voters with assigned *non*-Latino surnames. *See* Dkt. 79-1 at 8 (Table 1).

10        97.    Dr. Barreto took these numbers and divided the signature mismatch

11    rejection rates within a county. For example, he took the rate at which Benton

12    County determined signature mismatch for ballot declaration signatures with

13    assigned Latino surnames—1.13%—and divided it by the rate at which Benton

14    County rejected ballot declaration signatures with assigned *non*-Latino names—

15    0.38%. Barreto Tr. 52:1-54:5; *see also* Dkt. 79-1 at 8 (Table 1). The result of dividing

16    1.13% by 0.38% is 3.00. Barreto Tr. 52:1-54:5; *see also* Dkt. 79-1 at 8 (Table 1).

17    Doing the same exercise for ballot declaration signatures with assigned Spanish first

18    and last names yields the number 3.30. *See* Dkt. 79-1 at 8 (Table 1).

19        98.    These numbers for Chelan County are 4.09, calculated by dividing

20    0.87% by 0.21%, and 4.52, calculated by dividing 0.97% by 0.21%. *See id.*

21        99.    These numbers for Yakima County are 4.08, calculated by dividing

22    0.38% by 0.09%, and 4.51, calculated by dividing 0.42% by 0.09%. *See id.*

23        100.    Dr. Barreto calculated a similar ratio of the percentages of voters he

24    classified as Latino and non-Latino who returned ballots late. In Benton County, this

25    was 1.83. Dkt. 79-1 at 11 (Table 2). He described this difference as "almost

26    negligible." Barreto Tr. 69:19-70:5.

27

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 24
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

I.     **Explanations**

101.    None of these statistics indicates what caused them. Dr. Barreto did not analyze the effect on ballot rejection of any variable other than race. Barreto Tr. 106:16-20. Nor did he conduct a multivariate regression, *id.* at 106:5-15, to isolate the correlation between race and ballot rejection by controlling for the effect of other variables, Castillo Decl. Ex. JJ (Weber Tr.) 129:20-130:8. But not even a regression model can explain causation. *Id.* 139:6-15.

102.    At least as of 2020, the scholarly literature was sparse on why some groups see higher rates of signature-related ballot rejection. Barreto Tr.133:13-24.

103.    Social scientists have written about signature rejection in Georgia and Florida. *Id.* 122:1-123:10. The articles regarding these states used regression models to isolate the correlation between race and ballot rejection by controlling for numerous other possible factors, such as age, gender, and name length. *Id.* at 134:18-138:3, 151:8-152:25; *see also* Castillo Decl. Ex. W, RR. They reached ambiguous results, finding no statistically significant correlation between rejection rates and Latino voters or cautioning that the results did not indicate discrimination. *Id.* at 138:12-25, 153:11-23.

104.    Three experts—the State Auditor's office, plaintiffs' retained expert, and defendants' retained expert—considered data about Washington elections and reached different conclusions.

1.     **Washington State Auditor's Office**

105.    The Auditor's office conducted a statewide performance audit of ballot rejection. *See* Castillo Decl. Ex. KK. To do this, the Auditor's office conducted a regression analysis accounting for a variety of variables in addition to race—age, name complexity, voter history, census tract demographics, and the like. *Id.* at 52. It found that after accounting for other variables, Latinos were 28% more likely than white voters to have their signatures rejected. *Id.* at 55; Weber Tr. 148:1-16.

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 25
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

106.   This result does not indicate whether the increased likelihood of ballot rejection was because of voter actions or the actions of signature reviewers. Weber Tr. 139:6-15. But the Auditor's office made two additional findings that tend to make it *less* likely that signature reviewer actions explain the statistics.

107.   <u>First</u>, the Auditor determined that Latino voters were "almost 21 percent more likely to have their ballot rejected for being *unsigned* than a white voter is." Weber Tr. 148:1-16 (emphasis added). "In terms of practical significance," 28% additional likelihood of rejection for mismatch and 21% additional likelihood of rejection for failure to sign "are pretty similar." *Id.* 149:7-150:8. A determination that a ballot is unsigned involves a lot less discretion than does a determination that it was improperly signed. *Id.* at 143:817-144:20; *see also* Barreto Tr. 79:11-80:4.

