# EXHIBIT JJ

1

2  _____

3       30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

4          OFFICE OF THE WASHINGTON STATE AUDITOR

5                    LISA WEBER, Ph.D.

6       ALL PARTIES APPEARED REMOTELY VIA ZOOM

7                 ***AFTERNOON SESSION***

8  _____

9

10

11

12

13                      1:10 P.M.

14                  OCTOBER 14, 2022

15       LOCATION OF WITNESS: OLYMPIA, WASHINGTON

16

17

18

19

20

21

22

23

24  REPORTED BY:  JUDY STEENBERGEN-WEBB, WA CCR NO. 2495

25

                                        Page 126

```
1                    AFTERNOON SESSION
2         OLYMPIA, WASHINGTON; OCTOBER 14, 2022
3                       1:10 P.M.
4                       --OOO--
5
6             (Pursuant to Washington Supreme Court
7              Order Number 25700-A-1311, a remote
8              oath was administered by the Certified
9              Court Reporter.)
10
11             LISA WEBER, Ph.D.,
12     sworn as a witness by the Certified Court Reporter,
13              testified as follows:
14
15                    EXAMINATION
16    BY MR. McCURDY:
17       Q.  Dr. Weber, you and Mr. Dunn talked about a
18    logistic regression model; do you remember that?
19       A.  Yes.
20       Q.  Bearing in mind that I majored in history in
21    college, could you explain what a logistic regression
22    model is?
23       A.  Logistic regression is a way of looking at
24    what factors are associated with a particular outcome.
25    So in this case our outcome was whether or not a ballot
```

Page 129

1    was accepted or rejected, and we put a whole bunch of
2    different variables into our model to see which ones
3    seemed to have a higher association with a ballot
4    rejection.
5        Q.   Is it fair to say that it's an attempt to
6    isolate the correlation of one variable by controlling
7    for the effect of others?
8        A.   Yeah.   That would be a good way of putting it.
9        Q.   And I think I understood from your
10   conversation with Mr. Dunn that the State auditor's
11   office began by considering the use of I think the
12   Heckman regression model; is that right?
13       A.   Yes.
14       Q.   Were there other regression models apart from
15   the Heckman model that the State auditor's office
16   considered?
17       A.   No.   Given that an outcome was a binary S
18   note, logistic regression is the appropriate method to
19   use, the question then becomes are there multiple other
20   steps that into that process, and if so, then the
21   Heckman regression would be appropriate.
22       Q.   Did you attempt to assess the fit of the
23   logistic regression model against subsets of the data?
24       A.   No.   I don't think we did that.
25       Q.   Was there a reason not to do that?

Page 130

1    Q.  Can you give me an example of how you could

2  set up a rejection -- or, I'm sorry, a regression

3  analysis to focus on the rejected ballots?

4    A.  Well, we looked at the outcome.  Your outcome

5  variable is a one or a zero, and a regression analysis,

6  and we assigned a value of one to be a rejected ballot.

7    Q.  Okay.  Aside from doing that, is there any

8  other kind of particular decision you make on how to do

9  the analysis to address that that -- most ballots are

10  accepted?

11    A.  You mean in the statistical analysis, or in

12  the audit overall?

13    Q.  In the statistical analysis, I think you've

14  told me that, you know, the regression analysis is set

15  up to account for that, and I've never done a

16  regression analysis.

17        So I'm trying to get as much an understanding

18  of how you can set up a regression analysis to account

19  for the notion that the vast majority of ballots are

20  accepted and a small number of ballots are rejected.

21    A.  Without getting into all the mathematics

22  behind it, logistic regressions are used quite commonly

23  in biomedical research and a variety of other fields.

