CHAD W. DUNN
*Admitted Pro Hac Vice*
SONNI WAKNIN
*Admitted Pro Hac Vice*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: (310) 400-6019

MOLLY P. MATTER, WSBA #52311
Amend Law, LLC
PO Box 13203
Burton, WA 98013
Telephone: (206) 280-8724

ROSEMARY M. RIVAS
*Admitted Pro Hac Vice*
GIBBS LAW GROUP LLP
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

MARK H. TROUTMAN
*Admitted Pro Hac Vice*
GIBBS LAW GROUP LLP
1554 Polaris Parkway, Suite 325
Columbus, OH 43240
Telephone: (510) 340-4214
Facsimile: (510) 350-9701

EDWARDO MORFIN
Morfin Law Firm
732 N. Center Parkway
Kennewick, WA 99336
Telephone: 509-380-9999

SCOTT FUQUA
*Admitted Pro Hac Vice*
Fuqua Law & Policy, P.C.
P.O. Box 32015
Santa Fe, NM 87594
Telephone: (505) 982-0961

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| JESSE REYES, DANIEL REYNOSO, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, LATINO COMMUNITY FUND OF WASHINGTON,<br><br>　　　　　Plaintiffs,<br>　vs.<br><br>BRENDA CHILTON, *et al.*,<br><br>　　　　　Defendants. | Case No.: 4:21-cv-05075-MKD<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 1

II.   BACKGROUND ............................................................................ 1

III.  LEGAL STANDARD .................................................................... 2

IV.  ARGUMENT ................................................................................. 3

  A.  Plaintiffs' Section 2 Effects and/or Results Claim Under the VRA Presents a Triable Issue of Fact ....................................................................... 3

    1. Plaintiffs Have Demonstrated Genuine Issues of Fact Under the *Brnovich* Guideposts ........................................................................... 3

        Guidepost One: Size of the Burden ................................................ 4

        Guidepost Two: Departure from Voting Rules in 1982 ................................ 5

        Guidepost Three: Size of Disparity ................................................ 7

        Guidepost Four: Meaningful Alternatives to Voting ................................ 8

        Guidepost Five: State's Interest in Challenged Procedure ............................ 8

        Plaintiffs Have Demonstrated Genuine Issues of Disputed Fact Under the Totality of Circumstances ........................................................... 9

        Senate Factor One: History of Discrimination .................................... 10

        Senate Factor Five: Discrimination in Education, Housing, Employment, and Healthcare ..................................................................... 11

        Senate Factors Two, Three, Six, Seven, and Eight Findings ...................... 12

  B.  Whether Defendant Counties Acted with Discriminatory Intent in Operating the Signature Verification Systems Presents a Triable Issue of Fact ................. 13

  C.  Plaintiffs' Equal Protection Claims Present a Trial Issue of Fact ..................... 16

  D.  Plaintiffs' Procedural Due Process Claim Presents a Triable Issue of Fact ......... 17

V.   CONCLUSION ........................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ................................................................................15, 16, 17

*Ariz. Democratic Party v. Hobbs*,
  18 F.4th 1179 (9th Cir. 2021) ..............................................................4, 19

*Brnovich v. Democratic Nat'l Comm.*,
  141 S.Ct. 2321 (2021) ....................................................................*passim*

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .........................................................................15, 17

*Cowen v. Ga. Sec'y of State*,
  960 F.3d 1339 (11th Cir. 2020)..................................................................16

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) ..................................................................16

*Fair Fight Action v. Raffensperger*,
  2022 WL 4725887 (N.D. Ga. Sept. 30, 2022) ........................................12

*Fair Fight Action, Inc. v. Raffensperger*,
  593 F. Supp.3d 1320 (N.D. Ga. 2021) ..............................................6, 7, 8, 12

*Fla. State Conf. of NAACP v. Lee*,
  576 F. Supp.3d 974 (N.D. Fla. 2021)..................................................................4

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
  775 F.3d 1336 (11th Cir. 2015)..................................................................2

*Greater Birmingham Ministries v. Sec'y of State for State of*,
  992 F.3d 1299 (11th Cir. 2021)..................................................................13

*Johnson v. DeSoto Cnty. Sch. Bd.*,
  995 F. Supp. 1440 (M.D. Fla. 1998) ..........................................................13

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
  986 F.2d 728 (5th Cir. 1993)..................................................................11

*League of Women Voters of N.C. v. State of N.C.*,
　769 F.3d 224 (4th Cir. 2014)...................................................................20

*Lemons v. Bradbury*,
　538 F.3d 1098 (9th Cir. 2008)...............................................................17

*Luna v. Cnty. of Kern*,
　291 F. Supp.3d 1088 (E.D. Cal. 2018)..............................................10, 11

*Martinez v. City of Los Angeles*,
　141 F.3d 1373 (9th Cir. 1998)...................................................................2

*Mathews v. Eldridge*,
　424 U.S. 319 (1976)................................................................................17

*Mecinas v. Hobbs*,
　30 F.4th 890 (9th Cir. 2022) ..................................................................17

*Montes v. City of Yakima*,
　40 F. Supp. 3d 1377 (E.D. Wash. 2014) ..............................................9, 10

*Norman v. Reed*,
　502 U.S. 279 (1992)................................................................................15

*One Wis. Inst., Inc. v. Nichol*,
　186 F. Supp.3d 958 (W.D. Wis. 2016) .....................................................2

*Reynods v. Sims*,
　377 U.S. 533 (1964)................................................................................17