108.   <u>Second</u>, the Auditor's office conducted a review of 7,257 accepted and rejected 2020 general election ballot declarations from around the state. Castillo Decl. Ex. KK at 48. The Auditor's office used an automatic signature verification software and review by two or more members of the Auditor's team to identify 542 of these as inconclusive, meaning that at least one member of the Auditor's team disagreed with a county determination. *Id.* at 48-49.The Auditor's team then worked with the Secretary of State's office to determine which of the inconclusive ballot declaration signatures were wrongly accepted or rejected. *Id.* at 49. The Auditor's team initially identified 201 suspected wrong determinations, and then on further review by "[t]wo employees with experience in reviewing signatures," narrowed this to 158 suspected wrong determinations. *Id.* at 49. The Auditor's team analyzed both the inconclusive signatures and the suspected wrong determinations "to determine if there were any patterns that indicated potential unconscious bias." *Id.* at 49. The Auditor's office "found no evidence of bias when counties accepted or rejected ballots." *Id.* at 23.

### 2.   **Plaintiffs' Expert**

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 26
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

109.    Plaintiffs' expert Dr. Barreto "speculate[d] . . . on causes" for the ratios he found by dividing Latino ballot rejection rates from non-Latino rejection rates. Barreto Tr. 51:17-25. He stated that "individual discretion of election workers is *at play* in judging voters with more visible Spanish names more harshly." Dkt. 79-1 ¶ 29 (emphasis added); Barreto Tr. 70:17-71:1.

110.    Dr. Barreto declined an invitation to say that "at play" indicates causation. Barreto Dep. Tr,. 71:2-17. Instead, he said only that "election workers are the ones rejecting the signatures and that they are rejecting signatures that have more Spanish visible to them at higher rates. Therefore, they must be relying on some sort of racial cues, whether in the front or the back of their mind." *Id.* 71:8-17. Because Dr. Barreto conducted no regression analysis to isolate the effect of race, he relied on two observations about the data to make this statement.

111.    <u>First</u>, Dr. Barreto noted that voters with Latino first and last names were more likely to have their signatures rejected than were voters with Latino last names and non-Latino first names. Dkt. 79-1 ¶ 26. He thought that first name was a "proxy for race." Barreto Tr. 106: 16-20. Dr. Barreto also believed that "assignment of . . . first name by . . . parents is theoretically uncorrelated with" signature. *Id.* at 172:20-173:13. Dr. Barreto did not, however, have data to support the conclusion that signature variation or sloppiness is evenly distributed across both groups of interest—ballot declarations associated with voters with Latino names and ballot declarations associated with voters with Latino last names. *Id.* at 75:16-24. He noted that he and his team "were not presented with any evidence that the ballots' signatures were not randomly distributed in terms of any variations from day-to-day. So we just analyzed the Secretary of State data, which did not contain signature images." *Id.* 75:25-76:9.

112.    <u>Second</u>, Dr. Barreto calculated the ratio of the percentages of voters he classified as Latino and non-Latino whose ballots were rejected for being late. In

Benton County, this ratio was 1.83. Dkt. 79-1 at 11 (Table 2). In other counties, it was a little lower. *Id.* He described the difference between Latino and non-Latino voters for late ballot rejection as "almost negligible." *Id.* at 69:19-70:5. He then compared this to the ratio of the percentages of voters he classified as Latino and non-Latino whose ballot declaration signatures were determined to be mismatches. *Id.* 76:10-76:22. This number ranged from 3.00 to 4.09. Dkt. 79-1 at 8 (Table 1). Dr. Barreto concluded that there are "very small differences in ballots rejected for being voted too late, but large and statistically significant differences in ballots rejected for signature mismatch. Thus it cannot be that Hispanic citizens fail to understand the voting rules and are more frequently making mistakes." *Id.* ¶ 31. Dr. Barreto believed that the two rules he compared—voting on time and signing a ballot declaration with signature matching the registration file—were equally easy or hard for voters to understand. Barreto Tr. 76:23-77:2. He based this belief on being "a political science professor who's studied voting for 20 years" and his belief that "both rules are fairly simple" but on no "survey of the voters in the county to ask them their knowledge details about the voting laws." *Id.* 77:19-78:15. When asked why he did not instead compare signature mismatch to absence of a signature at all, Dr. Barreto could not recall whether the data was available to him, *id.* 78:16-79:10, as it clearly was to the State Auditor.