24  For instance, predicting who's going to get, say,

25  cancer, or who's going to die of a heart attack.  You

                                          Page 138

```
1   know, vast majority of people don't die of heart
2   attacks.
3          So, you know, it's quite common for this
4   technique to be trying to predict as something that's a
5   low probability of occurrence.
6      Q.  Do the audit's results with respect to race
7   and ethnicity indicate whether the results owe to the
8   cultural factors we talked about that are referenced on
9   Page 20 in the performance audit, or on the other hand
10  to the bias of signature reviewers?
11     A.  No.  Regression is a correlational technique.
12  It just says that something is related to the outcome
13  by higher than chance, but it does not tell you why.
14  We had a lot of discussion about this audit and what
15  really our scope would be.
16         And in conversations with our director, we
17  decided that the why is really more appropriate for
18  researchers to address, not auditors, and they really
19  weren't being asked that either in the mandate.
20     Q.  Does the State auditor's office have a view
21  apart from the statistical analysis of whether any
22  difference in the rejection rates or ballots depend --
23  for different racial groups relates to bias as opposed
24  to what the auditor refers to as cultural factors?
25     A.  I can't speak for the audit office as a whole.
```

Page 139

1  signature mismatch.

2      Q.  And to the extent you can, could you explain

3  what a signature mismatch is?

4      A.  A signature mismatch is when a ballot comes in

5  to a voter before you sign an envelope and -- a

6  security envelope.  And when that ballot gets processed

7  by the county that it's from, they open the outer

8  envelope, discard it.  They have the ballot that has

9  the signature on it.  They look at that signature, pull

10  up on a screen the signature as recorded in the

11  Secretary of State's database on your voter

12  registration record.  And someone with training

13  compares that signature that they see on the envelope

14  to what is in the records and makes a determination of

15  whether or not the same individual signed both

16  locations.

17      Q.  And skipping over to the next column,

18  "unsigned," what is that?

19      A.  That's looking specifically at ballots that

20  were rejected because that location on the ballot where

21  you're supposed to sign that security envelope was not

22  signed.  It was left blank.

23      Q.  Is it fair to say that whether a ballot is

24  unsigned is objectively measurable by the county that

25  receives it?

Page 143

1    A.  I suppose there's no way to tell if they

2  signed it in invisible ink and you can't see it.  But,

3  generally, yes, an observation if they do not see a

4  signature on the ballot, they would say it's unsigned.

5    Q.  Meaning that there's no meaningful element of

6  discretion in determining whether a ballot is signed or

7  unsigned?

8    A.  No.

9    Q.  And let me just -- let me ask that question a

10  little differently because it's going to be unclear on

11  the record whether your "no" there is no element of

12  discretion, or whether your "no" was a, no, I disagree

13  with you in the question you asked.

14      Is there any element of discretion of

15  determining whether a ballot is signed or unsigned?

16    A.  I suppose there's always an element of

17  discretion if it's so faint that you can't even tell if

18  it was actually a signature or a smudge, but probably

19  far less ambiguity in making that decision than there

20  are for other reasons such as a signature mismatch.

21    Q.  Okay.  What's an odds ratio?

22    A.  An odds ratio is the likelihood of the events

23  you're trying to predict occurring relative to whatever

24  you set up as your comparison group.

25      So, for example, on Page 55 there, top of it

Page 144

1    being Thurston County, it says odds ratio for any

2    reason is 2.755.  That means that voters in Thurston

3    County are 2.7 times more likely to have a ballot

4    rejected than if they're in Yakima.

5         Q.  And what is the standard error as is reflected

6    in that chart?  I realize standard error can mean a

7    couple of different things in the world of statistics,

8    generally.

9         A.  The standard error is the band of reliability

10   or -- but the band of an error estimate that there

11   could be around that odds ratio.

12        So when that band of plus, for instance, on

13   that Thurston one, 2.755, and then you have a plus or

14   minus .189 percent, if that does not totally negate the

15   differences, it's considered statistically significant.

16        Q.  Okay.  So is it fair to say that at a given

17   confidence level, the range of the odds level is -- and

18   we're still talking at this Thurston County example --

19   is 2.755 plus or minus .198?

20        A.  Yes.

21        Q.  Sticking with that Thurston County example, at

22   what confidence level, meaning at what P value, is that

23   standard error determined here?