*Rogers v. Lodge*,
　458 U.S. 613 (1982)................................................................................13

*Saucedo v. Gardner*,
　335 F. Supp. 3d 202 (D.N.H. 2018)........................................................19

*Short v. Brown*,
　893 F.3d 671 (9th Cir. 2018)..................................................................17

*State Conf. of NAACP v. McCrory*,
　831 F.3d 204 (4th Cir. 2016)..................................................................14

TABLE OF AUTHORITIES
Page iii

*Thornburg v. Gingles*,
　478 U.S. 30 (1986) ...............................................................................3

*U.S. v. Blaine Cnty.*,
　157 F. Supp.2d 1145 (D. Mont. 2001) ................................................2

*Veasey v. Abbott*,
　830 F.3d 216 (5th Cir. 2016) .............................................................13

*Village of Arlington Heights v. Metro Housing Dev. Corp.*,
　429 U.S. 252 (1977) ......................................................................13, 14

*Washington v. Davis*,
　426 U.S. 229 (1979) ...........................................................................14

*Weber v. Shelly*,
　347 F. 3d 1101 (9th Cir. 2003) ..........................................................16

*Wolff v. McDonnell*,
　418 U.S. 539 (1974) ...........................................................................17

## **Statutes**

RCW §29A.60.165(2)(a) ...........................................................................2

RCW §29A.40.110(3) ...............................................................................1

WAC 434-379-020 ...............................................................................1, 6

WAC 434-262-015 ...................................................................................1

## **Rules**

Fed. R. Civ. P. 56(a) .................................................................................2

## I.    INTRODUCTION

Defendants Benton County, Chelan County, and Yakima County's (collectively "Defendant Counties") implementation of Washington's signature verification requirement has the effect of racial discrimination in violation of Section 2 of the Voting Rights Act. Additionally, Defendant Counties apply the signature verification requirement in a manner that is both devoid of procedural due process and intentionally racially discriminatory. The record here demonstrates genuine issues of material fact regarding all of Plaintiffs' claims. Consequently, the Court should deny Defendants' Motion for Summary Judgment.

## II.    BACKGROUND

Plaintiffs' Statement of Disputed Material Facts provide relevant facts in detail, which show that genuine issues of material fact exist.  Defendant Counties must follow certain provisions of Washington's Revised Code and Washington Administrative Code to verify signatures by voters on their ballot envelopes. *See* RCW §29A.40.110(3); WAC 434-379-020. All final decisions on whether to accept or reject a ballot that was flagged for "signature mismatch" are made by the Canvassing Review Board ("CRB") of each county. WAC 434-262-015. Yet, election staff and CRB members are not adequately trained to verify voters' signatures. *See* Waknin Decl., Ex. A at 5-8 (Benton County Resp.), at 5-7 (Chelan County Resp.), at 5-7 (Yakima County Resp.); Ex. B at 60:5-64:11, 77:15-79:18); Ex. C at 78:2-8; 87:7-12; Ex. D at 38:9-55:10. None of the Defendant Counties mandate their CRB members receive signature verification training. *See id.*, Ex. E. It is undisputed that CRB members can identify the race of Spanish surname signatures. Extensive research findings in social psychology, political science, sociology, and economics demonstrate how people correlate race with name and how bias is a factor in signature evaluations. ECF No. 79-2 at ¶¶ 16-20. Furthermore, it is undisputed that Latino citizens suffer from higher rates of rejection

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 1

in these counties. A recent performance audit by the State of Washington confirmed that ballots of Latino voters are rejected at a statistically significant higher rate than those of white voters. *Id.*, Ex. F at 19.

After a ballot is flagged for signature mismatch, voters are mailed cure notices. RCW §29A.60.165(2)(a). Only Yakima County is required to provide notices and cure information in Spanish. *U.S. of Am. v. Yakima Cnty.*, CV-04-3072-LRS (E.D. Wash. 2004). If a voter submits a cure notice, they can still have their ballot rejected if the CRB believes that the cure signatures does not match the ballot declaration signature. *See* Waknin Decl., Ex. G at ¶¶ 2-3; Ex. H at ¶ 2.

Latino voters bear the burden of Defendant Counties' application of the signature verification regime. ECF No. 79-1 at ¶¶ 25-28. The fact that voters with Spanish and non-Spanish surnames voted their ballots too late at similar rates is strong evidence that the disparity of signature rejection is not due to Latino voters being less knowledgeable about the vote-by-mail process. *Id.* at ¶¶ 31-35. Defendant Counties have been aware that there is a racial disparity in signature mismatch rejections between Latino and non-Latino voters. *See* Waknin Decl., Ex. I at 132:21-145:7.

## III.    LEGAL STANDARD

Summary judgment is proper when a moving party has demonstrated "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The court views all underlying facts in the light most favorable to the non-moving party." *U.S. v. Blaine Cnty.*, 157 F. Supp.2d 1145, 1148 (D. Mont. 2001) (citing *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1378 (9th Cir. 1998)).

Summary judgment is generally not appropriate in cases concerning voting rights "due to the fact-driven nature of the legal tests required by the Supreme Court." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th

Cir. 2015); *see also One Wis. Inst., Inc. v. Nichol*, 186 F. Supp.3d 958, 968-70 (W.D. Wis. 2016).