113.    There were several matters about which Dr. Barreto had no opinion. Dr. Barreto expressed no opinion about what causes a voter to turnout. Barreto Tr. 34:20-23. Dr. Barreto expressed no opinion about ballots determined to be signature mismatches that voters cure so they may be counted. *Id.* at 43:25-45:8. Dr. Barreto expressed no opinion on the geographical distribution of rejected ballots within any defendant county. *Id.* at 85:21-86:11. Nor did he have an opinion on how many ballots were rejected in races below the county-wide level. *See id.* at 90:18-91:3. Dr. Barreto had no opinions in this case on what caused socioeconomic disparities

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 28
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

between Latinos and non-Latinos. *Id.* at 101:23-102:4.

114.    Dr. Barreto believes socioeconomic disparities are linked to lower voter participation, but he did not rely on a statistical analysis for this and instead relied on a legal citation to *Gingles v. Thornburg*, 478 U.S. 30 (1986). *Id.* at 102:5-103:22; Dkt. 100-2 ¶ 22.

### 3.    **Defendants' Experts**

115.    Defendants' experts, Aleksandr Aravkin and Mark Songer, rendered opinions bearing on the statistics plaintiffs produced.

116.    Dr. Aravkin used statistical analysis to infer which variables—voter age, voter history, voter gender, inferred voter ethnicity, and income associated to the voter's census block group—had a significant and consistent effect in explaining which ballots were flagged for mismatch in Yakima, Benton, and Chelan counties. Aravkin Decl. Ex. A ¶ 6.

117.    He analyzed data in "the general elections of 2019, 2020, 2021, and 2022, and primary elections of 2020, 2021, and 2022. *Id.* ¶ 5. Because each county conducted each of these 7 elections, Dr. Aravkin considered each county election to be one of 21 "natural replicates." *Id.* ¶ 18.

118.    Dr. Aravkin used a technique called Bayesian model averaging to evaluate which factors are the most important in explaining the data in each of the 21 elections. *Id.* ¶¶ 10-11. Rather than deciding ahead of time which voter characteristics are likely to be important and creating a model to address them, Bayesian model averaging allows the data to determine the degree of relevance—if any—of voter characteristics. *See id.* ¶¶ 36-38.

119.    Using this method, Dr. Aravkin concluded that voter age and voter experience had clear and statistically significant impact on which ballot declaration signatures were determined not to match the voter registration file. *Id.* ¶ 12(a). After controlling for other variables, new voters were 10 times more likely to be flagged

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 29
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

for signature mismatch as compared to experienced voters. *Id.* Similarly, after controlling for other variables, a 20-year-old voter was 2.8 times more likely to be determined to have submitted a non-matching signature than was a 40-year-old voter and 7.8 times more likely than was a 60-year-old. *Id.*

120.   By contrast, voter race did not have a statistically significant impact in most of the 21 elections that Dr. Arvakin analyzed. In only two elections did race appear to have a statistically significant effect, with ballots with Latino-sounding names in these two elections being about twice as likely as ballots with non-Latino sounding names to have the signatures determined to be mismatches. *Id.* at 25 (Figure 3). In the other 19 elections, there was no statistically significant result. *Id.*

121.   Mr. Songer, a forensic document examiner, evaluated 1,760 signatures from certain elections in 2020, 2021, and 2022. The overwhelming majority of these were rejected ballot declaration signatures. Songer Decl. Ex. A at 2-3. Mr. Songer reached conclusions similar to the State Auditor. He agreed with the vast majority of the county defendants' decisions to reject signatures. *Id.* at 31.