24        A.  In this table, you see right above, at the

25   very top there, it says -- darker orange the cell is?

                                            Page 145

1      Q.   Yeah.

2      A.   Those shades of orange will tell you what the

3   P value is.

4      Q.   Okay.  So the standard error in the Thurston

5   County example you gave is at a P value of .001.

6           Is that --

7      A.   Yes.  Uh-huh.  Yes.  That's the darkest shade

8   of orange on the table.

9      Q.   But if you were to look down at location

10  comparison out of state, the standard error for that

11  value references the mid-tone P value of .01?

12     A.   Yes.

13     Q.   I'd like to direct you to the race and

14  ethnicity chart on Page 55 and to the entry for

15  Hispanic and the odds ratio for signature mismatch.

16     A.   Okay.

17     Q.   Do you see that that's 1.283?

18     A.   Yes.

19     Q.   And the standard error is .031?

20     A.   Correct.

21     Q.   So the odds ratio at the confidence level

22  indicated for that cell is anywhere between 1.252 and

23  1.314, right?  And I realize I'm --

24     A.   I didn't do the math, but you have the right

25  approach.

                                        Page 146

1      Q.   Okay.  So, yeah.  So I was going to say I

2  realize I'm putting you in a position to do math in

3  your head.

4           Do you -- if you've got a calculator in front

5  of you, do you want to take a stab and just check my

6  numbers?

7      A.   Okay.  I'm getting a lower bound of 1.25 and

8  an upper bound of 1.31.

9      Q.   Okay.  And then let's go the same exercise, if

10 you don't mind, Dr. Weber, for the odds ratio and the

11 standard error for Hispanic unsigned.

12     A.   I'm getting a lower value of .963 and an upper

13 value of -- so that can't be right.  That's not right.

14 All right.  A lower value of 1.143.

15     Q.   Uh-huh.

16     A.   And then an upper value of 1.28.

17     Q.   Is it fair to say that the ranges for the odds

18 ratio of signature mismatch and unsigned overlap,

19 meaning that 1.28 is higher than 1.25?

20     A.   Well, 1.28 is higher than 1.25.

21     Q.   Yeah.  So the ranges of possibilities at a

22 given confidence level for these two odds ratios

23 overlap, right?

24     A.   Well, they're predicting different things.  So

25 there's no comparison really between one and the other.

                                        Page 147

1      Q.  Well, okay.  Let me ask -- let me ask it this
2   way.
3          Is it possible to say, based on this chart,
4   that with statistical significance at the level you've
5   indicated, that the chart indicates, that a ballot from
6   an Hispanic voter is more likely to be rejected than a
7   ballot from a white voter for the reason that it is
8   unsigned as opposed to the reason that the signatures
9   failed to match?
10     A.  No.  It isn't comparing one verus the other.
11  It is saying that the Hispanic voter is almost 21
12  percent more likely to have their ballot rejected for
13  being unsigned than a white voter is.  And an Hispanic
14  voter is about 28 percent more likely to have their
15  ballot rejected for signature match -- mismatch than a
16  white voter is.
17     Q.  Okay.  But that summary is a little bit
18  imprecise, right, because it doesn't account for the
19  standard error for both measurements?
20     A.  Yeah.  Uh-huh.
21     Q.  So would it be fair to say instead that an
22  Hispanic voter is somewhere between 25 and 31 percent
23  more likely than a white voter to have a ballot
24  rejected for signature mismatch; is that fair?
25     A.  Yes.  That's the -- with the band of error