## IV.   ARGUMENT

There are genuine disputes as to the material facts in this matter precluding summary judgment. All of Plaintiffs' claims are fact-intensive and require a fact intensive inquiry by this Court at trial.[1]

### A.   Plaintiffs' Section 2 Effects and/or Results Claim Under the VRA Presents a Triable Issue of Fact

Defendants Counties' application of the signature verification process violates Section 2 of the VRA and has the effect of racial discrimination against Latino voters. Pursuant to Section 2, the question this Court must answer is whether a "certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority voters] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Since this case was filed, the Supreme Court issued its opinion in *Brnovich v. Democratic Nat'l Comm.,* 141 S.Ct. 2321 (2021), which set several "guideposts" for this Court to consider, in addition to certain factors outlined in *Gingles.*

### 1.   Plaintiffs Have Demonstrated Genuine Issues of Fact Under the *Brnovich* Guideposts

There is a genuine issue of fact under the *Brnovich* guideposts that forecloses a finding of summary judgment. In *Brnovich*, the Supreme Court set out five non-

---

[1] Defendants mischaracterize Plaintiffs' requested relief. Plaintiffs are asking the Court to require Defendant Counties to implement easily applied remedies to prevent racial discrimination in the signature verification process.  Plaintiffs do not, as Defendants suggest, ask this court to invalidate the entire signature verification process. *See* ECF No. 49 at VI, 3a-3p.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 3

exhaustive guideposts that a court may consider when determining whether there has been a Section 2 violation. These guideposts include: (1) the size of the burden imposed by a challenged voting rule; (2) the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982; (3) the size of any disparities in a rule's impact on members of different racial or ethnic groups; (4) opportunities provided by a State's entire system of voting; and (5) the strength of the state interest served by a challenged voting rule. *See Brnovich*, 141 S.Ct. at 2336-40. Plaintiffs do not have to satisfy each of the *Brnovich* "guideposts" to defeat summary judgment; Plaintiffs simply must come forward with some evidence supporting some of them. *See Fla. State Conf. of NAACP v. Lee*, 576 F. Supp.3d 974, 984-85 (N.D. Fla. 2021) (finding that plaintiffs' evidence of socioeconomic disparities between minority voters and majority voters, higher costs associated with voting for minority voters, and reduced opportunities for a minority voter to return a ballot were sufficient to defeat defendants' motion for summary judgment under *Brnovich*).

### Guidepost One: Size of the Burden

The record contains evidence showing a disputed issue of material fact regarding the size of the burden imposed on Latino voters in Defendant counties. *Brnovich* asks the court to consider the size of burden in weighing the impact of voting practice. Constitutional concerns are heightened when a plaintiff raises a claim that the burden of a voting law falls disproportionally on a discrete group of voters. *See Ariz. Democratic Party v. Hobbs,* 18 F.4th 1179, 1190 (9th Cir. 2021). Here, Plaintiffs challenge the *application* of the signature verification requirement by Defendant Counties that disproportionately affects a discrete group of voters—Latinos. There is ample evidence of the burdens imposed on Plaintiffs and on Latino voters as a group and individually. Latino voters disproportionately have their ballots rejected by the CRB for apparent signature mismatch in Defendant Counties

compared to their Anglo counterparts. ECF No. 79-1 at ¶¶5-7. Voters with Hispanic sounding first names and surnames are three- to four-and-a-half times more likely than Anglo voters to have their ballots rejected. *Id.* at ¶¶ 7; 27-29.

There are also specific and individual burdens that Latino voters face through the application of the signature verification process. *See* ECF No. 123-34 at 37:5-21. Defendant Counties cite no evidence that non-Latino voters face the same level of burdens in these regards.  Additionally, Defendant Counties' failure to provide curing information in other languages further burdens individual Latino voters. *See* Waknin Decl., Ex. K. Even when Latino voters attempted to cure their ballots, they are denied the ability to have their vote count because their cure signatures are rejected by the CRB. *See id.*, Ex. H at ¶ 2 ("After I cast[] my ballot for the November 2017 election, I was informed that the Yakima County Elections Office flagged my ballot as having a mismatched signature. I returned the cure form to update my registration signature. Yet I learned that my vote continued to be denied by the Canvassing Review Board."); *see also* Ex. G at ¶¶ 2-3 ("I filled out the cure form and signed my name and my aunt delivered my cure form to the Yakima County Elections Office. On or around November 15th, 2017, I learned that my signature was still rejected, and my vote would not count."). Voters lose confidence in the electoral system once their ballots are rejected: a voter is three times less likely to vote in the next election after a signature mismatch rejection. ECF No. 49 at ¶ 147. Accordingly, the size of burden and its effects each grows exponentially every time a Latino voter's ballot is rejected for a mismatched signature. In conclusion, Latino voters' undue burden is demonstrated by racial disparity data, language access, lack of alternative means of voting, and unsuccessful attempts to cure confounded by socio-economic barriers that already impede Latino voter turn-out.

### **Guidepost Two: Departure from Voting Rules in 1982**

There is a disputed issue of material fact whether Washington's signature verification regime, as it stands today, existed in 1982. *Brnovich* asks whether the voting practice at issue departs from what was standard practice when the Voting Rights Act was amended in 1982. *Brnovich,* 141 S.Ct. at 2338. Such a determination based upon the record is inappropriate for summary judgment.