122.   Mr. Songer agreed with 99.0% of the signature rejection decisions he reviewed from Benton County. *Id.*

123.   Mr. Songer agreed with 99.4% of the signature rejection decisions he reviewed from Chelan County. *Id.*

124.   Mr. Songer agreed with every signature rejection decision he reviewed from Yakima County. *Id.*

J.   **Community Reaction**

125.   In 2017, there was a contentious mayoral election in the city of Wapato. Yakima County "received many complaints that voters were feeling intimidated by [one of the] candidate[s]; that he was using very forceful tactics in his campaign; the individuals from his campaign were providing misinformation to the community." Yakima 30B6 Tr. 133:23-134:5. Yakima County received complaints from voters in

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 30
CASE NO. 4:21-cv-05075-MKD

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

132996.0004/9408816.2

the Wapato election, including those represented by Molly Matter, one of the counsel in this case. Yakima 30B6 Tr. 111:19-113:15. In September 2020, Ms. Matter corresponded with a reporter named Joy Borkholder, to say, that the 2017 Wapato race . . . exposed racial disparity of signature mismatches." Dkt. 98-5 at 3. Ms. Matter provided Ms. Borkholder a "litigation memo" and said she would provide "[s]ignature data from Yakima 2016-2019." *Id.*

126. Ms. Borkholder published in February 2021 an article titled, "Investigation finds Latino ballots in WA more likely to be rejected." *See* https://crosscut.com/politics/2021/02/investigation-finds-latino-ballots-wa-more-likely-be-rejected.

127. This lawsuit followed in May 2021. *See* Dkt. 1.

128. Before the lawsuit was filed, no plaintiff contacted any county to raise concerns about the signature verification process or disparate rates at which ballot declaration signatures associated with Latino names are determined not to match. Reyes Tr. 60:10-61:4; Reynoso Tr. 39:17-25; Castillo Decl. Ex. LL (LCF 30B6 Tr.) 47:10-48:8; Castillo Decl. Ex. MM (LULAC 30B6 Tr.) 149:24-153:25; *see also* Jimenez Decl. ¶¶ 7-8.

K. **Plaintiffs' Requested Relief**

129. Plaintiffs are seeking a permanent injunction against Benton, Chelan, and Yakima Counites that would declare the application of the signature verification process RCW 29A.40.110 violative of the United States Constitution and of Section 2 of the Federal Voting Rights Act, 52 U.S.C. § 10301. Plaintiffs seek to enjoin permanently Defendants, their agents and successors, and all persons acting in concert with, or as agents of, any Defendants from implementing RCW 29A.40.110 and WAC 434-261-050 in future elections. Castillo Decl. Exs. MM, NN, OO, PP, QQ.

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 31
CASE NO. 4:21-cv-05075-MKD

132996.0004/9408816.2

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

DATED: June 9, 2023

LANE POWELL PC


By:   *s/ Callie A. Castillo*
      Callie A. Castillo, WSBA No. 38214


By:   *s/ Devon J. McCurdy*
      Devon J. McCurdy, WSBA No. 52663
      Erika O'Sullivan, WSBA No. 57556
      1420 Fifth Avenue, Suite 4200
      P.O. Box 91302
      Seattle, Washington 98111-9402
      Telephone:  206.223.7000
      castilloc@lanepowell.com
      mccurdyd@lanepowell.com
      osullivane@lanepowell.com
Attorneys for Defendants

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 32
CASE NO. 4:21-cv-05075-MKD

132996.0004/9408816.2

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 9, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will automatically generate a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: None.

Executed this 9th day of June, 2023, at Seattle, Washington.


By *s/Kathryn Savaria*
Kathryn Savaria, Legal Assistant
Lane Powell PC
Address: 1420 Fifth Ave #4200
P.O. Box 91302
Seattle, WA 98111
Telephone: 206-223-7000
savariak@lanepowell.com

DEFENDANTS' STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE - 1
CASE NO. 4:21-cv-05075-MKD

132996.0004/9408816.2

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107