Page 148

```
 1    that we're looking at here, that it says that, whatever
 2    it was, I think 90, 95 percent, somewhere in there, 90
 3    to 95 percent of the time you'd expect, if you ran an
 4    analysis with random things coming out, that you would
 5    expect to see the same result of where it would come
 6    within those values.
 7         Q.   And at that same confidence level an Hispanic
 8    voter is between 14 percent and 28 percent more likely
 9    than a white voter to have their ballot rejected for
10    the reason that it is unsigned, correct?
11         A.   Correct.
12         Q.   With that knowledge in front of you, are you
13    able to say at that confidence level that an Hispanic
14    voter is any more likely to have a ballot rejected, for
15    a discretionary reason, any more likely -- I'm sorry --
16    this is a little bit tricky, so I'm going to start
17    over.
18              At that confidence level are you able to say
19    that the percent chance over which an Hispanic voter is
20    likely to have a signature rejected for mismatch as
21    compared to a white voter differs from the percent
22    chance over which an Hispanic voter is likely to have a
23    signature rejected for being unsigned as opposed to a
24    white voter?
25         A.   It would depend on what level of confidence
```

Page 149

1    level you wanted to say that at.  The best point

2    estimate is the value that's under the odds ratio.  So

3    if you're willing to tolerate a whole lot of error in

4    making that statement, one is a higher number than the

5    other.

6            In terms of practical significance, if you're

7    looking at it that way, these numbers are pretty

8    similar.

9        Q.  Yeah.  So as a practical matter, the

10   difference between how Hispanic ballots are treated and

11   white ballots are treated is sort of identical whether

12   it's for an objective reason or a discretionary reason?

13       A.  It probably goes beyond what we looked at in

14   this audit to make a conclusionary statement like that.

15   So I'd be hesitant to make a conclusionary statement

16   based on the work that we did in this audit; like that

17   would be something as a methodologist we put in our

18   audio report in that phrasing.

19       Q.  Fair enough.

20           Does -- did the results of the audit give you

21   a basis to disagree with the statement?

22       A.  The results of the audit tell me that the

23   likelihood of an Hispanic voter getting their signature

24   rejected for signature mismatch is about the same

25   likelihood as them getting it rejected for being

                                              Page 150

```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, JUDY STEENBERGEN-WEBB, the undersigned Certified

 4    Court Reporter, pursuant to RCW 5.28.010 authorized to

 5    administer oaths and affirmations in and for the State of

 6    Washington, do hereby certify that the sworn testimony and/or

 7    proceedings, a transcript of which is attached, was given

 8    before me at the time and place stated therein; that any

 9    and/or all witness(es) were duly sworn to testify to the

10    truth; that the sworn testimony and/or proceedings were by me

11    stenographically recorded and transcribed under my

12    supervision, to the best of my ability; that the foregoing

13    transcript contains a full, true, and accurate record of all

14    the sworn testimony and/or proceedings given and occurring at

15    the time and place stated in the transcript; that a review of

16    which was requested; that I am in no way related to any party

17    to the matter, nor to any counsel, nor do I have any financial

18    interest in the event of the cause.

19         WITNESS MY HAND AND SIGNATURE this 28th day of October,

20    2022.

21

22

23    JUDY STEENBERGEN-WEBB, RPR

      Certified Court Reporter, WA CCR #2495

24    judyswebbccrwa@outlook.com

25
```

Page 165

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, JUDY STEENBERGEN-WEBB, the undersigned Certified

 4     Court Reporter, pursuant to RCW 5.28.010 authorized to

 5     administer oaths and affirmations in and for the State of

 6     Washington, do hereby certify that the sworn testimony and/or

 7     proceedings, a transcript of which is attached, was given

 8     before me at the time and place stated therein; that any

 9     and/or all witness(es) were duly sworn to testify to the

10     truth; that the sworn testimony and/or proceedings were by me

11     stenographically recorded and transcribed under my

12     supervision, to the best of my ability; that the foregoing

13     transcript contains a full, true, and accurate record of all

14     the sworn testimony and/or proceedings given and occurring at

15     the time and place stated in the transcript; that a review of

16     which was requested; that I am in no way related to any party

17     to the matter, nor to any counsel, nor do I have any financial

18     interest in the event of the cause.

19          WITNESS MY HAND AND SIGNATURE this 28th day of October,

20     2022.

21

22

23     JUDY STEENBERGEN-WEBB, RPR

       Certified Court Reporter, WA CCR #2495

24     judyswebbccrwa@outlook.com

25
```

Page 165