Widespread signature verification for statewide vote-by-mail ballot elections was not contemplated in 1982 in Washington State. Thus, the current signature verification process through the CRB in Defendant Counties departs from the voting rules in place in 1982. "[I]n 1982 States typically required nearly all voters to cast their ballots in person on election day..." *Brnovich*, 141 S.Ct. at 2339. Before 1983, Washington did not have "no excuse" absentee voting. Waknin Decl., Ex. L. Now, the state essentially requires *everyone* to vote by mail, a policy enacted in 2011.[2]  *Id.*

The voting rule at issue in this case, specifically the application of signature verification by the CRB, was enacted between 2003 and 2005. *See* WAC 434-379-020. Washington implemented the current entirely vote by mail elections system between 2005 and 2011. *See* Waknin Decl., Ex. L. Because nearly every voter must vote by mail now, these new rules affect nearly every ballot case in an election. Neither the composition of County CRBs nor the signature verification standard at issue can be considered extensions of the limited absentee voting system that was in place in 1982. *See e.g., Fair Fight Action, Inc. v. Raffensperger*, 593 F. Supp.3d 1320, 1338 (N.D. Ga. 2021) (finding that Georgia's law requiring county registrars to compare voters' information to a separate database maintained by a different state or federal agency was not an extension of a preexisting voting requirement that applicants registering to vote provide election registrars with "proper identification

---

[2] Before 2005, vote by mail was not a permanent option in the State, (Waknin Decl., Ex. K), and thousands of voters still went to the polls in-person. *See id.*, Ex. M.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 6

and information" to identify themselves and weighed against Defendants' motion for summary judgment). It cannot be inferred that the application of the signature verification policy fails to violate Section 2 of the federal Voting Rights Act, making summary judgment inappropriate.

### Guidepost Three: Size of Disparity

The record in this case demonstrates a genuine issue of material fact on the disparate impact of the application of signature verification. *Brnovich* states that the disparate impact on minorities must be large enough to constitute a §2 violation. *Brnovich*, 141 S.Ct. at 2346. The record demonstrates that the application of the signature verification requirement by Defendant Counties disproportionately affects minority voters: Latino voter ballots account for 9% of total ballots cast, but account for over 20% of all ballots rejected for signature mismatch. ECF No. 79-1 at ¶ 7. Ballots with Latino surnames were on average rejected anywhere from 3-4 times higher than their non-Latino counterparts. *See* ECF No. 79-1 at ¶¶ 25-29. That rejection rate increased to 3.3-4.5 times higher for voters with both a Spanish first name and surname. *Id.* at ¶ 27. While Defendants argue that the percentage of Latino surname ballots rejected due to signature mismatch is statistically small, the number of ballots rejected can determine local elections in these counties. ECF No. 79-1 at ¶¶ 36-37.

Even if only a handful of Latino voters' ballots were rejected, the impact is consequential and the burden substantial. In the 2019 City of Sunnyside Council race, the winning candidate won by a margin of one vote. *Id.* at ¶ 37. In that election, six ballots were rejected for signature mismatch, with four of those ballots belonging to voters with Spanish surnames. Waknin Decl., Ex. N. *See Fair Fight Action,* 593 F. Supp.3d at 1339-40 (finding a policy that affected only 4% of voters could have a disparate impact on voters such that evidence that 0.19% of white non-Hispanics being

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 7

in MIDR status, while 2% of Black voters, 1.5% of Hispanic voters, and 1.19% of Asian or Pacific Islander voters in the same status was enough evidence to create a genuine issue of material fact). The size of the disparity is statistically significant because it can determine an electoral race. Thus, summary judgment is inappropriate for this additional reason.

### Guidepost Four: Meaningful Alternatives to Voting

Washington does not provide other meaningful and easily available methods to vote by mail. Under *Brnovich*, Courts have to consider all available means for voting when evaluating burdens placed on voters. *Brnovich*, 141 S.Ct. at 2339. There is no robust in-person voting in Washington: collectively, Benton County, Chelan County, and Yakima County operated a total of only five in-person voting centers total during the 2022 General Election. Waknin Decl., Ex. O. None of the Defendant Counties provide information on in-person voting opportunities. Benton County in particular states in their "How to Vote" tutorial that "In Benton County, all voting is done by mail." Benton County Auditor, *How to Vote - Benton County WA*, YouTube (2022), https://www.youtube.com/watch?v=_b1BJpqgC1I. Whether there are ways to meaningfully cast a ballot other than by mail (there are not) is a material factual dispute.

### Guidepost Five: State's Interest in Challenged Procedure

The record contains a material issue of fact regarding the state's interest in the challenged procedure here. The last *Brnovich* factor considers a state's interest in the challenged voting policy, which Defendants assert is preventing voter fraud. While preventing voter fraud is a legitimate interest, "[a] state cannot simply cite fraud as a state interest for every voting rule without showing that rule prevents fraud or otherwise legitimately furthers that state interest." *Fair Fight Action, Inc.*, 593 F. Supp.3d at 1341. The record demonstrates that CRB members are not required to be

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 8

trained in signature verification and in many circumstances have not been trained to review signatures. Waknin Decl., Ex. I at 57:14-25, 59:1-7; Ex. A at 5-7 (Chelan County Resp.); Ex. B 60:5-64:11, 77:15-79:18; Ex. D at 38:9-55:10; Ex. J at 91:25-92:16). Defendants have not provided *any* evidence to show that the manner in which the Defendant Counties apply signature verification prevents fraud. The lack of training, application of meaningful published standards, and minimal efforts to provide fair notice to voters of how their signatures will be compared are relatively easy to remedy. Apparently recognizing they have no argument against these straightforward remedies—most of which are part of other state signature match schemes—Defendants construct a strawman: that Plaintiffs seek to enjoin voter signature matching in its entirety. Defendants have provided no argument or evidence as to why the specific, tailored remedies requested by Plaintiffs are so difficult to implement that, rather than implement them, the racially disparate signature rejection should be tolerated.

### Plaintiffs Have Demonstrated Genuine Issues of Disputed Fact Under the Totality of Circumstances

Courts may consider "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Brnovich*, 141 S.Ct. at 2338. Relevant in that determination are the non-exhaustive "Senate Factors" which include: (1) history of voting-related discrimination; (2) degree of racially polarized voting; (3) presence of voting practices or procedures that subjugated the minority group's voting preferences; (4) existence of candidate slating; (5) the extent to which the minority group bears the effects of past discrimination in areas that tend to hinger their ability to participate in the political process; (6) the use of subtle or overt racial appeals in political campaigns; (7) the extent to which minority group members have been elected to office; (8) the responsiveness of elected

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 9

officials to the particularized needs of the minority group; and (9) the tenuousness underlying the challenged voting practice or procedure. *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1408 (E.D. Wash. 2014). Senate Factors One and Five are more probative in vote denial cases. *Id.* at 1409, 1413. As set forth below, Plaintiffs have provided sufficient evidence under the totality of the circumstances test that voting is not equally open for Latino voters in Defendant counties. Consequently, summary judgment should be denied.

### Senate Factor One: History of Discrimination

The record demonstrates that there is a history of official discrimination in the state of Washington and in Defendant Counties. All evidence of discrimination within the target jurisdiction, including statewide discrimination, is clearly relevant and supports a finding of historic discrimination under Senate Factor One. *See Luna v. Cnty. of Kern*, 291 F. Supp.3d 1088, 1135 (E.D. Cal. 2018) ("Evidence of statewide discrimination is clearly relevant and may provide context for understanding instances of discrimination within the political subdivision at issue.").

From the 1960s to 1970s, English literacy tests were unequally and unfairly administered to Latinos in the Yakima Valley, with the effect of disenfranchising Latino voters. *See* ECF No. 79-3 at 24-30. Within the past two decades, Yakima County has been subjected to a federal consent decree under Section 203 of the VRA for failing to provide election materials in Spanish (*see U.S. of Am. v. Yakima Cnty.*, CV-04-3072-LRS (E.D. Wash. 2004)); the City of Yakima has been found in violation of Section 2 of the VRA (*Montes*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014)); and Yakima County recently settled a Washington Voting Rights Act (WVRA) lawsuit in which a Washington state court found liability for a violation under the WVRA Act. *See Aguilar v. Yakima Cnty.*, No. 20-2-0018019 (Kittitas Cty. Sup. Ct. July 13, 2020). *See,* e.g., ECF 79-3 at 10-30 (Plaintiffs' expert detailing the history of race relations

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 10

and discrimination in Washington, Eastern Washington, and specifically in Defendant Counties.). Indeed, one federal court has already found a history of voting related discrimination in Yakima County. *See Montes,* 40 F. Supp. 3d 1377, 1409-10 (finding that Yakima County being sued by the federal government for failing to provide Spanish-language voting materials and voter assistance to Spanish-speaking voters and steps taken by Yakima County to remedy related harm weighed in favor of Plaintiffs on Senate Factor One).

## Senate Factor Five: Discrimination in Education, Housing, Employment, and Healthcare

Evidence in the record shows that Latinos in Defendant Counties experience discrimination in housing, education, employment, and healthcare, among other areas of social life. Importantly, Plaintiffs are not required to establish causation under Senate Factor Five. *See Luna*, 291 F. Supp.3d at 1137 (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 750 (5th Cir. 1993). According to data from the 2021 United States Census, 34.8%, 31.1%, and 48.4% of Latinos in in Benton, Yakima, and Chelan County, respectively, have achieved some high school education, which is significantly less as compared to their Anglo counterparts. ECF No. 97-1 at ¶¶ 44-46. Latinos in all counties also make between $10,127 to $28,607 less in median income than Anglos. *Id.* Latinos in Defendant Counties are 18.1%, 22.8%, and 30.9% less likely to be homeowners. *Id.* Further, 25.7% of Latinos in Benton, 23.3% of Latinos in Yakima, and 16.9% of Latinos in Chelan counties live under the poverty line. *Id.* Latinos have lower political participation and turnout in Defendant Counties. ECF. No. 79-1 at ¶ 9 (Latinos in Defendant Counties comprising just 9% of ballots cast from 2019-2022). For example, in Yakima County, voters with Spanish surnames had a return rate of 33%, 23%, and 23%, respectively, for the County Commissioner District 1, 2, and 3 races compared

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 11

to total turnout rates of 63%, 43% and 36%. Waknin Decl., Ex. P. These socio-economic disparities influence Latino voters' ability to politically participate and ability to cure a challenged ballot, so summary judgment should be denied.

### Senate Factors Two, Three, Six, Seven, and Eight Findings

Plaintiffs have provided evidence to support this Court finding that Senate Factors Two, Three, Six, Seven, and Eight exist in Defendant Counties. *See*, e.g., ECF No. 79-1; 79-3. Voting in Defendant Counties is polarized. *See* ECF No. 79-1 at Appendix p27. In elections from 2020, Spanish surname voters in Defendant Counties demonstrate cohesion between 67% and 90% for certain candidates, while non-Spanish surname voters demonstrate cohesion for the *opposite candidates* at levels of 66% to 71%. Findings of racially polarized voting, even in vote denial cases, weigh in favor of finding a Section 2 violation. *See Fair Fight Action v. Raffensperger,* Case No. 1:18-CV-5391-SCJ, 2022 WL 4725887, at *92 (N.D. Ga. Sept. 30, 2022). Further, Defendant Counties have used voting procedures such as at-large elections that enhance the opportunity for discrimination against Latinos. *See* ECF No. 79-3 at 30-34.

Overt and subtle racial appeals have also been made during campaigns for office within Defendant Counties and by some elected officials in South Central and Southeastern Washington. *See* ECF No. 79-3. While running for re-election, past Yakima County Commissioner Ron Anderson shared posts on his Facebook page claiming that "illegals" were stealing elections in 2016. Waknin Decl., Ex. Q. In Chelan County, during the November 2021 Wenatchee School Board election, subtle racial appeals were used against a Spanish-surname candidate. *See* ECF No. 79-3 at 36-43. Defendants do not contest that these appeals exist, but instead argue that these types of racial appeals are not the sort that courts look for. *See* ECF No. 120 at 16-17. That assessment, however, goes to the weight of the evidence. *See Fair Fight Action,*

593 F. Supp. at 1343 (finding campaign ads, including one by then-Secretary of State Kemp that stated that he had 'a big truck ... Just in case I need to round up criminal illegals and take them home myself' sufficient evidence of racial appeals to carry a summary judgment burden).

Under the totality of the circumstances, the application of the signature verification system by Defendant Counties complements the vestiges of past and current racial discrimination to cause inequality of the electoral opportunities for Hispanic voters. *See Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (*en banc*). The Court should deny summary judgment as to Plaintiffs Section 2 claim.

### B.  Whether Defendant Counties Acted with Discriminatory Intent in Operating the Signature Verification Systems Presents a Triable Issue of Fact

Discriminatory intent claims, such as those here, are not suited for resolution by summary judgment. *See Village of Arlington Heights v. Metro Housing Dev. Corp.,* 429 U.S. 252, 266-68 (1977); *see also Greater Birmingham Ministries v. Sec'y of State for State of Alab.*, 992 F.3d 1299, 1322 (11th Cir. 2021). This is because courts are required to perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266-68. Nothing in *Arlington Heights* requires proof of direct evidence and other courts have similarly found a showing of intentional discrimination does not require direct evidence. *See Rogers v. Lodge*, 458 U.S. 613 (1982); *Veasey*, 830 F.3d at 231; *see also Johnson v. DeSoto Cnty. Sch. Bd.*, 995 F. Supp. 1440, 1449 (M.D. Fla. 1998). Intentional discrimination can be demonstrated by the continued operation of voting devices to further racial discrimination. *Rogers*, 458 U.S. at 617.

Here, there is evidence of direct discrimination. Voters with both Spanish sounding first names and surnames are more likely than voters with only Spanish surnames to have their ballots rejected. ECF No. 79-1 at ¶¶ 27-28. Despite

Defendants' contention that counties "rarely consider the name of a voter in deciphering a signature," ECF No. 120 at 15 (citing Def.'s Statement ¶¶ 54, 64), the names of voters are available and reviewed by CRB members during the signature verification process. Waknin Decl., Ex. C at 143:10-144:4. It is clear from testimony and Plaintiffs' expert literature review that surnames are direct markers of race or ethnicity. ECF. No 79-2 at ¶¶ 31-40. Further, Yakima CRB member Ron Anderson asked election staff for Spanish surname voting statistics and voting precinct statistics with Spanish surname information in Yakima County in relation to voting rights. Waknin Decl., Ex. D at 104:18-22; *see also id.*, Ex. V and Ex. W. CRB members and election staff are obviously aware of the racial and ethnic makeup of voters and use Spanish surnames as a proxy for Latino voters.

Further, Defendant Counties continued to apply the signature verification process in the same manner even after being presented with information that there was a racially disparate impact. Waknin Decl., Ex. I at 132:21-145:7; Ex. J at 120:7-21; Ex. R (stating that a news article that finds Latino ballots are more likely to be rejected "fits in with some of the preliminary findings of the State Auditor's audit on signature review--the fact that cultural minorities have a higher chance of getting challenged.").

Second, Plaintiffs have circumstantial evidence that is sufficient to support the denial of summary judgment. Under *Arlington Heights*, the factors courts look to are "the impact of the official action," especially "whether it bears more heavily on one race than another," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures," and "contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 266-68. "Discriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [law] bears more heavily on

one race than another.'" *N. Car. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1979)).

As detailed in Section 1 and in Plaintiffs' expert reports, the impact of the application of Defendant Counties' signature verification processes bears more heavily on Latino voters. *See* ECF No. 79-1. Plaintiffs' survey results demonstrated that racial bias plays a role in signature verification rejection. ECF No. 79-2. Study respondents rejected Spanish surname signatures 5.5% more than white-coded signatures. *Id.* at ¶¶ 91-92. When variables such as age, sex, education, partisanship, race, and political ideology were controlled for, explicit bias was still a statistically significant predictor of lower Hispanic signature acceptance races. *Id.* at ¶¶ 103-108. This study demonstrates that bias against Hispanic sounding names influences those who review signatures. [3]

There is also evidence of departures from normal procedures in Defendant Counties. Starting in 2020, Yakima County departed from its normal decade-long practice of Canvassing Review Board members authorizing the final decision-making of ballot rejections. Waknin Decl., Ex. J at 160:16-23. This delegation is an anomaly. Former Yakima County Commissioner even testified that the "determination of the validity of challenged ballots to auditor's staff" is not something the County can delegate. Waknin Decl., Ex. D at 80:11-15. He admitted the same regarding the CRB's duty to reject ballots rather than relying on the auditor's staff. *Id.* at 80:16-23. Plaintiffs have provided both direct and circumstantial evidence to present a genuine dispute of material fact regarding their intentional discrimination claims under the

---

[3] Plaintiffs' expert further suggested remedies that were found to reduce bias, including having reviewers watch implicit bias training that is already utilized for jurors in the federal court system. ECF No. 79-2 at ¶¶ 114-115.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 15

Fourteenth Amendment, and Fifteenth Amendment, and under Section 2 of the Voting Rights Act, so the Court should accordingly deny Defendants' motion.

### C.    Plaintiffs' Equal Protection Claims Present a Trial Issue of Fact

When analyzing the constitutionality of a restriction on the right to vote, courts "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justification for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). When a burden on the right to vote is severe or discriminatory, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

Plaintiffs have demonstrated a clear record that the restriction on the right to vote severely burdens Latino voters. ECF No. 79-1; s*upra,* Section 1. Defendants cannot say that the burden on the Plaintiffs' right to vote is indisputably reasonable or slight just because "signing a ballot declaration properly" is a "usual" burden. ECF No. 120 at 23–24. This is because the challenged issue here is the *application* of Defendant Counties' conduct, not the requirement of signing a ballot. Here, Plaintiffs *have* signed their ballot properly and returned their ballot properly. Defendants' actions, after the ballot has been cast, place the burden on Plaintiffs and Latino voters, not those voters' own actions. While all election laws have an impact on the right to vote, *Weber v. Shelly,* 347 F. 3d 1101, 1106 (9th Cir. 2003), the application of the election laws in this case have a severe and intolerable impact on Latino voters.

Defendants have not provided any justification sufficient to support the burden their conduct places on Plaintiffs' rights.  The best Defendants do is to claim, without

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 16

evidence, that the Defendant Counties' processes further the state's interest in preventing voter fraud. Defendants have not provided "evidence that signature matching ensures voters vote their own ballots." ECF No. 120 at 24. But even if they had, Washington law expressly allows the acceptance of ballots from voters who signed the ballot of another registered voter. W.A.C. 434-261-050(5). "This Court must evaluate 'the extent to which [Defendants'] justifications *require* the burden to plaintiffs' rights.' *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) (alterations added) (emphasis added). *See also Anderson*, 460 U.S. at 789, 103 S.Ct. 1564 (explaining that "the Court must not only determine the legitimacy and strength of each of [the state's] interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights") (alterations added). This inquiry "emphasizes the relevance of context and specific circumstances." *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020). There is no plausible claim that the interest of reducing voter fraud *requires* Defendant Counties to reject the ballots of Latino voters at a rate approximately 4 times higher than the rejection rate of non-Latino ballots. Defendants' motion also fails on this issue.

### D. Plaintiffs' Procedural Due Process Claim Presents a Triable Issue of Fact

There are triable issues of fact regarding whether Defendants Counties' application of Washington's signature matching regulations have violated Plaintiffs' procedural due process rights. The right to vote is a fundamental liberty or property interest protected by the procedural guarantees of the Fourteenth Amendment. *See Reynods v. Sims,* 377 U.S. 533, 560 (1964); *Lemons v. Bradbury*, 538 F.3d 1098, 1102 (9th Cir. 2008); *see Mecinas v. Hobbs*, 30 F.4th 890, 904 (9th Cir. 2022); *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018).

In the context of voting rights, Courts have evaluated procedural due process claims under the test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), or the standards of *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) (*Anderson-Burdick*). Regardless of whether this Court weighs the importance of the liberty interest at stake and risk of its erroneous deprivation against the government's interest, *see Mathews*, 424 U.S. at 335, or looks to the "character and magnitude" of the burden on the right to vote in light of the government's proffered justification, *see Anderson*, 460 U.S. at 789, the dispositive issues of fact will be the same. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). The record here demonstrates that Defendants' application of the signature verification process has arbitrarily deprived Plaintiffs and other Latino voters of their right to vote.

The crux of Plaintiffs' procedural due process claim is that the state's signature matching regulations are unconstitutionally "standardless" *as applied by Defendants*. ECF No. 49 at ¶¶ 204-206. Signature verification standards are not being uniformly applied or followed in Defendant Counties. Members of the CRBs who are actively reviewing ballots in elections may have not received any training in signature verification, scant training, or training 20 years prior to serving on the CRB. *See* Waknin Decl., Ex. A at 5-8 (Benton County Resp.), at 5-7 (Chelan County Resp.), at 5-7 (Yakima County Resp.) (indicating that there are no records relevant to signature verification training for many CRB members and alternates in Defendant Counties); Ex. B at 60:5-64:11, 77:15-79:18; Ex. D at 38:9-55:10.

Some CRB members, despite serving on multiple canvassing boards, can neither articulate the standards for review of a voter's signature nor identify whether there are laws generally that govern their conduct in reviewing signatures. Waknin

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 18

Decl., Ex. C at 77:8-78:25. Former Yakima County Commissioner and CRB member Ron Anderson could not even remember the training he received supposedly three times. Waknin Decl., Ex. D at 49:22-50:8 (failing to recall the training or whether he applied the ACE-V method to signature verification). Instead, he testified that he could rely upon his training and familiarity with signatures from his real estate career. *Id.* at 54:10-24. Additionally, Defendant Counties do not require CRB members to attend training in signature verification, despite having the power to require such training. *See* Waknin Decl., Ex. E. In some instances, election officials in Defendant Counties have told members of the CRB that they do not need to attend signature verification training. Waknin Decl., Ex. S at 2. There are genuine issues of fact for this Court to resolve at trial as to whether those in charge of verifying signatures are adequately trained, and thus whether there is a violation of procedural due process.

The lack of training of signature reviewers is also paired with a lack of articulable standards for implementing the appropriate signature verification process codes. None of the Defendant Counties provides written instructions to reviewers on how to interpret the signature verification provision. Waknin Decl., Ex. I at 65:13-21. Defendant Counties do not provide written instructions on the formal processes that signature verifiers must use for signature verification. *Id.* at 101:9-102:11; Ex. J at 183:16-21 (citing no checklist, just the guidelines in the WAC and WSP training). There is no record in Benton County of how many characteristics or "clusters" CRB members and election staff must determine are similar for a specific signature to qualify as a match. Waknin Decl., Ex. I at 164:10-14. Some Defendant Counties have no overview process to ensure that reviewers follow the Counties' own signature verification standards. *Id.* at 37:11-38:21, 39:25-40:21, 101:9-14.

There is also sufficient evidence for a reasonable factfinder to conclude that Defendants' signature matching processes do not provide a consistent notice and cure

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 19

procedure. Defendants admit that there is no uniformity concerning when they send cure notices as part of the review process. *Compare* ECF 121 ¶¶ 80–81 (discussing how Benton and Yakima Counties send cure notices after signatures are initially determined to be mismatches), *with id.* ¶ 82 ("Chelan County sometimes sends cure notices immediately following the first level of review and sometimes after the supervisory review."). This lack of clear standards and consistent procedures manifests in the arbitrary disenfranchisement of Latino voters, even after those voters attempt to cure their ballots in person before their county CRB. *See* Waknin Decl., Ex. T at ¶¶ 8, 11-12; Ex. U at ¶ 24; Ex. G at ¶¶ 2-3; Ex. H at ¶ 2.

There is sufficient evidence that Defendant Counties fail to provide any clear standard to determine what counts as a "proper" signature, fail to ensure that reviewers are trained in signature verification, lack any compliance review measures, and lack standards for when voters are notified to cure their ballots. The evidence of a severe or unreasonable burden is thus measurable not by the "consequence[s] of noncompliance," *Ariz. Democratic Party*, 18 F.4th at 1188, but by the fact that voters *attempting to comply* with Washington law lack any means of determining how to do so. Ascertaining the extent of the consequent burden on Plaintiffs' right to vote is a fact-intensive inquiry fit for trial. *See Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D.N.H. 2018) (finding that the process of determining signature mismatch violated due process due to election staff having unreviewable discretion to reject ballots, the natural variations of a voter's signature combined with a lack of training and functional standards, and lack of review process). The Court should accordingly deny Defendants' motion.

## V.    CONCLUSION

The law does not require minority voters to accept disenfranchisement because only small numbers of them are denied the right to vote. Indeed, "[s]etting aside the

basic truth that even one disenfranchised voter—let alone several thousand—is too many, what matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunities." *League of Women Voters of N.C. v. State of N.C.*, 769 F.3d 224, 244 (4th Cir. 2014). As shown above, there is a material dispute of fact as to whether minority voters are being denied equal opportunities to vote under Section 2 of the VRA and the First, Fourteenth, and Fifteenth Amendments. Defendants' assertions that the Counties are acting in good faith when their actions lead to disenfranchisement of Plaintiffs and Latino voters is a determination for this Court to make after a full trial on the merits, not on summary judgment. For all of these reasons, the Court should deny Defendants' Motion for Summary Judgment.

Dated: June 30, 2023                */s/ Edwardo Morfin*
                                    EDWARDO MORFIN
                                    Morfin Law Firm
                                    732 N. Center Parkway
                                    Kennewick, WA 99336
                                    Telephone: 509-380-9999

                                    SCOTT FUQUA
                                    Admitted Pro Hac Vice
                                    Fuqua Law & Policy, P.C.
                                    P.O. Box 32015
                                    Santa Fe, NM 87594
                                    Telephone: (505) 982-0961

                                    ROSEMARY M. RIVAS
                                    *Admitted Pro Hac Vice*
                                    GIBBS LAW GROUP LLP
                                    1111 Broadway, Suite 2100

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Page 21

Oakland, CA 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

MARK H. TROUTMAN
*Admitted Pro Hac Vice*
GIBBS LAW GROUP LLP
1554 Polaris Parkway, Suite 325
Columbus, OH 43240
Telephone: (510) 340-4214
Facsimile: (510) 350-9701

CHAD W. DUNN
*Admitted Pro Hac Vice*
SONNI WAKNIN
*Admitted Pro Hac Vice*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: (310) 400-6019

*Attorneys for Plaintiffs*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Page 22

## CERTIFICATE OF SERVICE

I, Molly Matter, hereby certify under penalty of perjury of the laws of the State of Washington that on June 30, 2023, I electronically filed the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system as follows:

Callie A. Castillo
Devon J. McCurdy
Erika O'Sullivan
Kimberly Foster
LANE POWELL PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, Washington 98111-9402
Telephone: (206) 223-7000
Facsimile: (206) 223-7107
Email: castilloc@lanepowell.com
Email: mccurdyd@lanepowell.com
Email: osullivane@lanepowell.com
Email: fosterk@lanepowell.com
Email: docketing@lanepowell.com

*Attorneys for Defendants*

June 30, 2023                                     */s/ Edwardo Morfin*
                                                        Edwardo Morfin

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Page 23